Monte N. Stewart (Nevada Bar No. 1459)
Craig G. Taylor (*pro hac vice* application pending)
**BELNAP STEWART TAYLOR & MORRIS PLLC**
12550 W. Explorer Drive, Suite 100
Boise, Idaho 83713
Tel: 208-345-3333 / Fax: 208-345-4461
Email: stewart@belnaplaw.com

D. Chris Albright (Nevada Bar No. 4904)
**ALBRIGHT, STODDARD, WARNICK & ALBRIGHT, PC**
801 South Rancho Drive, Suite D4
Las Vegas, Nevada 89106-3854
Tel: (702) 384-7111 / Fax: (702) 384-0605
Email: dca@albrightstoddard.com

*Lawyers for Intervenor-Defendant the Coalition for the Protection of Marriage*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| BEVERLY SEVCIK et al., | Case No.: 2:12-cv-00578-RLH-PAL |
| Plaintiffs, | |
| vs. | |
| BRIAN SANDOVAL, etc., et al., | **1. REPLY IN SUPPORT OF THE COALITION'S MOTION TO INTERVENE** |
| Defendants, | |
| and | **and** |
| COALITION FOR THE PROTECTION OF MARRIAGE, | **2. SUPPLEMENTAL APPENDIX IN SUPPORT** |
| Intervenor-Defendant. | |

1

# I. Introduction

On Friday, June 1, 2012, the plaintiffs made two filings – their opposition to the Coalition's motion to intervene ("Opposition") (D.I. 40) and their proposed scheduling order (D.I. 39) (collectively "Filings").  This is the Coalition's Reply in support of its motion to intervene.  We will also be filing an objection to the proposed scheduling order. We mention that fact here because the Filings share a common objective:  with the Filings, the plaintiffs are attempting to kill the chance, at the very outset of this litigation, that this Court will be fully advised of the full range of societal and hence governmental interests sustaining the constitutionality of Nevada's Marriage Amendment.

No one should underestimate how important and consequential the Filings' objective is. The real and ultimate issue in this case is whether the people of Nevada have sufficiently good reasons for preserving, as they have done with the Marriage Amendment, the man-woman meaning at the core of the marriage institution.  Just as it is in this case, the adequacy of the reasons for preserving that meaning has been the paramount issue in the dozens of cases involving constitutional challenges to the man-woman meaning – from the Hawaii state court litigation in the early 1990s to the First Circuit's decision of last week in a DOMA case.[1] Whether any particular judge holds for constitutionality or unconstitutionality depends in very large measure on which package of marriage facts she accepts.  If she accepts the narrow and certainly incomplete description of marriage always advocated by genderless marriage proponents (including the plaintiffs here), she holds the man-woman "limitation" unconstitutional – regardless of the level of judicial scrutiny employed.  If she adopts the broad and complete description of marriage that the Coalition (and none of the other defendants) is

---

[1]   *Baehr v. Lewin*, 852 P.2d 44 (Haw. 1993); *Massachusetts v. United States Department of Health and Human Services,* 2012 WL 1948017 (1st Cir. May 31, 2012).

ready, willing, and able to prove in this case, she will hold the "limitation" constitutional –

regardless of the level of judicial scrutiny employed.  That is because the complete

understanding of marriage illuminates clearly the compelling societal and hence governmental

interests served by preserving the man-woman meaning.[2]

The law governing intervention directs that the Coalition be allowed to intervene as of

right and by permission – without limitations on the Coalition's ability to prove with admissible

evidence that broad and complete description of the marriage institution.  The Opposition fails to

show otherwise, as this Reply demonstrates in the following sections.

## II.  Argument

**1.  The Opposition concedes the need for "evidence to this Court" on "the institution of marriage" and says the plaintiffs will be presenting such evidence but wants to preclude the Coalition – as the only party ready, willing, and able to present admissible evidence fully refuting the plaintiffs' "evidence" – from doing so.**

The Opposition at 3 says:  "Plaintiffs strongly disagree with the Coalition's view of the

institution of marriage and intend to present legal arguments *and evidence* to the Court on these

issues at the appropriate time." (Emphasis added.)  That statement pretty much ends the

intervention debate in favor of the Coalition.  To understand why that is so requires an

understanding of what that evidence – the plaintiffs' and the Coalition's – must consist of.  It

must consist of expert testimony that satisfies the requirements of Rule 702, FRE.  Looking at

the "executive summary" of the marriage facts in our Memorandum in Support of Motion to

Intervene (D.I. 30; "Opening Brief"), only the first sentence is an appropriate subject of judicial

---

[2]  For a demonstration of the material and paramount role played by judicial selection of the marriage facts in cases like this one, *see* Monte Neil Stewart, *Marriage Facts*, 31 HARV. J.L. & PUB. POL'Y 313 (2008) ["*Marriage Facts*"].

notice: "Marriage is a vital social institution."[3]   The rest of the marriage facts are of necessity

the subject of expert testimony – being as they are the product of the social sciences and related

disciplines; lay people, including lawyers and judges (despite what they may think they know

about marriage), unquestionably need "help ... to understand the evidence or to determine [those

facts] in issue.   Rule 702(a), FRE.[4]   That is especially true here where the plaintiffs have stated

their intent to present evidence on the social institution of marriage *contrary* to the Coalition's

evidence on that "fact in issue."

