Monte N. Stewart (Nevada Bar No. 1459)
Craig G. Taylor (admitted *pro hac vice*)
Daniel W. Bower (admitted *pro hac vice*)
**BELNAP STEWART TAYLOR & MORRIS PLLC**
12550 W. Explorer Drive, Suite 100
Boise, ID  83713
Tel:  208-345-3333 / Fax:  208-345-4461
Email:  stewart@belnaplaw.com

D. Chris Albright (Nevada Bar No. 4904)
**ALBRIGHT, STODDARD, WARNICK & ALBRIGHT, PC**
801 South Rancho Drive, Suite D4
Las Vegas, Nevada 89106-3854
Tel: (702) 384-7111 / Fax: (702) 384-0605
Email: dca@albrightstoddard.com

*Lawyers for Intervenor-Defendant the Coalition for the Protection of Marriage*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| BEVERLY SEVCIK et al., | Case No.: 2:12-cv-00578-RCJ-PAL |
| Plaintiffs, | **THE COALITION'S RESPONSE BRIEF RE:** |
| vs. | **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| BRIAN SANDOVAL, etc., et al., | |
| Defendants, | |

## I.  INTRODUCTION

In both the Coalition's filings in support of its motion to intervene, D.I. 30, and in its motion for summary judgment, D.I. 72 ("Coalition's Opening Brief"), the Coalition demonstrated society's and hence Nevada's powerful reasons for perpetuating the man-woman marriage institution.   Genderless marriage proponents cannot negate those bases supporting the Marriage Amendment.  At most, they can create a genuine debate as to the validity of only a few.

1

Under settled equal protection jurisprudence, this means that man-woman marriage readily withstands constitutional attack. Although the plaintiffs have been fully aware all along of the details of the Coalition's social institutional argument for man-woman marriage, their motion for summary judgment and supporting memorandum, D.I. 86 ("Plaintiffs' Opening Brief"), fails to negate that argument's many, independently adequate bases for perpetuating man-woman marriage.

Antecedent to that failure, however, is the plaintiffs' insistence that this Court apply some level of heightened scrutiny to their claims, even though numerous Ninth Circuit cases have plainly called for rational-basis review of claims of sexual orientation discrimination and *no* Ninth Circuit decision holds otherwise. Their sex discrimination claim is baseless, and similar claims have been found to be so in well-reasoned case after well-reasoned case. Further, the social goods provided by the institutionalized man-woman meaning are so valuable and so vital to society that the meaning can withstand all constitutional attacks no matter what level of judicial scrutiny is deployed.

## II. ARGUMENT

**A.     This Court should apply rational-basis review.**

Multiple Ninth Circuit cases apply rational-basis review to claims of sexual orientation discrimination. *See, e.g., High Tech Gays v. Def. Indus. Sec. Clearance Office,* 895 F.2d 563, 573-74 (9th Cir.1990); *Witt v. Dep't of Air Force,* 527 F.3d 806, 821 (9th Cir. 2008). *None* applies heightened scrutiny. Clearly, neither this Court nor a three-judge panel of the Ninth Circuit can change that settled circuit law. Such a change can happen only by way of circuit *en banc* review or a Supreme Court decision.

> We are bound by the decisions in [two earlier Ninth Circuit published opinions]. There has been no change in the relevant statutes or regulations, nor in any

2

governing authority, notably an intervening decision of the Supreme Court.
Absent such a change, only an en banc panel of our court may overrule or revise
the binding precedent established by a published opinion.

*United States v. Ramos-Medina*, 682 F.3d 852, 857-58 (9th Cir. 2012).  Just as a three-judge

circuit panel is not free to disregard earlier Ninth Circuit precedent, neither is this Court.

Yet the plaintiffs insist that this Court first should disregard the multiple Ninth Circuit

published opinions calling for rational-basis review and then make a change in the law by

applying some level of heightened scrutiny.  Plaintiffs' Opening Brief at 14-19.  As authority, the

plaintiffs point to three district court decisions (two within the Ninth Circuit), one bankruptcy

court decision, and President Obama and Attorney General Holder.  *Id.* at 15.  Such "authority"

does not override binding Ninth Circuit authority.  Accordingly, the plaintiffs' additional

arguments as to why the level of scrutiny should be heightened clearly are misdirected when

made to this Court.[1]

---

[1]   In addition, those arguments are simply wrong.  *See, e.g., Jackson v.Abercrombie,* 2012 WL
3255201, at *27-29 (D. Haw. Aug. 8, 2012) (rejecting the same arguments advanced by plaintiffs
here); *Conaway v. Deane*, 932 A.2d 571, 614 (Md. 2007); Kenji Yoshino, *The New Equal
Protection*, 124 HARV. L. REV. 747, 756-57 (2011) ("All classifications based on other
characteristics – including age, disability, and *sexual orientation* – currently receive rational
basis review. Litigants still argue that new classifications should receive heightened scrutiny. Yet
these attempts have an increasingly antiquated air in federal constitutional litigation, as the last
classification accorded heightened scrutiny by the Supreme Court was that based on nonmarital
parentage in 1977.  At least with respect to federal equal protection jurisprudence, *this canon has
closed.*" (emphasis added)); Janet E. Halley, *Sexual Orientation and the Politics of Biology: A
Critique of the Argument from Immutability*, 46 STAN. L. REV. 503, 567-68 (1994) ("Even worse,
when the . . . argument from immutability annexes recent scientific findings to bolster its
empirical claim that homosexual orientation is immutable, it becomes simply incoherent. . . . .
[T]here is as yet no proof that human sexual orientation has a biological cause; and even if a
biological cause of human sexual orientation were eventually identified, the conceptually distinct
question whether it causes *homosexuality* and *heterosexuality* would remain outstanding.");
Appendix in Support of the Coalition's Motion for Summary Judgment (hereinafter "App1") T48
and T52 (recent powerful examples of political clout; *see also* William C. Duncan, *Problems of
Classification*, 4 LIBERTY U.L. REV. 465 (2009).

3

The plaintiffs also wrongly argue that the man-woman meaning in marriage constitutes sex discrimination, which does require heightened scrutiny.  That meaning does not constitute sex discrimination because it treats men and women equally. *See, e.g., Jackson v. Abercrombie,* 2012 WL 3255201, at *27 (D. Haw. Aug. 8, 2012); *Smelt v. County of Orange*, 374 F. Supp. 2d 861, 876-77 (C.D. Cal. 2005); *Wilson v. Ake*, 354 F. Supp. 2d 1298, 1307-08 (M.D. Fla. 2005).

Because this case involves neither a "fundamental right" nor a "suspect" classification, it "falls directly within the scope of [Supreme Court] precedents holding such a law constitutionally valid if 'there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.'" *Armour v. City of Indianapolis, Ind.*, __U.S. __, 132 S. Ct. 2073, 2080 (2012).  "And it falls within the scope of [Supreme Court] precedents holding that there is such a plausible reason if 'there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Id.*

Finally, even application of a heightened level of scrutiny will avail the plaintiffs nothing.  As demonstrated by the social institutional argument for man-woman marriage, perpetuation of the man-woman marriage institution materially advances compelling societal and hence governmental interests and does so in the only way possible.[2]

---

[2]   The only two alternatives reasonably available to Nevada are man-woman marriage and genderless marriage.  The latter is inimical to the valuable social goods materially and even uniquely provided by the former.  Those social goods unquestionably qualify as compelling governmental interests. *See* Coalition's Opening Brief at 12 & nn. 16-18.