        This reality of the need here for Rule 702 expert testimony is underscored by a look at the

alternative.   In cases like this, the judge inevitably is faced with competing packages of marriage

facts, one advanced by the man-woman marriage proponents and the other by the genderless

marriage proponents.   (As seen, plaintiffs have already acknowledged that such is the situation

here.)   In the absence of Rule 702 expert witness testimony, the marriage facts can enter the case

---

[3]   That is so because many federal and state courts have so stated over more than one hundred years.

[4]   It has been accurately noted regarding litigation of the marriage issue:

> Perhaps no great issue in American constitutional law has been so plagued by conflict, confusion, and carelessness regarding the relevant facts. ... [T]he treatment of constitutional facts in recent American appellate court decisions addressing the marriage issue has been confused and even careless.

>        Such factual confusion in the marriage cases, although it does not bode well for constitutional adjudication, is at least understandable for three reasons. ... Second, at least until quite recently, the key players in the constitutional debates surrounding marriage (lawyers, judges, and legal scholars) had little specialized knowledge about marriage. Third, those participants *thought* they had a great deal of general knowledge about marriage. This is understandable because marriage is a ubiquitous social reality, encountered or experienced by nearly everyone; as a result, most people believe that they understand marriage. As we will see, however, that belief can impede defensible legal work on the marriage issue.

*Marriage Facts* at 314-317.

only as unproven fundamental premises[5] or as so-called "legislative facts."[6]  Yet neither of those

approaches provides much in the way of help or guidance to the judge; indeed, both those

approaches leave the judge largely unconstrained in coming up with a description of the nature

of the marriage institution supportive of one holding or the other.  If a judge is predisposed by

his worldview to see the move to genderless marriage as essential to a good and just society and

to see himself as the hero of that move, his choice is not in doubt.  Moreover, given the nature of

unproven fundamental premises or so-called "legislative facts," each judge at every level of

adjudication is pretty much free to write his own description of the marriage institution on a

blank slate.  In that situation, the record is simply not available to provide its usual focusing,

guiding, and constraining role.

Importantly, it is now certain that the Nevada Attorney General's office ("AGO") is not

in a position to present the marriage facts to this Court through the requisite expert testimony.

For one thing, the AGO stipulated to a proposed scheduling order proposed by the plaintiffs the

purpose and effect of which is to make it well-nigh impossible for the defense side (i) to gather

expert-witness testimony before the plaintiffs are presenting to this Court their summary

judgment motions or (ii) to make a Rule 56(f) motion for more time to get such testimony.  (For

more on the mischievous nature of the proposed scheduling order, see our Objection to it filed

simultaneously with this Reply.)  For another thing, the number two person in the AGO has

---

[5]  Fundamental premises are those premises from which an argument (here, for or against the constitutionality of man-woman marriage) proceeds but which it does not prove; it merely assumes them.  Decisions holding man-woman marriage unconstitutional invariably treat as their fundamental premises the narrow picture of marriage advocated by genderless marriage proponents.  *See* Monte Neil Stewart, Jacob D. Briggs, & Julie Slater, *Marriage, Fundamental Premises, and the California, Connecticut, and Iowa Supreme Courts*, 2012 BYU L. REV. 193 ["*Fundamental Premises*"].

[6]  The First Circuit very recently bemoaned the paucity of informative facts – including "legislative facts" – for resolving a constitutional challenge to DOMA.  *Massachusetts v. United States Department of Health and Human Services*, 2012 WL 1948017 (1st Cir. May 31, 2012).

communicated to the Coalition's counsel that the AGO does not have any expert witness "on its radar screen" and instead intends to rely on the deposition transcript of a lay witness (a Coalition officer) as "the document" evidencing the "governmental interests supporting the Marriage Amendment" on which the AGO's "defense" will rely.  Supplemental Appendix at 1-2.  For yet another thing, nowhere does the Opposition suggest, let alone support, the notion that the AGO is ready, willing, or able to present the expert testimony required to get properly into the record the full range of marriage facts supportive of the Marriage Amendment's constitutionality – and thereby to counter the contrary evidence that the plaintiffs intend to present on the institution of marriage.  Finally, nothing in the record here suggests that the AGO either intends to or can (even if willing) marshal the broad range of expert witness testimony required to establish that full range of marriage facts.  All the evidence in the record is exactly to the contrary.