**B. The plaintiffs' personal interests are not relevant in determining the adequacy of governmental interests under rational-basis review.**

The plaintiffs acknowledge that the "central question" for this Court is whether the man-woman limitation in marriage is "supported by adequate governmental interests." Plaintiffs' Opening Brief at 14. To answer that question rationally requires attention to the societal interests at stake. Yet the plaintiffs continually seek to divert attention away from those societal interests and toward the personal interests of same-sex couples in general and their own interests in particular, doing so with multiple pages describing the unhappiness, indignities, and difficulties they feel because they cannot marry. *E.g.*, Plaintiffs' Opening Brief at 4, 7-8, 13. The plaintiffs appear to be arguing that the greater the difficulties for same-sex couples, the more rigorous the test that the man-woman meaning must pass to be held constitutional. But that is certainly *not* the law. The Supreme Court has made clear that, in the absence of a claim of deprivation of a fundamental right (and there is no such claim here), the fact and extent that a law disadvantages a particular group does *not* alter the rational-basis test. *See, e.g., Romer v. Evans*, 517 U.S. 620, 632-33 (1996) ("In the ordinary case, a law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or *works to the disadvantage of a particular group*, or if the rationale for it seems tenuous.") (emphasis added); *United States Railroad Retirement Board v. Fritz*, 449 U.S. 166, 175-76 (1980) (as long as "the classification has some 'reasonable basis,' it does not offend the Constitution simply because . . . in practice it results in some inequality" and the rational-basis test does not change – in theory or application – just because the classification "would undoubtedly seem inequitable to some members of a class . . . .") (citations omitted). Accordingly, the constitutionality of the man-woman meaning is not determined at all by the rhetoric used to describe the plaintiffs' difficulties or the relative strength of their sense of mistreatment and indignity. The test is whether any reasonably

5

conceivable state of facts could provide a rational basis for that meaning. The only way to answer that question sensibly is to focus on the societal interests at stake in the man-woman meaning's perpetuation. The plaintiffs' personal interests are simply irrelevant to the task of answering the "central question" and thus should not be allowed to distract from, confuse, or distort the well-established constitutional standard.

**C. The Plaintiffs' arguments are all premised on a materially incomplete description of contemporary American marriage.**

The plaintiffs and their experts premise their legal arguments on a conception of marriage that portrays it as a private relationship between two people, the primary purpose of which is to satisfy the adults who enter it (the "close personal relationship model" or "pure relationship model"). In that light, marriage is really about the couple.[3] This narrow description is based on the view that our society has moved "from a marriage culture to a culture that celebrates 'pure relationship,'" in which marriage is understood as a relationship "that has been stripped of any goal beyond the intrinsic emotional, psychological, or sexual satisfaction which the relationship currently brings to the [two adult] individuals involved."[4] The plaintiffs' narrow view of marriage depicts an adult-centered "partnership entered into for its own sake, which lasts only as long as both partners are satisfied with the rewards (mostly intimacy and love) that they get from it."[5] Genderless marriage proponents depict marriage only as "a deeply personal commitment to

---

[3]   *See, e.g.,* INSTITUTE FOR AMERICAN VALUES (DAN CERE, PRINCIPAL INVESTIGATOR), THE FUTURE OF FAMILY LAW: LAW AND THE MARRIAGE CRISIS IN NORTH AMERICA 15-16 (2005) (available at App1 T7 pp149-50); Monte Neil Stewart, *Marriage Facts*, 31 HARV. J.L. & PUB. POL'Y 313, 329-37 (2008) ("*Marriage Facts*").

[4]   INSTITUTE OF AMERICAN VALUES, FUTURE OF FAMILY LAW, *supra* note 3, at 16 (available at App1 T7 p150).

[5]   Andrew J. Cherlin, *The Deinstitutionalization of American Marriage*, 66 J. MARRIAGE & FAM. 848, 853, 858 (2004) (reporting both that the "pure relationship is not tied . . . to the desire to raise children" and that scholarly "attempts to incorporate children into the pure relationship are unconvincing").

6

another human being and a highly public celebration of the ideals of mutuality, companionship, intimacy, fidelity, and family"; "it is the exclusive and permanent commitment of the marriage partners to one another . . . that is the *sine qua non* of civil marriage." *Goodridge v. Dep't of Pub. Health*, 798 N.E.2d 941, 954, 961 (Mass. 2003). Under this pure relationship model, marriage's social goods are "love and friendship, security for adults and their children, economic protection, and public affirmation of commitment."[6]

As explained in our opening brief, marriage is a social institution much broader and richer in meaning than the narrow view the plaintiffs and their experts portray. Conceived in its fullness as a social institution, marriage encompasses most of what the close personal relationship model describes but also *much* more. For example, while marriage certainly provides "love and friendship, security for adults and their children, economic protection, and public affirmation of commitment" and the ideal of "a partnership of equals with equal rights, who have mutually joined to form a new family unit, founded upon shared intimacy and mutual financial and emotional support," it also provides the following *additional* social goods to which the plaintiffs' adult-centered conception is blind: the most effective (or only) means of supporting the child's bonding interest and the concept of natural parenthood; maximizing the private welfare provided to the children conceived by heterosexual intercourse; sustaining the optimal child-rearing mode (married mother and father); bridging the male-female divide; and furnishing the statuses and identities of *husband* and *wife*. *See* Coalition's Opening Brief at 8-26. We refer hereafter to these additional meanings, practices, and goods as the "Additional Marriage Goods."

Plaintiffs' legal argument for genderless marriage founders because it rests on a view of

---

[6] LINDA C. MCCLAIN, THE PLACE OF FAMILIES: FOSTERING CAPACITY, EQUALITY, AND RESPONSIBILITY 6 (2006).

marriage that is radically incomplete.  Marriage, as commonly understood and lived by Nevadans, is more than the close personal relationship model the plaintiffs advance.  As fully demonstrated in our opening brief, marriage is a rich social institution with duties and relationships that transcend the couple; among other important features, marriage continues to be a child-protective and child-centered institution, aimed at protecting, nurturing and rearing children.