Because of the reality regarding the AGO and the marriage facts, the Opposition's entire argument of "adequate representation of the Coalition's interests" collapses.   After all, "adequacy of representation" is very much a fact issue here, and the *only* facts properly in the record all sustain the conclusion that the Coalition's interest in preserving the Marriage Amendment will *not* be adequately represented by the "government defendants."  In addition to the facts set forth in the previous paragraph regarding the AGO and the marriage facts, there are the facts illuminated in our Opening Brief at 20-21 and App. 9, 19.  That includes the unrebutted, admissible testimony that "the Coalition will be the only defendant in this case that will be able to and will present fully both the marriage facts and the social institutional argument for man-woman marriage."  Further, it is now certain that the three clerks named as defendants are not going to mount any kind of a defense.  *See* Answer of Defendant Amy Harvey, Washoe County Clerk (D.I. 35 at p. 2) ("Ms. Harvey wishes to express that she has no intention to defend the

substantive merits of this case and has agreed to be bound by the final decision herein."); Answer of Defendant Diana Alba (D.I. 34 at p. 3) ("there is no genuine case or controversy between" Clerk Alba and the plaintiffs and all the clerks should be dismissed as "unnecessary parties to this action"); *see also* D.I. 33 and D.I. 38 (clerk Glover simply doing a "me-too" to filings by the AGO).

Against those facts in the record, all the Opposition can muster is a bald, unsupported assertion that the defense to be presented by the government defendants will be adequate.  That bald, unsupported assertion will not do; it is clearly insufficient to counter what is in the record. The "adequacy of representation" issue accordingly must be resolved in favor of the Coalition both as a matter of fact and as a matter of law.  Ninth Circuit law is clear that the decisive factors are: "(1) whether the interest of a present party is such that it will undoubtedly make all of a proposed intervenor's arguments; (2) whether the present party is capable and willing to make such arguments; and (3) whether a proposed intervenor would offer any necessary elements to the proceeding that other parties would neglect." *Citizens for Balanced Use v. Montana Wilderness Ass'n*, 647 F.3d 893, 898 (9th Cir. 2011).  On this record, the respective answers must be No, No, and Yes.

The few cases marshaled by the Opposition are clearly inapposite; they are cases where the respective answers either were Yes, Yes, and No or the record contained no evidence in support of contrary answers.  Absence of evidence in the record was very much the hallmark of the case of which the Opposition relies so heavily, *Prete v. Bradbury*, 438 F.3d 949 (9th Cir. 2006).  There the Ninth Circuit emphasized repeatedly that the intervenors had gotten into the record *no* evidence establishing inadequacy of representation.  *Id*. at 957 (intervenors "fail to present that compelling showing of inadequate representation"); *id*. ("there is no evidence in the

record that [government defendant] is unable to mount an effective defense"); *id.* at 958 (intervenors "have failed to present evidence sufficient to meet their burden … on this score as well"); *id.* (intervenors "provided no evidence to support their speculation that the Secretary of State lacks comparable expertise"); *id.* (interventors "failed to present evidence sufficient to support a finding that their interests are not adequately represented by the [government] defendants in this action").

In stark contrast to the record in *Prete*, in this case ***all*** the substantial evidence in the record points to inadequacy of representation, none the other way.  It is the plaintiffs here who rely, as did the unsuccessful intervenors in *Prete*, only on bald, unsupported assertions and not at all on evidence in the record. Accordingly, no matter how stringent any "presumption" or "assumption" against inadequate representation may be, *id.* at 956-958, because ***all*** the substantial evidence in the record here points to inadequacy of representation, any such presumption or assumption must give way before that evidence. (*Prete* is also inapposite here because the Coalition has substantial interests at stake beyond its status as the proponent of Nevada's Marriage Amendment, a reality we address in section 2 below.)

**2. The Opposition's "adequacy of representation" arguments are necessarily premised entirely on the false notion that the Coalition's only substantial interest at stake here is as proponent of the Marriage Amendment; the Coalition, however, certainly has substantial interests at stake here beyond its proponent status, and the Opposition's dismissive argument regarding those interests is without merit.**

The Opposition without question premises its "adequacy of representation" arguments on the notion that the Coalition's ***only*** substantial interest at stake here is as proponent of the Marriage Amendment. *E.g.*, Opposition at 8 ("Because the Coalition has only one significant protectable interest – as proponent of the Constitutional marriage ban – that is the only interest that may be impaired by disposition of this lawsuit.").There is a clear reason the Opposition

8

takes this tack.  It is because the Opposition's arguments based on *Prete* and the like depend entirely on the intervenor having no interest at stake other than as proponent and therefore having no "ultimate outcome" in view other than, like the government defendants, seeing the impugned law upheld.  *Prete* itself makes this dependence clear when it says that "it will be presumed that a state adequately represents its citizens when the applicant shares ***the same interest***."  *Id*. at 956 (quoting *Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003)) (emphasis added).  When the intervenor has substantial interests at stake in addition to that "same interest," Ninth Circuit intervention law clearly compels intervention as of right.  That is because the government defendants will have no reason to defend interests not the State's own. *See* Opening Brief at 19-20.  Thus, the Ninth Circuit found inadequate representation in *Citizens for Balanced Use v. Montana Wilderness Ass'n, supra*, 647 F.3d 893, exactly because the intervenors had an interest at stake beyond the interest that the government defendant was defending.