The testimony of plaintiffs' expert on contemporary American marriage, Nancy Cott, fails to rebut the concept that marriage is a social institution much broader than the adult-centered partnership the plaintiffs describe.  D.I. 86-2 at 3-37[7] ("Cott").  Although Cott lists aspects of marriage common to both the narrow and the broad descriptions, she does not aver that contemporary marriage is limited to those aspects or that the Additional Marriage Goods are factually false.  This is particularly telling because the Additional Marriage Goods were set forth in considerable detail in both our opening brief and other relevant literature before Cott prepared her declaration.  Furthermore, although Cott states that marriage is an evolving and changing institution, she does not assert that the changes have eliminated the Additional Marriage Goods.  Her statements only set forth now-abandoned institutional meanings and practices *other than* the Additional Marriage Goods.  The most that Cott says regarding the validity of the Additional Marriage Goods is that the "exclusion of same-sex couples from equal marriage rights stands at odds with the direction of historical change in marriage in the United States."[8]  That statement carefully avoids saying that the "historical change" has overtaken and eliminated the Additional

---

[7]   We use the clerk-imprinted pagination at the top of the pages whenever referring to the Appendix to Plaintiffs' Opening Brief.
[8]   Cott at 7, 24.

8

Marriage Goods.  The Additional Marriage Goods are continuing, valuable, and important components of contemporary American marriage.

Finally, Cott's attempted challenge to the man-woman marriage institution as the provider of the optimal child-rearing mode actually reaffirms that social good's continuing validity.  Cott says: "The notion that the main purpose of marriage is to provide an ideal or optimal context for raising children was never the prime mover in states' structuring of the marriage institution in the United States, and it cannot be isolated as the main reason for the state's interest in marriage today."[9]  Note the careful limitation to "main purpose," "prime mover," and "main reason."  Cott does *not* deny that perpetuating the optimal child-rearing mode (by perpetuating the man-woman marriage institution) continues as *an* important, even compelling, societal interest.  Any quibble over whether it is the "main" or "prime" interest at stake is irrelevant to this Court's constitutional analysis; what is relevant is that the interest is real, valuable and enduring.

In a further effort to evade that relevant and valuable interest (and to bolster the narrow description of marriage at the expense of the child-centered broad description), the plaintiffs argue that the bearing and rearing of children are at best tangential to the marriage institution's roles and purposes – as evidenced by the fact that society does not screen out of marriage man-woman couples who are infertile by nature or choice.  Opposing Brief at pp. 25-26.  This argument ignores the biological facts and the social realities flowing from them.  Man-woman sexual relations are intrinsically procreative; the human species is a two-sex species exactly for the purpose of procreation; and no other human relationship – whether a same-sex sexual relationship or a cooperative but platonic relationship – is intrinsically procreative.  The

---

[9]   Cott at 12.

9

plaintiffs' argument further provides no good answer to the demonstrations of society's good

sense in refusing to undertake such a "screening out" endeavor.[10]  The argument that same-sex

couples can be "procreative" too through artificial reproductive technologies does not bolster the

plaintiffs' cause.  This argument actually underscores how genderless marriage destroys the

child's interest in bonding with its biological parents, which, in turn, highlights the

reasonableness of society's endeavor, through perpetuation of the essential man-woman marriage

institution, to perpetuate that bonding interest and the closely related interests in natural

parenthood held by the state, natural parents, and children.

Because all the plaintiffs' arguments are premised on a conception of marriage that is

radically incomplete, they fail to come to grips with the actual interests served by marriage as a

social institution.  Consequently, plaintiffs' constitutional challenge fails by leaving unrebutted

multiple rational grounds and compelling interests supporting the man-woman meaning of

marriage.

**D.  The plaintiffs fail to negate the rational bases pertaining to the man-woman marriage institution's vital role relative to children in our society.**

Perpetuation of the man-woman marriage institution is vital to the long-term quality of

child-rearing and child-welfare in our society.  Coalition's Opening Brief at 9-24.  Through its

core, constitutive meanings including the "union of a man and a woman," that institution

transforms and prepares individuals to meet heightened obligations of care (in the broadest

sense) to the children that their passionate, heterosexual coupling bring into the world – and then

sustains those adults in the fulfillment of their child-centered obligations.  In this way, the man-

---

[10]  *See, e.g., Andersen v. King County*, 138 P.3d 963, 983 (Wash. 2006); *Morrison v. Sadler*, 821 N.E.2d 15, 27 (Ind. App. 2005); Monte Neil Stewart, *Judicial Redefinition of Marriage*, 21 CAN. J. FAM. L. 11, 58-60 (2004) ("*Judicial Redefinition*").

woman marriage institution materially and even uniquely protects the child's bonding interest and the concept of natural parenthood, maximizes the private welfare provided to the children conceived by heterosexual intercourse, and sustains the optimal child-rearing mode (married mother-father).  In short, the man-woman marriage institution performs the large task of the orderly reproduction of society.

The plaintiffs' attempts to negate these social realities all fail.  First, the plaintiffs focus on only one of society's two large child-welfare endeavors while ignoring the other one. Because several of the unique social goods provided by the institutionalized man-woman meaning focus on the welfare of children, man-woman marriage is a child-centered and child-protective institution.  Government efforts to preserve that institution, including the Marriage Amendment, are therefore child welfare endeavors.  But government also engages in another child-welfare endeavor: providing public assistance in various forms (through protective laws, access to resources, material resources themselves, and so on) to individual children or their caregivers.  These endeavors are different.  The former entails the protection, sustenance, and perpetuation of a social institution because that institution is good for children generally through the generations; the latter entails the present provision to each child, regardless of the child's circumstances, of those resources that society deems minimally due to every child. By engaging in both endeavors simultaneously, government attempts to maximize the well-being of all children, both those now among us and those of future generations.  However, the plaintiffs ignore the first endeavor and its institutionally protective nature and attempt to paint the Marriage Amendment as somehow hostile to or inconsistent with the second endeavor, which by seeking to provide at least minimal resources to every child cultivates an ethos of government-assured equality of circumstances for all children.  The plaintiffs seek to persuade this Court that,

11

for the sake of all children, it must mandate genderless marriage under the Fourteenth Amendment.  The social reality (and irony), however, is that genderless marriage is destructive of the first child-welfare endeavor and its focus on the important interests of children across the generations.

The plaintiffs' also attack the idea that the married mother-father child-rearing mode, the child-rearing mode uniquely provided by the man-woman marriage institution, is optimal.  They make this attack with three arguments, *none* of which negatives this rational basis for the Marriage Amendment and only one of which even manages to create a plausible debate about it.