Our Opening Brief demonstrated that the Coalition had real, concrete, and substantial interests at stake here beyond its interests as the Marriage Amendment's proponent.  Those are the reputational interests at stake because the plaintiffs will make the Coalition the target of their animus/bigotry arguments and the associational interests in the Coalition's members' liberty interest in perpetuation of the man-woman marriage institution and their religious liberties. *See* Opening Brief at 7-11, 13-15 and App. 2-3, 20-28.

The Opposition deploys two tactics in an effort to dismiss the Coalition's additional substantial interests.  One, it ignores the concrete factual reality of those interests (fully demonstrated in the Opening Brief), radically recharacterizes them in a way congenial to the Opposition's purposes, and then dismisses them with an *ipse dixit* that becomes a mantra:

"undifferentiated, generalized interest" and "porous." *E.g.*, Opposition at 7.  Two, it attempts to argue that settled law refuses to recognize such interests, either in general or in the intervention context specifically.  Both tactics fail. .

The first tactic requires that we briefly revisit the concrete factual reality of the Coalition's additional interests. In our Opening Brief, we set forth both an "executive summary" and a fuller summary of the social institutional realities of marriage.  Opening Brief at 7-11 and App. 20-28.  We expressly stated two reasons for doing so:  "Besides sustaining the constitutionality of man-woman marriage, ***those facts make plain the nature and reality of some of the Coalition's substantial interests at stake in this litigation***."  Opening Brief at 7 (emphasis added).  We further provided a credible basis for concluding that the Coalition can and will present admissible evidence in support of the full range of those marriage facts, including those making "plain the nature and reality of" the Coalition's additional interests at stake in this case. *See* App. 19.  That real and concrete record fully evidences real, specific, and concrete interests at stake in this case – some unique to the Coalition and other interests real, active, and live to its members (and thereby giving rise to associational interests of the same caliber in the Coalition). We submit that, in assessing those additional Coalition interests, this Court clearly should do so on the basis of the unrebutted record now before it.

That "unrebutted" reality merits further comment.  All the Opposition does is say that the plaintiffs will present their own contrary evidence on the marriage institution later "at the appropriate time."  Opposition at 3.  Yet our Opening Brief expressly said that our evidence demonstrated the "nature and extent" of the Coalition's additional interests sustaining its right to intervene, so "the appropriate time" was certainly at the time the plaintiffs filed their Opposition. They passed, however, on their opportunity, so it does not wash now for them to utter their

mantra in *ipse dixit* fashion; the unrebutted record shows the Coalition's additional interests to be real, specific, and concrete and very much at stake in this litigation.  The Opposition's first tactic accordingly must be rejected.

The Opposition's second tactic – attempting to argue that settled law refuses to recognize the Coalition's additional interests, either in general or in the intervention context specifically – likewise fails.  A first example involves the Coalition's associational interest in the religious liberty of its members whose religious foundations support man-woman marriage and oppose genderless marriage.  The unrebutted record says that admissible evidence will show that a judgment here favorable to the plaintiffs "will materially interfere with, diminish, and otherwise injure over time [that] religious liberty."  App. 19, 28.  Although not strictly necessary, a bit of background in this context is helpful:

> The religious liberty issue was initially brought to the forefront by the Becket Fund for Religious Liberty. The Becket Fund is the preeminent public-interest law firm in the nation relative to the defense of religious liberties, and it represents a wide range of churches and faith communities, some of which favor and some of which oppose the redefinition of marriage.  In December 2005, the Becket Fund hosted a gathering of distinguished scholars, some favoring and some opposing redefinition [of marriage].  Those scholars considered the ways and the extent to which redefinition would affect religious liberties in the United States. At the risk of over-simplifying these scholars' deliberations, they can be summarized like this: Those opposed to redefinition concluded that redefinition would very much hurt American religious liberties, while those favoring redefinition concluded that it would very, very much hurt those liberties but this was an acceptable price to pay to advance the civil rights of gay men and lesbians.[7]

Faced with these realities, the Opposition attempts to argue that Judge Reinhardt's majority opinion in *Perry v. Brown*, 671 F.3d 1052 (9th Cir. 2012), means that, for all cases and purposes in the Ninth Circuit, as a matter of law the redefinition of marriage does not and never will adversely impact religious liberties – all the while ignoring the salient limitations on that opinion.  The Opposition at 7-8 says:

---

[7] *Fundamental Premises* at 263-264.

> In that case [*Perry*], the Ninth Circuit unequivocally held that permitting same-sex couples to marry does not require any religious group to "change its religious policies or practices with regard to same-sex couples" and that California's marriage ban did nothing to promote "the religious liberty interest" of religious organizations by, for example, permitting them to refuse public accommodation based on sexual orientation in violation of anti-discrimination statutes. … Because Nevada's marriage ban does nothing to promote religious liberty, its invalidation will do nothing to undermine that interest.