The plaintiffs argue that Nevada legislation addressing parental rights, especially the Domestic Partnership Act ("DPA"), establishes a policy of equality for "the State's full spectrum of parental obligations and protections."  Plaintiffs' Opening Brief at 26.  This is in effect an argument that the Nevada legislature has resolved the social science debate in favor of the "no differences" studies.  But that is erroneous.  For one thing, providing a certain equality of treatment for all parents – regardless of the family structure or mode in which they are raising children – is not at all a policy judgment on the relative *quality* of those modes; at most it expresses a judgment that performance of the parental task, regardless of the mode in which undertaken, may be helped by a certain level of legal "obligations and protections."  By contrast, the Marriage Amendment's express reservation of marriage to man-woman couples *is* a policy judgment by the people about which mode of parenting is optimal.  For another thing, the Marriage Amendment is of constitutional stature, while the legislation on which the plaintiffs rely is not.  If there is any conflict in the public policies articulated by the two, the public policy emerging from the Marriage Amendment certainly trumps any public policy conjured out of the legislation.  Thus, because the Marriage Amendment preserves the man-woman meaning

12

productive of the "gold standard" of child-rearing, its public policy of privileging that "gold standard" must be the guiding public policy on this point and must be viewed as accepting the social science conclusions in favor of married mother-father child-rearing as the optimal mode.[11]

Plaintiffs also argue that "an undeniable consensus has emerged among the leading authorities" and among various professional associations in favor of the "no differences" conclusion. Plaintiffs' Opening Brief at 27. But the plaintiffs are simply wrong. The studies they point to as the basis for an alleged scientific "consensus" have been contested in credible and responsible ways.[12] In passing the Marriage Amendment, Nevada's voters did not buy into the touted "consensus," as they had every constitutional right not to. Their choice was perfectly reasonable, given that "the attempts at scientific study of the ramifications of raising children in same-sex couple households are themselves in their infancy and have so far produced inconclusive and conflicting results," that "studies to date reveal that there are still some observable differences between children raised by opposite-sex couples and children raised by same-sex couples," that "[i]nterpretation of the data gathered by those studies then becomes clouded by the personal and political beliefs of the investigators," and that "[t]his is hardly the first time in history that the ostensible steel of the scientific method has melted and buckled under the intense heat of political and religious passions." *Goodridge*, 798 N.E.2d at 979-80

---

[11] *See, e.g., Armour*, 132 S. Ct. at 2080 (it is sufficient that "the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker").

[12] *See, e.g.*, Mark Regnerus, *How different are the adult children of parents who have same-sex relationships? Findings from the New Family Structures Study*, 41 SOC. SCI. RES. 752-70 (2012) (available at App1 T33); Loren Marks, *Same-sex parenting and children's outcomes: A closer examination of the American psychological association's brief on lesbian and gay parenting*, 41 SOC. SCI. RES. 735-51 (2012) (available at App1 T34).

(Sosman, J., dissenting).[13]

Finally, the plaintiffs rely on expert witness Michael Lamb's opinions that there are "no differences" in outcomes between married mother-father child-rearing and same-sex couple child-rearing and that there is "no empirical support for the notion that the presence of both male and female role models in the home promotes children's adjustment or well-being." D.I. 86-3 at 61. For two powerful reasons, however, Lamb's opinions fail to end the debate about the rational bases related to child-rearing. First, although Lamb attempts to explain away scientific studies reinforcing the view that married mother-father child-rearing is the unique "gold standard" and demonstrating that the "no differences" studies are methodologically flawed, D.I. 86-3 at 67-71, the fact remains that the studies Lamb attacks are the work-product of social scientists at least as qualified in their fields as he is and were published in respected peer-reviewed journals. Second, and even more compelling, Lamb's opinions given for this case are contradicted and refuted by Lamb's own body of work, including these Lamb statements:

- "it is disturbing that there appears to have been a devaluation of the father's role in western society such that many children may suffer affective paternal deprivation."
- "[b]oys growing up without fathers seem to have problems in the area of sex role and gender identity development, school performance, psychosocial adjustment, and perhaps in the control of aggression."
- "[b]oys growing up without fathers seem especially prone to exhibit problems in the areas of sex role and gender identity development."[14]

The collection of Lamb self-contradictions goes on and on, including such concessions as that there are indeed differences between men and women that have implications for child

---

[13]   *See also* WILLIAM C. DUNCAN, MISPLACED RELIANCE ON SOCIAL SCIENCE EVIDENCE IN THE PROPOSITION 8 CASE, Vol. 5, No. 6, an Institute for Marriage and Public Policy Research Brief 1-4 (2012) (available at Appendix, Volume 2 Tab 54 pages 1332-35). Volume 2 (hereinafter "App2") is being filed simultaneously with this Response Brief; both its tabs and its Bates numbers run consecutively from the tabs and Bates numbers in our Appendix in Support of the Coalition's Motion for Summary Judgment.
[14]   *Id.* at 2 (available at App2 T54 p1333).

14

development.  Those self-contradictions cannot be explained away on the basis of research developments that arose since his earlier statements and the date of his declaration in this case.[15] Lamb's self-impeachment is so troubling as to lead to the fair observation that Lamb's opinions "are influenced by factors other than scientific research," including a desire to promote a particular ideology.[16]  At a minimum, his views cannot be relied on as the basis for overturning the deeply rooted understanding of the people of Nevada—one developed over centuries of experience in Western civilization—that being raised by one's own parents in a stable, man-woman marriage is best for children.

   In short, the plaintiffs have failed to negate the adequate and independent rational basis for the man-woman meaning found in that meaning's provision of the optimal child-rearing mode.  Ironically, their brief confirms that there is a genuine debate on whether same-sex parenting can meet that "gold standard."  It follows that a straightforward application of rational-basis review requires the Court to sustain the constitutionality of the Marriage Amendment on this rational basis alone.  *See Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464 (1981) ("Although parties challenging legislation under the Equal Protection Clause may introduce evidence supporting their claim that it is irrational, they cannot prevail so long as 'it is evident from all the considerations presented to [the legislature], and those of which we may take judicial notice, that the question is at least debatable.'  Where there was evidence before the legislature reasonably supporting the classification, litigants may not procure invalidation of the legislation merely by tendering evidence in court that the legislature was mistaken." (citations omitted)).

---

[15]  *See id.* at 2-3 (available at App2 T54 p1333-35).
[16]  *Id.* at 4 (available at App2 T54 p1335).

15

**E.  The plaintiffs fail to negate the rational bases pertaining to the child's bonding interest and to the concept of natural parenthood.**

The plaintiffs understandably are silent regarding the reality that a genderless marriage regime is inimical to the child's bonding interest and to the concept of natural parenthood. Unquestionably, "same-sex marriage . . . unlink[s] child-parent biological bonds" and thereby "raises . . . important issues [including] children's right to know the identities of their biological parents [and] children's right to both a mother and a father, preferably their own biological parents."[17]

Moreover, a genderless marriage regime is inimical to the concept of natural parenthood. *See* Coalition's Opening Brief at 17-18.  As such, it also is necessarily inimical to the concept of the natural family as an institutional buffer between family members and the state and as the situs of rights on which the state cannot impinge.  Genderless marriage "is nothing more than a legal construct.  Its roots run no deeper than positive law.  It therefore cannot present itself to the state as the bearer of independent rights and responsibilities, as older or more basic than the state itself.  Indeed, it is a creature of the state . . . ."[18]  As a consequence, a genderless marriage regime would "de-naturalize the family by rendering familial relationships, in their entirety, expressions of law.  But relationships of that sort – bled as they are of the stuff of social tradition and experience – are no longer family relationships at all.  They are rather policy relationships, defined and imposed by the state."[19]  The chilling consequence is that, by displacing man-woman

---

[17]   Margaret Somerville, *Children's Human Rights to Natural Biological Origins and Family Structure*, 1 INT'L J. JURISPRUDENCE FAM. 35, 36 (2010) (available at App2 T53 p1311).
[18]   Douglas Farrow, *Why Fight Same-Sex Marriage?*, TOUCHSTONE, Jan.–Feb. 2012 (available at App1 T38 pp868-69).
[19]   F.C. DeCoste, *Courting Leviathan: Limited Government and Social Freedom in* Reference re Same-Sex Marriage, 42 ALTA. L. REV. 1099, 1122 (2005) (available at App2 T59); F.C. DeCoste, *The* Halpern *Transformation: Same-Sex Marriage, Civil Society, and the Limits of Liberal Law*, 41 ALTA. L. REV. 619, 625-26 (2003) (available at App2 T58).