For one thing, Judge Reinhardt did ***not*** say that redefinition of marriage does not and will not adversely impact religious liberties. He rather assumed that it will – in the realm of anti-discrimination statutes, for example.

> [T]he religious-liberty interest that Proposition 8 supposedly promoted was to decrease the likelihood that religious organizations would be penalized, under California's antidiscrimination laws and other government policies concerning sexual orientation, for refusing to provide services to families headed by same-sex spouses. But Proposition 8 did nothing to affect those laws. To the extent that California's antidiscrimination laws apply to various activities of religious organizations, their protections apply in the same way as before. Amicus's [the Becket Fund for Religious Liberty] argument is thus more properly read as an appeal to the Legislature, seeking reform of the State's antidiscrimination laws to include greater accommodations for religious organizations.

*Id.* at 1091. Because this opinion assumes that redefinition of marriage will adversely affect religious liberty, it sustains rather than undercuts the factual reality of the Coalition's concrete associational interest relative to its members' religious liberty.

Moreover, as Judge Reinhardt has taken pains at every opportunity to state, his *Perry* opinion addresses only a situation where a ballot measure ends a genderless marriage regime and does not apply to a situation where a ballot measure preserves and perpetuates the vital social institution of man-woman marriage (Nevada's situation).[8] This very week in his opinion concurring in the denial of rehearing en banc of his panel opinion, he referred to "the narrow issue that we decided in our opinion": "We held only that under the particular circumstances

---

[8] *E.g.*, *Perry v. Brown*, 671 F.3d 1052, 1064, 1076, 1082 n.14, 1087 n.20 (9th Cir. 2012).

12

relating to California's Proposition 8, that measure was invalid. ... [W]e did not resolve the fundamental question ... whether the Constitution prohibits the states from banning same-sex marriage." *Perry v. Brown*, 2012 WL 1994574 (9th Cir. Jun 05, 2012) (Reinhardt, J., concurring in denial of rehearing en banc). This limitation leads to another one.

Because adverse impact on religious liberty is a question of fact, *Perry's* treatment of the issue is necessarily limited to and by the record made in that California litigation. We do not know what that record says on the religious liberty issue, but we do know that it is not binding on the Coalition or any other party to this litigation because none was a party to the California litigation. *E.g., Robi v. Five Platters, Inc.*, 838 F.2d 318, 328 (9th Cir. 1988).

Finally, what the Opposition may be trying to say (this is the reading that makes it both coherent and consistent with the limitations on the panel opinion in *Perry*) is: Yes, this religious liberty interest is real, concrete, factual, but, as a matter of law, society's interest in avoiding adverse impacts on religious liberties is not a sufficiently weighty interest to sustain the man-woman meaning against constitutional attack. (This is something akin to the position of the genderless marriage proponents at the Becket Fund's conference.) But even that argument does not wash; it is nothing other than an assertion that, because it is not certain that the intervenor's interest will prevail at the end of the case, it is not weighty enough to justify intervention at the beginning of the case. Yet the very purpose of intervention is to allow someone whose substantial interests are at stake to protect those interests as best as possible, which means in the role of a party. Further, the presumption is that the Marriage Amendment is constitutional and therefore will prevail against the plaintiffs' attack – and that presumption continues until a contrary final judgment ends it. *See Forbes v. Napolitano*, 236 F.3d 1009, 1012 (9th Cir. 2000) ("challenged statute enjoys a presumption of constitutionality"); *see also Miller v. Burk*, 188

P.3d 1112, 1123 (Nev. 2008) ("In challenging a voter-enacted constitutional amendment postelection, the [plaintiff] 'bear[s] a heavy burden of persuasion,' given the presumptive soundness afforded to the vote of the people. ... [W]ith respect to constitutional amendments made through voter initiatives, 'every reasonable presumption, both of law and fact, is to be indulged in favor of the legality of the amendment, which will not be overthrown, unless illegality appears beyond a reasonable doubt.') Accordingly, at this stage of the proceeding, the Coalition's associational interest in protecting the religious liberty of its members cannot simply be dismissed by a wave of the hand, as the Opposition attempts to do.