16

marriage, genderless marriage would do away with the only institution that exists to support the natural family and to affirm its independence from the state.  A genderless marriage regime would effectively turn every citizen's most fundamental human connections into legal constructs at the state's gift and disposal.[20]  This reality qualifies as another rational basis for the Marriage Amendment, one that surely is compelling.

**F. The plaintiffs fail to negate the rational basis pertaining to the valuable identities and statuses of *husband* and *wife*.**

The plaintiffs make two indirect arguments against the rational basis pertaining to the identities and statuses of *husband* and *wife*.  First, they suggest that the very consideration of the identities and statuses of *husband* and *wife* is a form of invidious sexism and, apparently, that man-woman marriage must therefore somehow be considered a form of sex discrimination.  Second is the Peplau opinion that "[t]here is no scientific support for the notion that allowing same-sex couples to marry would harm different-sex relationships or marriages."  Peplau at 49.

The "sexism" argument makes sense only to people who have accepted a particular theory of gender advanced by radical social constructivists, a theory generally in opposition to its essentialist rival.[21]  The very word *gender* is caught up in the dispute between the two positions.  Both the essentialist and the radical social constructivist acknowledge (each in her own way) the biological differences between men and women and the reality of social influences in individual development, including gender identity.  But then the two theories diverge.  Essentialism teaches that gender is an essential characteristic of individual identity and that inherent, or natural, differences between the sexes extend beyond mere differences in body parts to certain

---

[20]  *See* Farrow, *supra* note 18 (available at App1 T38 p869).
[21]  Regarding the information set forth in this paragraph, *see generally* D. Richardson, *Sexuality and Gender, in* INTERNATIONAL ENCYCLOPEDIA OF THE SOCIAL & BEHAVIORAL SCIENCES 14018-21 (2001) (available at App2 T55 p1337-40).

differences of cognition and emotion that are expressed socially, and often differently from culture to culture.  Radical social constructionism holds that everything that our language codes as male or female, masculine or feminine, and especially most everything that really matters for human experience and growth, is socially and culturally constructed.  Under this approach, a sharp distinction is often made between *sex* or *sexuality*, on one hand, and *gender*, on the other, with *sex* referring to the biological distinction between females and males, and *gender* referring to "the social meanings and value attached to being female or male in any given society, expressed in terms of the concepts femininity and masculinity."[22]

Adherents to the radical social constructionist position see distinctions between male and female attributes, desires and needs as socially constructed, as facilitative in nearly all cultures of unequal power relationships, and as harmful to the individual's fullest human development.  To a greater or lesser extent, they take it as their project to deconstruct the "gendered" differences between men and women.[23]  Many of them wish to deconstruct marriage because they see it as preserving the societal distinctions between men and women.[24]  Some of their deconstructive strategies include advocating that law not make gender-based distinctions and that law redefine civil marriage from a man-woman relationship to a person-person relationship.  Genderless marriage advocates attempt to use radical social constructionist conclusions because, they argue, there is no defensible basis under equality jurisprudence for legally defining marriage as a man-woman relationship rather than a person-person relationship if there are no differences between men and women that matter (or should matter) in the eyes of the law.

In making the Marriage Amendment part of their constitution, Nevada's voters declined

---

[22]  *Id.* at 14019 (available at App2 T55 p 1338).
[23]  *See, e.g.*, JONATHAN CULLER, LITERARY THEORY: A VERY SHORT INTRODUCTION 97-101 (1997); MONIQUE WITTIG, *One Is Not Born a Woman, in* THE STRAIGHT MIND (1992).
[24]  *See, e.g.*, KATE MILLET, SEXUAL POLITICS 33-36 (1977).

18

to buy into the radical social constructivists' theory of gender.  Equally important, the United States Supreme Court has declined to accept it.  In *United States v. Virginia*, 518 U.S. 515 (1996), the Supreme Court found Virginia's maintenance of an all-male military academy violative of federal equality jurisprudence.  The State attempted to justify the school's exclusion of women by reference to the extraordinarily rigorous nature of the school's unique educational experience, and thereby potentially raised a question regarding relevant inherent (or essential) differences between men and women.  For present purposes, this language from the Supreme Court's opinion is important:

> "Inherent differences" between men and women, we have come to appreciate, remain cause for celebration, but not for denigration of the members of either sex or for artificial constraints on an individual's opportunity.  Sex classifications may be used to . . . advance full development of the talent and capacities of our Nation's people.  But such classifications may not be used, as they once were, to create or perpetuate the legal, social, and economic inferiority of women.

*Id.* at 533-34 (citations omitted).  The Court was true to this language.  It did *not* strike down the exclusion of women from the school on the basis that there are no relevant "inherent differences" for purposes of education law; rather, the Court avoided any assessment of the extent to which women are biologically or socially different from men.  The Court acted because Virginia "use[d] women's differences from men as a justification for prescribing gender roles in a way that deprives women of equal opportunity,"[25] and, by so acting, the Court "avoid[ed] a claim that equal treatment is necessarily required in all contexts."[26]  Indeed, the Supreme Court gave due deference to the biological facts that we referenced earlier:  "Physical differences between men and women, however, are enduring: '[T]he two sexes are not fungible; a community made up exclusively of one [sex] is different from a community composed of both.'"  518 U.S. at 533.

---

[25]  Cass Sunstein, *Foreward:  Leaving Things Undecided*, 110 HARV. L. REV. 4, 76 (1996).
[26]  *Id.*; *see also Judicial Redefinition*, *supra* note 10, at 85-99 (available at App2 T57).

19

Because humankind is a two-sex species exactly for purposes of procreation, there is no identity or status more closely tied to the enduring biological facts than *husband* and *wife*.  To call those statuses "sex-stereotyping," as the plaintiffs do, is to ignore biological and social reality.  It is to say that a woman can be a husband, but that simply cannot be absent a massive and Orwellian governmental intervention in and interference with our language and hence our society's enduring social realities and institutions – because *husband* "is a distinct mode of association and commitment that carries centuries and volumes of social and personal meaning."[27]

In declining to accept the radical social constructivists' theory of gender, the courts have heeded Justice Holmes's caution against the tendency of judges, consciously or unconsciously, overtly or covertly, to read social theories into the constitution: "Otherwise a constitution, instead of embodying only relatively fundamental rules of right, as generally understood by all English-speaking communities, would become the partisan of a particular set of ethical or economical opinions . . . ."[28]  Because the Fourteenth Amendment is not a partisan of radical social constructivism's theory of gender, the plaintiffs' "sexism" argument fails.