With respect to the Coalition's reputational interest, the Opposition stoops to something rather astounding. Our Opening Brief said that the Coalition, uniquely, will be the target of the plaintiffs' inevitable animus/bigotry arguments. The Opposition tries to dismiss this interest or diminish it into nothingness by making a number of arguments except the obvious one: denying that the plaintiffs will make the Coalition, uniquely, the target of its inevitable animus/bigotry arguments. On that point, the Opposition's silence is as loud as thunder and confirms that the Coalition is very much in the animus/bigotry cross-hairs. The Opposition attempts to evade its silence by arguing that the Coalition "cannot identify any specific charge of animus or bigotry in the complaint or any substantive pleading directed *specifically* against the Coalition. Opposition at 6 (emphasis in original). This argument, of course, ignores that the Complaint makes contiguous what it says about the Coalition and what it says about animus/bigotry and, more tellingly still, ignores the well-founded testimonial evidence in the record that the plaintiffs will make the animus/bigotry arguments and that "it is not the defendant government officials who will be the targets of the animus/bigotry arguments; rather, the target will be most particularly the Coalition because of its unique role as the leader of the campaign in favor of the Marriage

14

Amendment and as the primary source of the campaign ads." App. 28-29.  And, again, if that is not what the plaintiffs will do, why does the Opposition not just deny it?  After all, the matter is all in the plaintiffs' hands.

Against that background, the Opposition attempts to argue that, in any event and as a matter of law, in no case will an intervenor's reputational interest at stake in a case sustain intervention.  The Opposition cites as follows:  "*See Flynn v. Hubbard*, 782 F.2d 1084, 1093 (5th Cir. 1986) (holding that "a party's reputation interest has not been found sufficient to require interventions as of right")."  Opposition at 6.  This is wrong and misleading.  What is quoted is language from a concurring opinion and therefore, of course, is not the "holding."  The holding by the majority opinion is that "[i]t would be premature to decide now whether the interests asserted by [the proposed intervenors, including reputational interests] meet the requirements of Rule 24." *Id*. at 1089.  Moreover, the law is that reputational interests can qualify as a Rule 24(a) interest:

> The court erred also in not allowing appellants to intervene as defendants. Orders against them were sought and obtained. If they had been valid, these orders might have compelled them to make disclosures that would have injured their reputations and so their economic and social interests. The law does not ignore such injuries. Appellants were squarely within Rule 24(a) of the Federal Rules of Civil Procedure ....

*In re McElrath*, 248 F.2d 612, 616 (D.C. Cir. 1957).  Further, in the words of Rule 24(a), the Coalition's reputational interest at stake here "relat[es] to the property or transaction that is the subject of the action."  It could not be otherwise given that, as the Opposition's silence on the matter now confirms, in seeking to establish their claim the plaintiffs will make their animus/bigotry arguments and the Coalition will be the target.

The Opposition is likewise deficient in its argument about the Coalition's additional associational interest in its married and engaged members' liberty interests embedded in

15

preservation of the man-woman marriage institution.  The Opposition at 7 begins with a patent

misstatement of that interest:  "The Coalition seeks to establish and maintain an ideological

uniformity between the law and its members' views."  False.  Nothing in our Opening Brief or

anything else sustains such an assertion; rather, the Opening Brief establishes that the Coalition

seeks to perpetuate the man-woman marriage institution because its married and engaged

members have a real, concrete, and substantial interest in that perpetuation; that a judgment in

favor of the plaintiffs will bring the full force of another institution (the law) to bear in

deinstitutionalizing man-woman marriage; and that over time that deinstitutionalization will

thereby occur, with inevitable loss of the dead institution's unique social goods.  *See* App. 2-3,

21-22.  Accordingly, again in the words of Rule 24(a), the Coalition's interest at stake here

"relat[es] to the property or transaction that is the subject of the action."  It could not be

otherwise given that a judgment in this action favorable to the plaintiffs will literally end the

Coalition's members' real, concrete, and substantial interests embedded in the man-woman

marriage institution.

　　　　Nor does it work to do what the Opposition does next:  assert without analysis that the

real interest of real people in a real and presently vital social institution is an "undifferentiated,

generalized interest … too porous … to premise intervention as of right."  If this is an argument

that, because a substantial number of Nevadans, albeit a minority, are married, the Coalition's

members' interest is "generalized," then the argument certainly fails.  Those members both

possess and highly value a real, concrete, and substantial interest in perpetuation of the man-

woman marriage institution – and that interest is not diminished at all because others also

possess that interest.  The "generalized interest" argument is the same as an argument that,

because a large number of tenants-in-commons own a piece of property, no one of them has an

interest sufficient to sustain intervention in a case where the property is in dispute.  Tellingly, the

Opposition presents no law that a person's interest will not sustain intervention simply because it

is shared by a number of others.  That is not the law.  *See California ex rel. Lockyer v. United

States*, 450 F.3d 436, 441 (9th Cir. 2006) (although only some, not all, health care providers with

conscientious objections to abortion sought to intervene, the "proposed intervenors' interest … is

neither 'undifferentiated' nor 'generalized.'")  Further, it is important to remember in this context

> that "the 'interest' test is primarily a practical guide to disposing of lawsuits by
> involving as many apparently concerned persons as is compatible with efficiency
> and due process." … The 'interest test' is basically a threshold one, rather than the
> determinative criterion for intervention, because the criteria of practical harm to
> the applicant and the adequacy of representation by others are better suited to the
> task of limiting extension of the right to intervene.

*Fresno County v. Andrus*, 622 F.2d 436, 438 (9th Cir. 1980).