The plaintiffs also rely on expert witness Letitia Anne Peplau's opinion that "[t]here is no scientific support for the notion that allowing same-sex couples to marry would harm different-sex relationships or marriages.  The facts that affect the quality, stability, and longevity of different-sex relationships would not be affected by marriages between same-sex couples."  D.I. 86-2 at p. 49 ("Peplau").  This opinion evidences a large blind spot.  Peplau ignores or is ignorant of the teachings of the "new institutionalism" in the social sciences, which focus on the

---

[27]  RONALD DWORKIN, IS DEMOCRACY POSSIBLE HERE? 86 (2006).

[28]  *Otis v. Parker*, 187 U.S. 606, 608-09 (1903).  Even more pithy was his statement that the Constitution did not "enact Mr. Herbert Spencer's *Social Statics*," a book embodying the social Darwinism that gained considerable currency for awhile in American constitutional law.  It is equally certain that the Constitution did not enact Ms. Judith Butler's *Gender Trouble*.  *See* Richardson, *supra* note 21, at 14018 (available at App2 T55 p1337).

20

role of social institutions in shaping social behaviors through widely shared public meanings that form and transform individuals in profound ways.[29]   Accordingly, she does not come to grips with and *certainly does not deny* that marriage is a vital social institution; that like all fundamental institutions, marriage is constituted by widely shared public meanings that form and transform individuals in profound ways, providing them with identities, statuses, projects, purposes, and norms; that the man-woman marriage institution is the sole provider in our society of the statuses of *husband* and *wife*; that because it is, it enables and empowers men and women to do and become what they could not do and become without the institution; that genderless marriage is and must be inimical and hostile to the statuses of *husband* and *wife*; that the law has the power to suppress the now-institutionalized man-woman meaning; and that when it does, the valuable social goods inhering in the *husband* and *wife* statuses and identities will be diminished over time and then lost.

Peplau's blind spot regarding social institutional realities is evident in other ways.  An example is her reliance on divorce data from Massachusetts in the few years immediately before and immediately after the 2004 inception of court-mandated genderless marriage there.  Peplau at 65-66.  Her point is that the sky is not falling now that Massachusetts has a genderless marriage regime.  But the undeniable reality of institutional momentum clearly invalidates this point.  Something as massive and deep-rooted in our society and humanity as the man-woman marriage institution, like a massive ocean-going ship, does not stop or turn in a short space or a

---

[29]   *See generally* THE NEW INSTITUTIONALISM IN ORGANIZATIONAL ANALYSIS (Walter W. Powell & Paul J. DiMaggio eds., 1991); Peter A. Hall & Rosemary C.R. Taylor, *Political Science and the Three New Institutionalisms*, 44 POL. STUD. 936 (1996); Victor Nee, *Sources of the New Institutionalism, in* THE NEW INSTITUTIONALISM IN SOCIOLOGY 1 (Mary C. Brinton & Victor Nee eds., 2001); *see also Marriage, Fundamental Premises, and the California, Connecticut, and Iowa Supreme Courts*, 2012 BYU L. REV. 193, 204 ("*Fundamental Premises*").

short time.  With an institution as fundamental and deep-rooted as marriage, one must think in

terms of decades to observe the full effects of changes in the public meanings.

Neither with Peplau's "opinion" nor in any other way do the plaintiffs counter the social

realities that a genderless marriage regime over time will diminish and then end the statuses and

identities of *husband* and *wife* with clear adverse consequences for husbands and wives and those

in the future who might want those enabling statuses and powers – if the new regime's language

even allows those persons to comprehend them.

**G.  The plaintiffs fail to negate the rational basis pertaining to the religious liberties of a large portion of Nevada's citizens and churches.**

A genderless marriage regime will adversely affect the religious liberties of a large

portion of *both* Nevada's citizens *and* churches.  For churches, the adverse impacts include

increased liability in private anti-discrimination lawsuits and a range of government penalties,

such as exclusion from government facilities, ineligibility for government contracts, and

withdrawal of tax exempt status; for individuals, they include government-authorized sanctions –

either directly imposed by government or resulting from private anti-discrimination lawsuits –

for heeding conscience and declining to provide services connected to such activities as same-

sex couple weddings and lodging.  Coalition's Opening Brief at 26-27.

In an effort to counter this rational basis, the plaintiffs cite *Perry v. Brown*, 671 F.3d 1052

(9th Cir. 2012), for the proposition that a genderless marriage regime will not require any church

to change its policies or practices relative to same-sex couples or to perform weddings for such

couples.  *Perry* is wholly inapposite.  The Ninth Circuit opinion simply did not address the

demonstrated adverse impacts for churches such as exclusion from government facilities,

ineligibility for government contracts, and withdrawal of tax exempt status and did not address at

all any adverse impacts on individuals.  Further, the court acknowledged the reality of adverse

impacts on churches when it said that churches should take their plight to legislatures and request

there expanded exemptions from anti-discrimination laws.  *Id.* at 1091.  This last aspect of *Perry*

is important because that case dealt with a balancing of religious liberties against a state-

recognized right to genderless marriage subsequently eliminated by voter initiative.  In contrast,

Nevada has never seen either a state-recognized right[30] or a federally recognized right[31] to

genderless marriage, and there is clearly no such right now because the presumption in favor of

the constitutionality of the Marriage Amendment continues in full force and effect.[32]  By

enacting the Marriage Amendment, Nevada's voters were protecting valued religious liberties

without in any way diminishing the rights of any individuals or groups.  So to acknowledge, as

*Perry* does, the reality of any adverse impacts on religious liberty as a result of the adoption of a

genderless marriage regime is to demonstrate the Coalition's point—that the Marriage

Amendment rationally serves the legitimate interest in protecting religious liberties.

The plaintiffs' last effort to counter the rational basis centering on protection of religious

liberties is to quote a law journal article[33] that in turn cites *In re Marriage Cases*, 183 P.3d 384

(Cal. 2008), and *Varnum v. Brien*, 763 N.W.2d 862 (Iowa 2009), for the proposition that a

genderless marriage regime will not prohibit religions from "interpret[ing] their scripture and

tradition to prohibit [same-sex] unions."  Interpreting scripture is not one of the religious liberties

at stake here.  Since government is powerless to constrain the thought processes of people of

faith, the plaintiffs' assertion that religious liberty is unaffected by the adoption of genderless

---

[30]  *See* Memorandum of Points and Authorities in Support of Defendant Glover's Motion for Summary Judgment, D.I. 74 at 6, (Showing that since territorial days Nevada has always defined marriage as the union of a man and a woman.)

[31]  *See, e.g.*, *Baker v. Nelson*, 409 U.S. 810 (1972).

[32]  *See, e.g.*, *Town of Lockport, New York v. Citizens for Cmty. Action at Local Level, Inc.*, 430 U.S. 259, 272-73 (1977); *Miller v. Burk*, 188 P.3d 1112, 1123 (Nev. 2008).