Nor does it work to do what the Opposition does next, that is, quote Judge Reinhardt's

*Perry* opinion again:  "Furthermore, as the Ninth Circuit recently held, '[i]t is implausible to

think that denying two men or two women the right to call themselves married could somehow

bolster the stability of families headed by one man and one woman.'"  Opposition at 7.  For one

thing, that language does not engage the deinstitutionalization issue at the heart of the Coalition's

members' liberty interest in man-woman marriage.  For another thing, and again, Judge

Reinhardt's *Perry* opinion addresses only a situation where a ballot measure ends a genderless

marriage regime and does not apply to Nevada's situation.  Further, and again, because

deinstitutionalization is a question of fact, any engagement by *Perry* of that question (we see

none and the Opposition points to none) is necessarily limited to and by the record made in that

California litigation, and that is not binding on the Coalition or any other party to this litigation

because none was a party to the California litigation.  Finally, and again, if the Opposition is

trying to say that the members' liberty interest embedded in the man-woman marriage institution

is real, concrete, factual, but, as a matter of law, society's interest in avoiding adverse impacts on

that liberty interest is not a sufficiently weighty interest to sustain the man-woman meaning

against constitutional attack, that is not a valid argument for precluding the Coalition's

intervention at the beginning of the case, for the reasons already given.

In sum, the Coalition's associational interest in protecting its members' religious liberty

and their liberty interest in perpetuation of the man-woman marriage institution and its own

reputational interest are real, concrete, and substantial, and each is an interest beyond any interest

the government defendants have in this litigation; accordingly, the inadequacy of representation

issue is readily resolved in favor of the Coalition.  Nothing in the Opposition supports any notion

to the contrary.

**3. The Opposition's proposed limitations on the Coalition's role as a permissive intervenor have the purpose and effect of preventing the Coalition – as the only party ready, willing, and able to do so – from marshalling and presenting the evidence establishing the marriage facts, that is, the evidence that will counter the plaintiffs' evidence on the marriage institution.**

The Opposition concedes that permissive intervention is proper for the Coalition but then

proposes a series of limitations on the Coalition's role as a party.  Opposition at 13-15.  Those

limitations have the purpose and effect of preventing the Coalition from marshalling and

presenting the evidence establishing the marriage facts.  The Coalition, as already demonstrated,

is the only party ready, willing, and able to do that work.  Moreover, that work is crucial to a just

resolution of this action, especially in light of the plaintiffs' stated intent to present their own

"evidence" on the "marriage institution" to counter the marriage facts we have detailed.

The proposed limitations are that (i) the AGO will control the Coalition's discovery,

meaning that the Coalition itself cannot notice any depositions; (ii) if the AGO uses a witness

that says anything about topic A, the Coalition cannot use any witness of its own to address topic

A; and (iii) the Coalition will be bound by the proposed scheduling order.  Opposition at 14-15.
We respectfully submit that the first two proposed limitations are powerful evidence of the
plaintiffs' sanguine views about the quality of defense that the AGO will provide here (some
further evidence on the issue of inadequacy of AGO representation).  As to the last proposed
limitation, the pernicious nature of the proposed scheduling order is addressed in our separately
filed Objection to it.  Suffice it to say here that it is a key part of the plaintiffs' effort to kill the
chance, at the very outset of this litigation, that this Court will be fully advised of the full range
of societal and hence governmental interests sustaining the constitutionality of Nevada's
Marriage Amendment.   The first two proposed limitations on the Coalition's role are other key
parts of that same effort.

**4. The Opposition's request to strike the affidavits of Monte Neil Stewart and William C.
Duncan is without merit.**

        The Opposition at 3 says that the "executive summary and supporting Affidavit of Monte
Neil Stewart are unrelated to the legal issues raised in the Coalition's motion and should be
stricken and disregarded by the Court."  We demonstrated above how the Opposition, in
discussing the Coalition's additional interests at stake here, ignores the concrete factual basis of
those interests appearing in Mr. Stewart's affidavit, ignores that the Opening Brief expressly
stated that the marriage facts set forth in his affidavit "make plain the nature and reality of some
of the Coalition's substantial interests at stake in this litigation," Opening Brief at 7, and ignores
that affidavit's express factual statement regarding the inadequacy of AGO representation of the
Coalition's interests.  The Opposition's request to strike that affidavit is a continuation of this
pattern of willful blindness.  It suffices here to say that the Opening Brief's and this Reply's use
of Mr. Stewart's affidavit both on the nature and extent of the Coalition's additional interests at
stake here and on the inadequacy of AGO representation fully puts the lie to the Opposition's

bald, unsupported assertion that the affidavit is "unrelated to the legal issues raised in the Coalition's motion."