[33]  Eric Isaacson, *Are Same-Sex Marriages Really a Threat to Religious Liberty?*, 8 STAN. J. C.R. & C.L. 123, 124 (2012).

23

marriage so long as people of faith and religious organizations can interpret scripture without government compulsion is so shriveled a concept of religious liberty as to practically eliminate it from the American landscape.  Moreover, in rejecting the religious-liberties rational basis, the opinions in *Marriage Cases* and *Varnum* build on the false premise that civil marriage and religious marriage are separate and distinct phenomena in our society.  However, the social science scholarship identifies marriage as one institution, not separate civil and religious institutions.[34]  Moreover, top scholars on both sides of the marriage issue agree that a genderless marriage regime will adversely affect religious liberties at multiple points where the law touches marriage and is applied to individuals and churches.[35]  Neither the cited law review article nor any other source attempts to engage, let alone counter, the conclusion reached by those scholars.

**H. The DPA does not render the Marriage Amendment unconstitutional.**

The plaintiffs are correct in saying that a "governmental interest must, at a minimum, 'find some footing in the realities of the subject addressed by the legislation.'"  Plaintiffs' Opening Brief at 22. (quoting *Heller v. Doe*, 509 U.S. 312, 321 (1993)).  True to that governing principle, the multiple rational bases sustaining the constitutionality of the Marriage Amendment find their footing in the realities of the contemporary American social institution of man-woman marriage.  Those social institutional realities are largely uncontroverted.  Only because the plaintiffs turn a blind eye towards those realities can they argue that no rational basis sustains the Marriage Amendment.

---

[34] *See* RICHARD R. CLAYTON, THE FAMILY, MARRIAGE, AND SOCIAL CHANGE 19 (2d ed. 1979); F.C. DeCoste, *Courting Leviathan: Limited Government and Social Freedom in* Reference Re Same-Sex Marriage, 42 ALTA. L. REV. 1099, 1102-03 (2005) (available at App2 T59 p1433); *see also* JOHN R. SEARLE, THE CONSTRUCTION OF SOCIAL REALITY 32 (1995) (available at App1 T36 p787).
[35] *See generally* Brief of *Amicus Curiae*, Becket Fund for Religious Liberty, *Perry v. Brown*, No. 10-16696, at 1-3 (9th Cir. Sept. 24, 2010) (available at App1 T49 pp1164-66); *Fundamental Premises, supra* note 29, at 263-74 and authorities collected there.

24

These observations are important in the context of the plaintiffs' argument that the DPA somehow operates to render the Marriage Amendment unconstitutional.  Plaintiffs' Opening Brief at 1, 2, 5-6, 26-27.  The heart of that argument is that the DPA somehow paints a picture of contemporary American marriage that coincides with the plaintiffs' adult-centered concept of marriage and thereby rejects the common understanding of marriage as a social institution with duties and relationships that transcend the two adults who enter it.  The short answer to this argument is that the DPA does no such thing.  There is *nothing* about the DPA that denies or negates that man-woman marriage is a vital social institution; that like all fundamental institutions, marriage is constituted by widely shared public meanings which form and transform individuals in profound ways, providing them with identities, statuses, projects, purposes, and norms; that through this transformative process the institutionalized man-woman meaning materially and even uniquely provides valuable social goods; that genderless marriage is and must be inimical and hostile to many of those goods; that the law has the power to suppress the now-institutionalized man-woman meaning; and that when it does so by mandating the "any two persons" meaning, the valuable social goods provided by the man-woman meaning will be diminished over time and then lost.  The DPA actually reinforces these social realities by expressly providing that a domestic partnership is *not* a marriage, Nev. Rev. Stat. § 122A.510.  Indeed, the "not marriage" meaning of the DPA and similar legislative schemes in other states looms very large in the public understanding, a fact the plaintiffs emphasize—indeed, a fact that is the primary basis of their equal protection claim.  Plaintiffs' Opening Brief at 12-13.  Accordingly, when the plaintiffs say that the DPA "exposes the absence of any rational connection between [the Marriage Amendment] and any legitimate governmental interest,"

Plaintiffs' Opening Brief at 1-2 (emphasis added), they do so either ignoring or ignorant of the social institutional realities of marriage and what the DPA does and does not do.

On the other hand, if the plaintiffs are suggesting that, rather than *describe* present social institutional realities, the DPA *changes* those realities by force of law and does so in a way that deprives the Marriage Amendment of any federal constitutional basis, then they are saying that the DPA violates Nevada's constitution.  If the DPA is unconstitutional, it is void and can have no effect, adverse or otherwise, on the Marriage Amendment and that amendment's constitutional stature.  These conclusions flow inexorably from fundamental law, including the basic concept that a state legislature cannot by legislation invalidate or defeat a provision of the state constitution.[36]  Nevada's voters put the Marriage Amendment into their constitution to preclude, among other things, the state legislature from replacing man-woman marriage with a genderless marriage regime.  Consequently, Nevada's legislature cannot enact any legislation with the purpose or effect of invalidating or defeating the constitutionally mandated man-woman meaning, such as by opening the door to a federal-court order mandating the any-two-persons meaning.[37]  Yet the plaintiffs may well be arguing that the DPA does just that, apparently oblivious to the fundamental legal principle that if the DPA is indeed doing that, then it violates Nevada's constitution.  If the DPA violates Nevada's constitution, it is void and of no effect, *see*,

---

[36]  *See, e.g.*, *Gibson v. Mason*, 5 Nev. 283, 295 (1869) (state legislation valid only when "not in conflict with some provision of the Federal or State Constitutions"); *King v. Bd. of Regents of Univ. of Nev.*, 200 P.2d 221, 225 (1948) ("state constitutions are limitations of the lawmaking power" and legislation cannot "contravene some expressed or necessarily implied limitation appearing in the constitution itself"); *see also City of Boerne v. Flores*, 521 U.S. 507 (1997).

[37]  *See King*, 200 P.2d at 226 ("It is not essential that any given limitation of power be definitely expressed in the constitution. 'Every positive direction contains an implication against anything contrary to it, *or which would frustrate or disappoint the purpose of that [constitutional] provision*.'") (emphasis added).   Certainly the legislature cannot do indirectly what it clearly cannot do directly, namely, remove the Marriage Amendment from Nevada's constitution.

e.g., *Clark County v. City of Las Vegas*, 550 P.2d 779, 794-95 (1976), and can provide no basis for the plaintiffs' DPA argument.[38]

**I. The plaintiffs misuse and misapply *Perry*.**

The plaintiffs repeatedly argue that the decision in *Perry* somehow "binds" this Court to hold the Marriage Amendment unconstitutional, but this is clearly wrong. For one thing, *Perry* repeatedly and clearly limited the scope of its holding to a situation where same-sex couples enjoyed a state supreme court granted right to marry that the state's voters subsequently ended (by way of Proposition 8). 671 F.3d at 1064, 1076, 1082 n.14, 1087 n.20. Then in concurring in denial of rehearing *en banc* and referring to "the narrow issue that we decided in our opinion," the panel majority said: "We held only that under the particular circumstances relating to California's Proposition 8, that measure was invalid. . . . [W]e did not resolve the fundamental question . . . whether the Constitution prohibits the states from banning same-sex marriage." *Perry v. Brown*, 681 F.3d 1065, 1067 (9th Cir. 2012) (Reinhardt, J. and Hawkins, J., concurring in denial of rehearing en banc). California's "particular circumstances" are not at all like Nevada's where marriage has always been legally defined as the union of a man and a woman. Because of its own self-described limitations, *Perry's* holding does not apply to Nevada's different situation; to suggest otherwise is to say that the Ninth Circuit did not mean what it expressly stated.