The Opposition at 3 n.1 says that "the Affidavit of William C. Duncan – which purports to describe the litigation strategy used in other cases – is not relevant, lacks foundation, and is not based on personal knowledge. It should also be stricken and disregarded by the Court." The simple answer is that Mr. Duncan did not testify as a percipient witness but as an expert witness. His affidavit and his attached resume fully qualify him for that role relative to the subject of his testimony. Indeed, it is fair to say that, given Mr. Duncan's intense involvement with the marriage issue since the mid-1990s, no other expert anywhere is more qualified on that subject. Further, although the plaintiffs may want to style this civil action as just some *sui generis* case brought by "productive and loyal residents of the State of Nevada" and existing independently of the great, coordinated juggernaut on the march since the Hawaii case in the early 1990s, that just is ***not*** the truth. The context in which this civil action has been brought and will be adjudicated is highly relevant, especially to the inadequacy of AGO representation (the Opposition's central issue), and this Court deserves to be fully informed on it.

### III. Conclusion.

In light of all the foregoing, we respectfully request that this Court enter an order allowing the Coalition to intervene as a party-defendant both as of right and by permission, without any limitations on the Coalition's role as a party.

June 8, 2012

Monte Neil Stewart (Nevada Bar No. 1459)

# SUPPLEMENTAL APPENDIX IN SUPPORT OF

# MOTION TO INTERVENE

## Table of Contents

Supplemental Affidavit of Monte Neil Stewart ............................................................1

21

## SUPPLEMENTAL AFFIDAVIT OF MONTE NEIL STEWART

State of  Idaho                    )
                                            ) ss
County of Ada                  )

I, Monte Neil Stewart, being first duly sworn testify of my own personal knowledge that:

1. I am one of the lawyers representing the Coalition for the Protection of Marriage ("Coalition") relative to *Sevcik et al. v. Sandoval, etc., et al.*, Case No.: 2:12-cv-00578-RLH-PAL, United States District Court for the District of Nevada ("this case").

2. This affidavit supplements my affidavit filed in this action as part of the Appendix in Support of the Coalition's Motion to Intervene (D.I. 30; App. 18-33).

3. On June 5, 2012, I took a telephone call from Keith Munro, who I know to be Nevada's Assistant Attorney General and therefore the number two person in the Nevada Attorney General's office ("AGO").  Mr. Munro said that he had on the speaker phone with himself Chief Deputy Attorney General (Public Safety) Stephen Quinn, who was also involved in this case.

4. The main purpose of Mr. Munro's call was to seek an expedited deposition with a knowledgeable officer or director of the Coalition who could testify as to the reasons supporting the constitutionality of Nevada's Marriage Amendment at issue in this case and otherwise "tell our side."  Mr. Munro was rather insistent that the deposition occur very quickly.

5. I questioned whether the AGO had any expert witnesses "on its radar screen."  Mr. Munro said, "No."

6. I told Mr. Munro and Mr. Quinn that I would check with the Coalition on the possibility of such a deposition.

1

7.  On June 7, 2012, I took a telephone call from Mr. Munro and Mr. Quinn, who said they were following up to learn the Coalition's position on the proposed deposition.  I said that, in response to a Rule 30(b)(6) notice of deposition directed to the Coalition, the Coalition would produce its president, Will Stoddard.

8.  Mr. Munro and Mr. Quinn further said that they wanted the Coalition witness to testify regarding the "governmental interests supporting" the Marriage Amendment; that this deposition would be "a platform" from which the Coalition could "tell its story" and "tell its side"; and that the AGO would use the deposition transcript as "the document" in support of the Marriage Amendment.

9.  I asked whether they knew that Mr. Stoddard was "just a lawyer and did not have a Ph.D. in any of the social sciences?"  They responded that they fully understood that.

10. Based on these communications and other relevant data, I am convinced that the AGO does not intend to rely on expert witness testimony in this case and otherwise has little or no idea of how to defend effectively the Marriage Amendment.

SUBSCRIBED AND SWORN TO before me June _____, 2012.

Notary Public
Residing at _Boise, ID_
My Commission Expires: _12/21/13_

2

**CERTIFICATE OF SERVICE**

I hereby certify that on June 8, 2012, the foregoing document was filed with the Clerk of

the Court for the United States Court, District of Nevada by using the CM/ECF system on

June 8, 2012.  The following parties received copies electronically:

Jon W. Davidson – jdavidson@lambdalegal.org
Tara L. Borelli – tborelli@lambdalegal.org
Peter C. Renn – prenn@lambdalegal.org
Shelbi Day - sday@lambdalegal.org
Carla Christofferson – cchristofferson@omm.com
Dawn Sestito – dsestito@omm.com
Melanie Cristol – mcristol@omm.com
Rahi Azizi – razizi@omm.com
Kelly H. Dove - kdove@swlaw.com
Marek P. Bute – mbute@swlaw.com
C. Wayne Howle – whowle@ag.nv.gov
Michael Foley – michael.foley@ccdanv.com
Herbert Kaplan - hkaplan@da.washoecounty.us
Randal Munn – rmunn@carson.org

/s/Monte N. Stewart
Monte N. Stewart