*Perry* also does not apply to this case for reasons centering on the concepts of adjudicative facts and legislative facts.[39] None of the adjudicative facts found by the *Perry* trial

---

[38] The plaintiffs also fail to come to grips with the fatal defects in their "mere word *marriage*" argument, defects that we made clear in the Coalition's Opening Brief at 28-29.

[39] *See Perry*, 671 F.3d at 1075 (adjudicative facts "are capable of being 'found' by a court through the clash of proofs presented in adjudication, as opposed to 'legislative facts,' which are generally not capable of being found in that fashion. 'Adjudicative facts are facts about the

court and accepted by the circuit panel are even relevant here.  (They are peculiar to the parties and to the unique legal landscape in that case.)  More importantly, those findings are not binding on this Court.  Although generally applicable *legal* principles announced by the Ninth Circuit bind this Court, *see, e.g.*, *Hart v. Massanari*, 266 F.3d 1155, 1170-72 (9th Cir. 2001), findings of adjudicative facts based on the record in a particular case do not bind either this Court or any present party who was not a party (or in privity with a party) in that earlier case.  *See, e.g.*, *Robi v. Five Platters, Inc.*, 838 F.2d 318, 328 (9th Cir. 1988).

The circuit panel in *Perry* expressly declined to rely on any legislative facts "found" by the trial court except one not contested there.  671 F.3d at 1075.  More importantly, the circuit panel majority opinion did *not* address the social institutional realities presented by the Coalition here, which compel a holding of constitutionality.  Thus, *Perry* simply cannot be said to have done anything regarding those realities, whether by way of finding, holding, or otherwise.  Because *Perry* engaged in *no* judicial action regarding those vital social realities, *Perry* provides no basis for denying or even just ignoring them.[40]

In short, *Perry* does nothing to undermine the Marriage Amendment's constitutionality.

---

parties and their activities . . . usually answering the questions of who did what, where, when, how, why, with what motive or intent' . . . . 'Legislative facts,' by contrast, 'do not usually concern [only] the immediate parties but are general facts which help the tribunal decide questions of law, policy, and discretion.'") (quoting *Marshall v. Sawyer*, 365 F.2d 105, 111 (9th Cir. 1966)).

[40]   *See, e.g.*, *In re Payroll Exp. Corp.*, 921 F.Supp. 1121, 1123 (S.D.N.Y. 1996) ("When an issue was not raised in the circuit court, a district court is not bound by the resulting decision."). Indeed, even when a higher court does address and rule on legislative facts, the ruling may not be binding on lower courts.  *See generally A Woman's Choice-E. Side Women's Clinic v. Newman*, 305 F.3d 684, 688-89 (7th Cir. 2002).

**J. The plaintiffs wrongly argue that supporters of the Marriage Amendment acted only out of animus.**

As predicted, the plaintiffs now accuse the Coalition of animus.  *See* Plaintiffs' Opening Brief at 5, 12.  However, the plaintiffs' own evidence of that supposed animus defeats the charge.  The plaintiffs point to two Coalition ads as constituting "false, stigmatizing messages that same-sex couples are inferior . . . and that both the institution of marriage and children need to be protected from same-sex couples." *Id.* at 5.  The first ad said:  "Let's not experiment with Nevada's children." *Id.*  The second ad said that in a genderless marriage regime parents "would be unable to stop the proliferation of teaching that promotes homosexuality in our schools." *Id.*  As to the first ad, genderless marriage is without any question an experiment.[41]  Indeed, a recent op-ed piece in The New York Times acknowledged:  "Same-sex marriage is a social experiment, and like most experiments it will take time to understand its consequences."[42]  Because marriage as an institution has always been much intertwined with the interests and needs of children, to experiment with that institution is indeed to "experiment with Nevada's children."  As to the second ad, a genderless marriage regime will without any question promote homosexuality in our schools and everywhere else touched by the law's coercive and pedagogical powers; that promotion will entail deconstructing heteronormativity and also teaching the "evil" of any expression of disagreement with homosexuality.[43]  To inform the public on such an important

---

[41]  *See, e.g.*, Katherine K. Young & Paul Nathanson, *The Future of an Experiment*, in DIVORCING MARRIAGE 41 (Daniel Cere & Douglas Farrow eds., 2004) (genderless marriage proponents "want to indulge in a massive experiment, … leaving future generations to pick up the pieces.").

[42]  Ross Douthat, *Gay Parents and the Marriage Debate*, THE NEW YORK TIMES, June 11, 2012 (available at App2 T56 p1343).

[43]  App. T46 pp1080-81 ("Where the law [chooses genderless marriage], it has the effect of inducing social acceptance of homosexuality as normal … and legally establishing a liberal conception of moral equality.")

29

issue *is the opposite* of sending "false, stigmatizing messages" and *is not evidence* of any impermissible animus. Instead, it *is the hallmark* of rationality and good citizenship.

## III. CONCLUSION

The core, tripartite message of the genderless marriage project in general and this case's plaintiffs in particular is that men and women are interchangeable, that a child does not need or benefit from having both her mother and her father, and that those who believe otherwise are bigots. As demonstrated, under settled equal protection jurisdiction this message utterly fails to invalidate the Marriage Amendment. This Court should enter final judgment against the plaintiffs on all their claims.

Date: October 25, 2012

Monte Neil Stewart (Nevada Bar No. 1459)

**CERTIFICATE OF SERVICE**

I hereby certify that on October 25, 2012, the foregoing document was filed with the

Clerk of the Court for the United States Court, District of Nevada by using the CM/ECF system.

The following parties received copies electronically:

Jon W. Davidson – jdavidson@lambdalegal.org
Tara L. Borelli – tborelli@lambdalegal.org
Peter C. Renn – prenn@lambdalegal.org
Shelbi Day - sday@lambdalegal.org
Carla Christofferson – cchristofferson@omm.com
Dawn Sestito – dsestito@omm.com
Melanie Cristol – mcristol@omm.com
Rahi Azizi – razizi@omm.com
Kelly H. Dove - kdove@swlaw.com
Marek P. Bute – mbute@swlaw.com
C. Wayne Howle – whowle@ag.nv.gov
Michael Foley – michael.foley@ccdanv.com
Herbert Kaplan - hkaplan@da.washoecounty.us
Randal Munn – rmunn@carson.org

Monte N. Stewart

31