1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

8   BEVERLY SEVCIK et al.,                    )
                                              )
9               Plaintiffs,                   )
                                              )        2:12-cv-00578-RCJ-PAL
10      vs.                                    )
                                              )
11   BRIAN SANDOVAL et al.,                    )              **ORDER**
                                              )
12              Defendants.                    )
    ——————————————————————————————            )
13

14          This case arises out of the refusal of the State of Nevada to permit same-sex couples to

15   enter into civil marriages, as well as its refusal to recognize same-sex marriages performed in

16   other states as "marriages" under Nevada law.  The question before the Court is not the wisdom

17   of providing for or recognizing same-sex marriages as a matter of policy but whether the Equal

18   Protection Clause of the Fourteenth Amendment to the U.S. Constitution prohibits the People of

19   the State of Nevada from maintaining statutes that reserve the institution of civil marriage to one–

20   man–one-woman relationships or from amending their state constitution to prohibit the State

21   from recognizing marriages formed in other states as "marriages" under Nevada law if those

22   marriages do not conform to Nevada's one-man–one-woman civil marriage institution.  For the

23   reasons given herein, the Court rules that it does not.  To the extent the present challenge is not

24   precluded by U.S. Supreme Court precedent, Defendants are entitled to summary judgment.

25   ///

1    **I.       FACTS AND PROCEDURAL HISTORY**

2          The sixteen Plaintiffs in this case comprise eight same-sex couples who desire to marry

3    one another in Nevada or who have validly married one another in other jurisdictions and desire

4    to have their marriages recognized as "marriages" by the State of Nevada. (*See* Compl. ¶¶ 5–12,

5    Apr. 10, 2012, ECF No. 1).  Defendants are Governor Brian Sandoval, Clark County Clerk and

6    Commissioner of Civil Marriages Diana Alba, Washoe County Clerk and Commissioner of Civil

7    Marriages Amy Harvey, and Carson City Clerk–Recorder Alan Glover. (*See id.* ¶¶ 13–16).

8    Except for the fact that they are of the same sex, the unmarried Plaintiff couples are otherwise

9    legally qualified to marry one another in Nevada. (*See id.* ¶ 24).  Between April 1 and 6, 2012,

10   four of the unmarried Plaintiff couples were denied marriage licenses in Clark County, Washoe

11   County, and Carson City, variously, for this reason. (*See id.* ¶¶ 25–28).  The other four Plaintiff

12   couples were validly married in other jurisdictions and challenge the State's refusal to recognize

13   their foreign marriages as "marriages," as opposed to "domestic partnerships," under Nevada

14   law. (*See id.* ¶¶ 29–32).

15         Plaintiffs sued Defendants in this Court on a single claim under the Equal Protection

16   Clause of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983, requesting declaratory and

17   injunctive relief.  The Court granted the Coalition for the Protection of Marriage's (the

18   "Coalition") motion to intervene after Plaintiffs withdrew their opposition to the motion.  The

19   Court has heard oral argument on Governor Sandoval's and Clerk–Recorder Glover's separate

20   motions to dismiss.  The Coalition, Clerk–Recorder Glover, Governor Sandoval, and Plaintiffs

21   have since filed cross motions for summary judgment.  The Court decides all of these motions

22   via the present Order.

23   **II.      LEGAL STANDARDS**

24        **A.       Dismissal**

25   Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the

claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957).  Federal Rule of Civil Procedure 12(b)(6) mandates that a court dismiss a cause of action that fails to state a claim upon which relief can be granted.  A motion to dismiss under Rule 12(b)(6) tests the complaint's sufficiency. *See N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  When considering a motion to dismiss under Rule 12(b)(6) for failure to state a claim, dismissal is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable claim and the factual grounds upon which it rests. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  In considering whether the complaint is sufficient to state a claim, the court will take all material allegations as true and construe them in the light most favorable to the plaintiff. *See NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986).  The court, however, is not required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  A formulaic recitation of a cause of action with conclusory allegations is not sufficient; a plaintiff must plead facts pertaining to his own case making a violation plausible, not just possible. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–79 (2009) (citing *Twombly*, 550 U.S. at 556) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").  In other words, under the modern interpretation of Rule 8(a), a plaintiff must not only specify a cognizable legal theory (*Conley* review), but also must plead the facts of his own case so that the court can determine whether he has any plausible basis for relief under the legal theory he has specified, assuming the facts are as he alleges (*Twombly-Iqbal* review).

        "Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion.  However, material which is properly submitted as part of the

1    complaint may be considered on a motion to dismiss." *Hal Roach Studios, Inc. v. Richard Feiner*

2    *& Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990) (citation omitted).  Similarly, "documents

3    whose contents are alleged in a complaint and whose authenticity no party questions, but which

4    are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6)

5    motion to dismiss" without converting the motion to dismiss into a motion for summary

6    judgment. *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994).  Moreover, under Federal Rule

7    of Evidence 201, a court may take judicial notice of "matters of public record." *Mack v. S. Bay*

8    *Beer Distribs., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986).  Otherwise, if the district court

9    considers materials outside of the pleadings, the motion to dismiss is converted into a motion for

10   summary judgment. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir.

11   2001).

12        **B.     Summary Judgment**

13        A court must grant summary judgment when "the movant shows that there is no genuine

14   dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

15   Civ. P. 56(a).  Material facts are those which may affect the outcome of the case. *See Anderson v.*

16   *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there

17   is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*  A

18   principal purpose of summary judgment is "to isolate and dispose of factually unsupported

19   claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  In determining summary

20   judgment, a court uses a burden-shifting scheme:

21        When the party moving for summary judgment would bear the burden of proof at
           trial, it must come forward with evidence which would entitle it to a directed verdict
22         if the evidence went uncontroverted at trial.  In such a case, the moving party has the
           initial burden of establishing the absence of a genuine issue of fact on each issue
23         material to its case.

24   *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations

25   and internal quotation marks omitted).  In contrast, when the nonmoving party bears the burden

of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24.  If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).  In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations unsupported by facts. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

At the summary judgment stage, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.  The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.  But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

///

///

1    **III.    ANALYSIS**

2       **A.    Nevada's Marriage and Domestic Partnership Laws**

3       The Nevada Constitution prohibits official recognition of same-sex marriages by the

4    State. *See* Nev. Const. art. I, § 21 ("Only a marriage between a male and female person shall be

5    recognized and given effect in [Nevada]."). The Nevada Legislature, however, has recently

6    provided for "domestic partnerships" between two persons of any gender. *See generally* Nev.

7    Rev. Stat. ch. 122A. Nevada recognizes both foreign marriages and foreign quasi-marriage

8    relationships that do not qualify as "marriages" under the Nevada Constitution as "domestic

9    partnerships" under Chapter 122A, regardless of the label used in the jurisdiction where the

10   relationship was formed. *See* Nev. Rev. Stat. § 122A.500.

11      A couple desiring to enter into a domestic partnership in Nevada must satisfy eligibility

12   requirements similar to, but not identical to, those requirements a couple desiring to enter into a

13   marriage must satisfy. *See* Nev. Rev. Stat. §§ 122A.100, 122A.110. Prospective domestic

14   partners must prove to the Secretary of State that they share a residence on at least a part-time

15   basis, that they are neither married nor in a domestic partnership in any state, that they are not

16   related by blood in a way that would prevent them from being married in Nevada, and that they

17   are both eighteen years old and competent to consent. *See id.* at § 122A.100(2), (4). If these

18   requirements are satisfied, the couple must then file with the Secretary of State a signed,

19   notarized form declaring their decision "to share one another's lives in an intimate and

20   committed relationship of mutual caring" and that they desire of their own free will to enter into

21   a domestic partnership, and they must pay a reasonable fee to the Office of the Secretary of State.

22   *See id.* at § 122A.100(1). Domestic partners may solemnize their relationship, but they need not

23   do so to perfect it, and religious ministers and organizations may choose not to solemnize or

24   otherwise recognize such relationships. *See id.* at § 122A.110. Nevada's laws do not purport to

25   prevent the celebration of domestic partnerships in religious or secular ceremonies, nor do they

1   purport to prevent domestic partners or others from using the word "marriage" to describe the

2   relationship.

3           A couple desiring to enter into a civil marriage must satisfy slightly different

4   requirements, some of which are more stringent, and some of which are less stringent.

5   Prospective spouses must be one male and one female, and both must be eighteen years old,

6   although a person who is at least sixteen years old may marry with the permission of at least one

7   parent or legal guardian, and a person under sixteen may marry with the permission of at least

8   one parent or legal guardian plus approval by the district court—exceptions that are not available

9   to prospective domestic partners. *See id.* at §§ 122.020, 122.025.  Although prospective domestic

10  partners must be neither married nor in another domestic partnership, *see* Nev. Rev. Stat.

11  § 122A.100(2)(b), a person who is already in a domestic partnership could apparently marry a

12  third person in Nevada, because the anti-bigamy clause under the marriage chapter prevents only

13  married persons from marrying again and says nothing of persons who are already in domestic

14  partnerships, *see id.* at § 122.020(1).  Also, Chapter 122A is silent on whether opposite-sex

15  couples may enter into domestic partnerships; presumably, therefore, they can, though such a

16  union would not constitute a "marriage" under the Nevada Constitution. *See id.* at § 122A.510.

17  Unlike prospective domestic partners, prospective spouses may obtain the required marriage

18  license from the county clerk in any county in Nevada but must provide the clerk with certain

19  documentary evidence and must answer questions on the application form under oath. *See id.* at

20  § 122.040.  They must also pay a fee to the county clerk. *See id.* at § 122.060.  However, unlike

21  the "reasonable fee" to be charged by the Secretary of State to prospective domestic partners, the

22  fees to be paid by prospective spouses to county clerks are fixed by statute. *See id.* at § 122.060.

23  Unlike domestic partnerships, a judge, justice, or minister must solemnize a marriage. *See id.* at

24  § 122.010.

25          Except as otherwise provided in the statutes, domestic partners in Nevada have the same

rights and responsibilities as spouses have, Nev. Rev. Stat. § 122A.200(1)(a), former domestic

partners have the same rights and responsibilities as former spouses have, *id.* at

§ 122A.200(1)(b), surviving domestic partners have the same rights and responsibilities as

widows and widowers have, *id.* at § 122A.200(1)(c), domestic partners and former and surviving

domestic partners have the same rights and responsibilities with respect to their children as

spouses and former and surviving spouses have, *id.* at § 122A.200(1)(d), where state actors are

concerned, Nevada law immunizes domestic partners from any discriminatory effects of federal

law, *id.* at § 122A.200(1)(e) ("[t]o the extent that provisions of Nevada law adopt, refer to or rely

upon provisions of federal law in a way that otherwise would cause domestic partners to be

treated differently from spouses, domestic partners must be treated by Nevada law as if federal

law recognized a domestic partnership in the same manner as Nevada law"), and domestic

partners have the same right to nondiscriminatory treatment as spouses as a general matter, *id.* at

§ 122A.200(1)(f). There is at least one notable exception to these equality provisions: "The

provisions of this chapter do not require a public or private employer in this State to provide

health care benefits to or for the domestic partner of an officer or employee," *id.* at

§ 122A.210(1), though employers may offer such coverage voluntarily, *id.* at § 122A.210(2).

Although the Nevada Constitution independently provides that a domestic partnership between

persons of the same sex cannot be a "marriage" in Nevada, Chapter 122A itself provides that no

domestic partnership is a "marriage" under the Nevada Constitution. *See id.* at § 122A.510. The

statutory provision is likely only important for opposite-sex domestic partners, because it adds

nothing to the Nevada Constitution's prohibition against same-sex marriages.

### B.   *Baker v. Nelson*

Defendants argue that the present equal protection challenge is precluded by *Baker v.*

*Nelson*, 409 U.S. 810 (1972). In that case, the Supreme Court summarily dismissed an equal

protection challenge to Minnesota's marriage laws for lack of a substantial federal question. *See*

1    *id.* at 810.

2          The summary dismissal of an appeal for want of a substantial federal question operates as

3    a decision on the merits. *Hicks v. Miranda*, 422 U.S. 332, 344–45 (1975) ("[U]nless and until the

4    Supreme Court should instruct otherwise, inferior federal courts had best adhere to the view that

5    if the Court has branded a question as unsubstantial, it remains so except when doctrinal

6    developments indicate otherwise. . . . [L]ower courts are bound by summary decisions by this

7    Court until such time as the Court informs [them] that [they] are not." (citations and internal

8    quotation marks omitted; alterations in original)).  "Summary . . . dismissals for want of a

9    substantial federal question . . . reject the specific challenges presented in the statement of

10   jurisdiction and do leave undisturbed the judgment appealed from.  They do prevent lower courts

11   from coming to opposite conclusions on the precise issues presented and necessarily decided by

12   those actions." *Mandel v. Bradley*, 432 U.S. 173, 176 (1977).  "A summary disposition affirms

13   only the judgment of the court below, and no more may be read into [the] action than was

14   essential to sustain that judgment." *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S.

15   173, 182–83 (1979) (citation omitted).  "Questions which 'merely lurk in the record' are not

16   resolved, and no resolution of them may be inferred." *Id.* at 183 (citation omitted).  Accordingly,

17   *Baker* controls the present case, unless the specific challenge presented in this case was not

18   decided by the Minnesota Supreme Court.

19          In *Baker*, the Minnesota Supreme Court ruled, *inter alia*, that "[t]he equal protection

20   clause of the Fourteenth Amendment, like the due process clause, is not offended by the state's

21   classification of persons authorized to marry. . . . We hold, therefore, that [the statute permitting

22   only opposite-sex marriage] does not offend the . . . Fourteenth Amendment[] to the United

23   States Constitution." *Baker v. Nelson*, 191 N.W.2d 185, 187 (Minn. 1971).  The Supreme Court

24   summarily dismissed the appeal from this decision "for want of a substantial federal question."

25   *See Baker*, 409 U.S. at 810.  The challenged statute in *Baker* was Chapter 517 of the Minnesota

1    Statutes, which prohibited same-sex marriages. *See Baker*, 191 N.W.2d at 186.  The plaintiffs in

2    *Baker* challenged that statute under the Ninth Amendment and the Due Process and Equal

3    Protection Clauses of the Fourteenth Amendment. *See id.*  The Minnesota Supreme Court ruled

4    that the statute offended none of these constitutional provisions. *See id.* at 186–87.  The U.S.

5    Supreme Court summarily dismissed the appeal, *see Baker*, 409 U.S. at 810, so this Court "had

6    best adhere to the view that" the question of whether a state's refusal to recognize same-sex

7    marriage offends the Equal Protection Clause is constitutionally insubstantial, *see Hicks*, 422

8    U.S. at 344–45, and the Court is prevented from coming to an opposite conclusion, *see Mandel*,

9    432 U.S. at 176.

10        Governor Sandoval and Clerk–Recorder Glover therefore ask the Court to dismiss.

11   Plaintiffs respond that *Baker* does not control because *Baker* concerned the broader question of

12   whether the Equal Protection Clause requires a state to permit same-sex marriages, whereas the

13   present case concerns the narrower question of whether the Equal Protection Clause permits a

14   state to set up nearly identical civil institutions, i.e., marriage and domestic partnership, and then

15   exclude same-sex couples from one and not the other.  As discussed in more detail, *infra*, the

16   State of Nevada has not done this in the way Plaintiffs argue it has.  The Court finds that the

17   present challenge is in the main a garden-variety equal protection challenge precluded by *Baker*.

18   Plaintiffs also argue that the outcome in *Perry v. Brown*, 671 F.3d 1052 (9th Cir. 2012) cannot be

19   squared with Defendants' interpretation of the *Hicks* doctrine.  But the Court finds *Perry* to be

20   consistent with the view that *Baker* precludes a large part of the present challenge.  The equal

21   protection claim is the same in this case as it was in *Baker*, i.e., whether the Equal Protection

22   Clause prevents a state from refusing to permit same-sex marriages.  There is an additional line

23   of argument potentially applicable in this case based upon *Romer v. Evans*, 517 U.S. 620 (1996)

24   concerning the withdrawal of existing rights or a broad, sweeping change to a minority group's

25   legal status.  A *Romer*-type analysis is not precluded by *Baker*, because the *Romer* doctrine was

not created until after *Baker* was decided.  But the traditional equal protection claim is precluded, and this is consistent with *Perry*.  The *Perry* court was clear and emphatic that its decision was based solely upon the Supreme Court's withdrawal-of-existing-rights theory adopted in *Romer* in 1996, twenty-four years after *Baker* was decided, not upon a general equal protection challenge, which the Court finds *Baker* precludes.

In summary, the present equal protection claim is precluded by *Baker* insofar as the claim does not rely on the *Romer* line of cases, and Defendants are entitled to dismissal in part, accordingly.  Although the Court finds that *Baker* precludes a large part of the present challenge, the Court will conduct a full equal protection analysis so that the Court of Appeals need not remand for further proceedings should it rule that *Baker* does not control or does not control as broadly as the Court finds.

### C.   Plaintiffs' Equal Protection Challenge

"[B]ecause of the[] differences [in the rights and responsibilities of spouses and domestic partners], coupled with the stigma of exclusion and of being branded by the government as inferior, same-sex couples and their children suffer both tangible and dignitary harms, all of which are of constitutional dimension." (*See* Compl. ¶ 39).  For this reason, Plaintiffs challenge Section 21 of Article I of the Nevada Constitution ("Section 21") and Nevada Revised Statutes ("NRS") section 122.020 under the Equal Protection Clause of the Fourteenth Amendment, both facially and as applied. (*See* Compl. ¶¶ 88–89).  Section 21 provides that only a marriage between one man and one woman may be recognized as a marriage in Nevada, *see* Nev. Const. art I, § 21, and NRS section 122.020 provides that prospective spouses must be, *inter alia*, of opposite sexes to qualify for marriage, *see* Nev. Rev. Stat. § 122.020.  Plaintiffs do not appear to challenge any other provisions of Nevada law in the present lawsuit, and they have brought no due process challenge.

In analyzing an equal protection challenge, a court first identifies the categorical

1  distinction the state has drawn and determines what level of constitutional scrutiny applies to

2  such distinctions. *E.g.*, *United States v. Lopez-Flores*, 63 U.S. 1468, 1472 (9th Cir. 1995) (citing

3  *Jones v. Helms*, 452 U.S. 412, 423–24 (1981); *Hernandez v. Texas*, 347 U.S. 475, 479 (1954)).

4  The court then scrutinizes the challenged law, accordingly. *Id.* (citing *Plyler v. Doe*, 457 U.S.

5  202, 217–18 (1982)).

6  **1.      Identification of the Distinction Drawn by the State**

7           The parties appear to agree that the distinction drawn by the state of Nevada is

8  heterosexual versus homosexual persons, except that at least one Defendant argues that the State

9  has drawn no distinction at all because the laws at issue are facially neutral with respect to both

10  gender and sexual orientation.  Under the conception of the distinction drawn by the State as

11  being between homosexual and heterosexual persons, the Court would apply rational-basis

12  scrutiny. *See High Tech Gays v. Def. Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir.

13  1990).

14           Before determining the level of review, however, the Court will more closely analyze the

15  distinction the State has drawn.  Although the distinction the State has drawn (between one-

16  man–one-woman marriages on the one hand, and any other gender- or number-configuration of

17  spouses on the other hand) largely burdens homosexuals, the distinction is not by its own terms

18  drawn according to sexual orientation.  Homosexual persons may marry in Nevada, but like

19  heterosexual persons, they may not marry members of the same sex.  That is, a homosexual man

20  may marry anyone a heterosexual man may marry, and a homosexual woman may marry anyone

21  a heterosexual woman may marry.  In this sense, the State of Nevada has drawn no distinction at

22  all.  Under this conception of the (lack of) distinction drawn by the State, the laws at issue would

23  receive no scrutiny at all under the Equal Protection Clause.

24           In another sense, the State of Nevada may be said to have drawn a gender-based

25  distinction, because although the prohibition against same-sex marriage applies equally to men

1   and women, "the statutes proscribe generally accepted conduct if engaged in by members of" the

2   same gender. *Loving v. Virginia*, 388 U.S. 1, 11 (1967).  In pre-1967 Virginia, both Caucasians

3   and non-Caucasians were prohibited from interracial marriage (though a non-Caucasian could

4   marry another non-Caucasian of a difference race), and in Nevada, both men and women are

5   prohibited from same-sex marriage.  The *Loving* Court, however, specifically rejected the

6   argument that a reciprocal disability necessarily prevents heightened scrutiny under the Equal

7   Protection Clause. *See id.* at 8 ("Because we reject the notion that the mere 'equal application' of

8   a statute containing racial classifications is enough to remove the classifications from the

9   Fourteenth Amendment's proscription of all invidious racial discriminations, we do not accept

10   the State's contention that these statutes should be upheld if there is any possible basis for

11   concluding that they serve a rational purpose.").  In other words, *Loving* could fairly be said to

12   stand, *inter alia*, for the proposition that if a person could engage in generally acceptable activity

13   (marriage) but for characteristic $X_1$ (non-Caucasian), then the level of scrutiny applicable to X-

14   based (race-based) distinctions applies to the disability, regardless of whether persons with

15   characteristic $X_2$ (Caucasian) are subject to a reciprocal disability according to their own X-based

16   characteristic.  Application of this principle here might counsel the use of intermediate scrutiny.

17   That is, just as in pre-1967 Virginia a Caucasian but not a non-Caucasian could marry another

18   Caucasian, and vice versa, in Nevada a man but not a woman may marry another woman, and

19   vice versa. *Cf. id.* at 11 ("There can be no question but that Virginia's miscegenation statutes rest

20   solely upon distinctions drawn according to race.  The statutes proscribe generally accepted

21   conduct if engaged in by members of different races.").  Under this conception of the distinction

22   drawn by the State, i.e., a gender-based distinction, the Court would apply intermediate scrutiny.

23   *See, e.g.*, *Hibbs v. Dep't of Human Res.*, 273 F.3d 844, 855 (9th Cir. 2001).

24        Although the State appears to have drawn no distinction at all at first glance, and although

25   the distinction drawn by the State could be characterized as gender-based under the *Loving*

1    reciprocal-disability principle, the Court finds that for the purposes of an equal protection

2    challenge, the distinction is definitely sexual-orientation based.  The issue turns upon the alleged

3    discriminatory intent behind the challenged laws, which is the *sine qua non* of a claim of

4    unconstitutional discrimination. *See Washington v. Davis*, 426 U.S. 229, 240 (1976).  "To state a

5    claim under 42 U.S.C. § 1983 for a violation of the Equal Protection Clause of the Fourteenth

6    Amendment a plaintiff must show that the defendants acted with an intent or purpose to

7    discriminate against the plaintiff based upon membership in a protected class." *Lee v. City of*

8    *L.A.*, 250 F.3d 668, 686 (9th Cir. 2001) (quoting *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th

9    Cir. 1998)).  "Where the challenged governmental policy is 'facially neutral,' proof of its

10   disproportionate impact on an identifiable group can satisfy the intent requirement only if it tends

11   to show that some invidious or discriminatory purpose underlies the policy." *Id.* (citing *Vill. of*

12   *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–66 (1977) (citing *Washington*,

13   426 U.S. at 242)).

14          The laws at issue here are not directed toward persons of any particular gender, nor do

15   they affect people of any particular gender disproportionately such that a gender-based animus

16   can reasonably be perceived.  So although the *Loving* reciprocal-disability principle would

17   indicate a gender-based distinction in a case where the members of a particular gender were

18   targeted, because it is homosexuals who are the target of the distinction here, the level of scrutiny

19   applicable to sexual-orientation-based distinctions applies. *See Loving*, 388 U.S. at 11 (noting

20   that the anti-miscegenation laws at issue in that case targeted racial minorities because the laws

21   were "designed to maintain White Supremacy").  Here, there is no indication of any intent to

22   maintain any notion of male or female superiority, but rather, at most, of heterosexual superiority

23   or "heteronormativity" by relegating (mainly) homosexual legal unions to a lesser status.  In

24   *Loving*, the elements of the disability were different as between Caucasians and non-Caucasians,

25   whereas here, the burden on men and women is the same.  The distinction might be gender based

1  if only women could marry a person of the same sex, or if only women could marry a

2  transgendered person, or if the restriction included some other asymmetry between the burdens

3  placed on men and the burdens placed on women.  But there is no distinction here between men

4  and women, and the intent behind the law is to prevent homosexuals from marrying.

5  　　　　　**2.**　　　**The Level of Scrutiny Applicable to Sexual-Orientation-Based Distinctions**

6  　　　　　The Supreme Court has never explicitly stated what level of scrutiny inferior courts are to

7  apply to distinctions drawn according to sexual orientation, though it has implied that rational

8  basis scrutiny applies because it has never applied any higher standard in relevant cases. *See, e.g.*,

9  *Romer*, 517 U.S. at 631–32 (citing *Heller v. Doe*, 509 U.S. 312, 319–20 (1993)) (applying the

10  rational basis standard).  The Court of Appeals, however, has ruled that "homosexuals do not

11  constitute a suspect or quasi-suspect class entitled to greater than rational basis scrutiny under the

12  equal protection component of the Due Process Clause of the Fifth Amendment." *High Tech*

13  *Gays*, 895 F.2d at 574.[1]  Although the *High Tech Gays* court cited to *Bowers v. Hardwick*, 478

14  U.S. 186 (1986) (holding that private, homosexual activity may be criminalized), which was

15  overruled by *Lawrence v. Texas*, 539 U.S. 558 (2003), *see Golinski v. Office of Pers. Mgmt.*, 824

16  F. Supp. 2d 968, 983–84 (N.D. Cal. 2012), the *Lawrence* Court did not adopt any standard of

17  review applicable to distinctions drawn according to sexual orientation for the purposes of equal

18  protection, and therefore *Lawrence* is not on point for the purposes of the standard of review to

19  be applied, and only the Court of Appeals sitting en banc may overrule *High Tech Gays*'

20  adoption of the rational basis standard for distinctions drawn according to sexual orientation, *see*

21  *Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003) (en banc).

22

23

_____

24  [1] Although *High Tech Gays* concerned the "equal protection component" of the Fifth
Amendment, *see id.*, "[e]qual protection analysis in the Fifth Amendment area is the same as that
under the [Equal Protection Clause of the] Fourteenth Amendment," *Buckley v. Valeo*, 424 U.S.

25  1, 93 (1976).

*High Tech Gays*' adoption of rational basis scrutiny for sexual-orientation-based distinctions is not "clearly irreconcilable" with *Lawrence* such that a district court may ignore it under *Miller*.  Rather, the Court agrees with the *Jackson* and *Dragovic* courts, which have ruled that *High Tech Gays* survived *Lawrence* in this regard. *See Jackson v. Abercrombie*, No. 11–00734 ACK–KSC, 2012 WL 3255201, at *29, (D. Haw. 2012) (ruling that *Lawrence* did not undercut *High Tech Gays*' holding that rational basis scrutiny applies to sexual-orientation-based distinctions); *Dragovich v. U.S. Dep't of the Treasury*, No. C 10–01564 CW, 2012 WL 1909603, at *9 (N.D. Cal. 2012) (same).  More importantly, as those courts also noted, the Court of Appeals directly ruled just four years ago that *High Tech Gays* survived *Lawrence* with respect to the level of scrutiny to be applied in sexual-orientation-based equal protection challenges. *See Witt v. Dep't of Air Force*, 527 F.3d 806, 821 (9th Cir. 2008) (citing *Philips v. Perry*, 106 F.3d 1420, 1424–25 (1997) (citing *High Tech Gays*, 895 F.2d at 574)) ("*Philips* clearly held that [the Department of Defense's former 'don't ask, don't tell' policy] does not violate equal protection under rational basis review, and that holding was not disturbed by *Lawrence*, which declined to address equal protection." (citation omitted)).

And this would be the result even in the absence of *Witt*.  The *Lawrence* Court had certified three questions: (1) whether Texas' anti-sodomy law was infirm under the Equal Protection Clause of the Fourteenth Amendment; (2) whether the law was infirm under the Due Process Clause of the Fourteenth Amendment; and (3) whether *Bowers* should be overruled. *See* 539 U.S. at 564.  The Court resolved the case under the second two questions. *See id.* ("We conclude the case should be resolved by determining whether the petitioners were free as adults to engage in the private conduct in the exercise of their liberty under the Due Process Clause of the Fourteenth Amendment to the Constitution.  For this inquiry we deem it necessary to reconsider the Court's holding in *Bowers*.").  *Lawrence*'s rejection of Texas' anti-sodomy law was based upon the Due Process Clause, not upon the Equal Protection Clause. *See id.* at 578

1   ("Their right to liberty under the Due Process Clause gives them the full right to engage in their

2   conduct without intervention of the government."). *Bowers* in turn had also been decided purely

3   under the Due Process Clause. *See Bowers*, 478 U.S. at 190 ("The issue presented is whether the

4   Federal Constitution confers a fundamental right upon homosexuals to engage in sodomy . . . .");

5   *id.* at 201 (Blackmun, J., dissenting) (lamenting the Court's refusal to consider an equal

6   protection challenge).

7       The *High Tech Gays* court noted that other Courts of Appeals had reasoned that the fact

8   that homosexual behavior could be criminalized outright necessarily precluded a ruling that a

9   group defined by a desire or propensity to engage in such activity could be a suspect or quasi-

10  suspect class for the purposes of equal protection. *See* 895 F.2d at 571 & n.6.  But it simply does

11  not follow that because *Bowers* independently prevented heightened scrutiny, that heightened

12  scrutiny is necessarily an open question now that *Bowers* has been overruled.  That would be the

13  case if *High Tech Gays* had relied exclusively upon *Bowers*, but it did not.  The *High Tech Gays*

14  court's analysis of whether sexual-orientation-based distinctions deserve heightened scrutiny did

15  not need to rely on *Bowers* simply because *Bowers* independently necessitated the result.  The

16  *High Tech Gays* court separately analyzed whether homosexuals constituted a suspect class under

17  the traditional factors and determined they did not. *See* 895 F.2d at 573–74.  The court noted that

18  to obtain recognition as a suspect class for equal protection purposes, the class "must 1) have

19  suffered a history of discrimination; 2) exhibit obvious, immutable, or distinguishing

20  characteristics that define them as a discrete group; and 3) show that they are a minority or

21  politically powerless, or alternatively show that the statutory classification at issue burdens a

22  fundamental right." *Id.* at 573 (citing *Bowen v. Gilliard*, 483 U.S. 587, 602–03 (1987) (citing

23  *Lyng v. Castillo*, 477 U.S. 635, 638 (1986))).  The court found that homosexuals had suffered a

24  history of discrimination, but that homosexuality was not immutable and that homosexuals were

25

1    not politically powerless because they had successfully lobbied legislatures to pass anti-

2    discrimination legislation protecting them. *See id.* at 573–74.

3         Although *Witt* confirmed that *Lawrence* did not reopen *High Tech Gays*' determination

4    that homosexuals are not a suspect or quasi-suspect class, reexamination of the issue today would

5    only tend to tilt the scales further towards rational basis review.  First, homosexuals have indeed

6    suffered a history of discrimination, but it is indisputable that public acceptance and legal

7    protection from discrimination has increased enormously for homosexuals, such that this factor is

8    weighted less heavily towards heightened scrutiny than it was in 1990.  It is the present state of

9    affairs and any lingering effects of past discrimination that are important to the analysis, not the

10   mere historical facts of discrimination taken in a vacuum.  Although historical discrimination

11   taken alone may be relevant to a showing under the second factor, i.e., whether the group is in

12   fact a discretely identifiable group, without a showing of continuing discrimination or lingering

13   effects of past discrimination, the first factor does not tend to support an argument that the group

14   need be protected from majoritarian processes.  Unlike members of minority races, for example,

15   homosexuals do not in effect inherit the effects of past discrimination through their parents. That

16   is, members of certain racial minorities are more likely to begin life at a socioeconomic

17   disadvantage because of historical discrimination against their ancestors, the effects of which are

18   passed from parent to child, taking many generations to ameliorate via the later removal of

19   discrimination.  On the contrary, homosexuality by its nature, whether chosen or not, is a

20   characteristic particularly unlikely to be passed from parent to child in such a way that the effects

21   of past discrimination against one's ancestors will have effects upon oneself.  In the context of a

22   characteristic like homosexuality, where no lingering effects of past discrimination are inherited,

23   it is contemporary disadvantages that matter for the purposes of assessing disabilities due to

24   discrimination.  Any such disabilities with respect to homosexuals have been largely erased since

25   1990.

Second, the Supreme Court has not yet ruled that homosexuality is immutable for the purposes of equal protection, so although public and scientific opinion on the matter may have changed in the intervening years, *High Tech Gays*' analysis on the point cannot be countermanded by a district court on that basis. Assuming for the sake of argument that the characteristic is immutable for the purposes of an equal protection analysis, this factor would weigh in favor of heightened scrutiny.

Third, and most importantly, the Supreme Court has not ruled that homosexuals lack political power such that *High Tech Gays*' determination that they do not lack it has been undermined, and homosexuals have in fact gained significant political power in the years since *High Tech Gays* was decided. Today, unlike in 1990, the public media are flooded with editorial, commercial, and artistic messages urging the acceptance of homosexuals. Anti-homosexual messages are rare in the national informational and entertainment media, except that anti-homosexual characters are occasionally used as foils for pro-homosexual viewpoints in entertainment media. Homosexuals serve openly in federal and state political offices. The President of the United States has announced his personal acceptance of the concept of same-sex marriage, and the announcement was widely applauded in the national media. Not only has the President expressed his moral support, he has directed the Attorney General not to defend against legal challenges to the Defense of Marriage Act ("DOMA"), a federal law denying recognition to same-sex marriages at the federal level. It is exceedingly rare that a president refuses in his official capacity to defend a democratically enacted federal law in court based upon his personal political disagreements. That the homosexual-rights lobby has achieved this indicates that the group has great political power. The State of Nevada has itself outlawed sexual-orientation-based discrimination as a general matter. *See generally* Nev. Rev. Stat. ch. 233. Congress has not included the category under Title VII's protections, however. *See* 42 U.S.C. § 2000e-2. In 2012 America, anti-homosexual viewpoints are widely regarded as uncouth. All in all, the

1   political power of homosexuals has increased tremendously since 1990 when the *High Tech Gays*

2   court ruled that the group did not, even then, sufficiently lack political power for the purposes of

3   an equal protection analysis.  This factor therefore weighs greatly in favor of rational basis

4   review.

5        The Court respectfully disagrees with the recent conclusion of the Second Circuit to the

6   contrary in a DOMA case. *See Windsor v. United States*, Nos. 12-2335, 12-2435, 2012 WL

7   4937310 (2nd Cir. 2012).  That court concluded: "The question is not whether homosexuals have

8   achieved political successes over the years; they clearly have.  The question is whether they have

9   the strength to politically protect themselves from wrongful discrimination." *Id.* at *9.  That

10  statement is strictly true, but the answer to the second question is powerfully influenced by the

11  answer to the first question, because political success is the most direct, if not defining, indicator

12  of the ability to protect oneself through political processes.  The Court believes the test as

13  presented, or at least as applied, by the Second Circuit is little test at all, but rather a reason

14  behind an absolute (or nearly absolute) rule that the Second Circuit has now impliedly adopted,

15  i.e., that a discrete minority group challenging a discriminatory law necessarily lacks political

16  power for the purposes of a level-of-scrutiny analysis based purely upon the fact that the group

17  has not been able democratically to avoid or alter the law it is challenging in a particular case.

18  That result obviates the Supreme Court's use of political powerlessness as a factor in assessing

19  the level of scrutiny to be applied.  If a plaintiff could necessarily win on the political

20  powerlessness factor of the level-of-scrutiny analysis by the very fact that he was unable to

21  challenge a particular law democratically, the factor would be meaningless.  Political

22  powerlessness for the purpose of an equal protection analysis does not mean that the members of

23  a group have failed to achieve all of their goals or have failed to achieve the particular goal they

24  aim to achieve via the lawsuit in which the political powerlessness issue is litigated.  The English

25  suffix "-less" means "without," and "powerless" means "without power," not "without *total*

power." If there were no legal space in which a minority group had sufficient political power

such that it were not entitled to heightened scrutiny under an equal protection analysis, but where

it had failed to succeed democratically on a particular challenged issue, then the analysis of the

group's political power for the purposes of a heightened scrutiny analysis would be no analysis at

all—a plaintiff would have prevailed on the issue by the mere fact that he had standing to file a

lawsuit. What legal space would such reasoning leave for a state to prevail on the Supreme

Court's political powerlessness factor, which inferior courts must presumably treat as a

meaningful inquiry?

Any minority group can reasonably argue that its political power is less than it might be

were the group either not a minority or more popular. That is simply an inherent aspect of

democracy. That issue is relevant to the powerlessness analysis, but it is not dispositive of it.

There are a myriad of factors in a democratic society that may permit a minority or disfavored

group to succeed democratically, such as legislators' disinclination to be labeled as bigots or

even as unreasonable, the desire of another faction to pass legislation on which it needs the first

minority's or their allies' cooperation, or other factors. The question of "powerlessness" under

an equal protection analysis requires that the group's chances of democratic success be virtually

hopeless, not simply that its path to success is difficult or challenging because of democratic

forces. Even assuming that homosexuals are themselves under-represented in legislatures, *see id.*

(discussing the practical difficulty in assessing this fact), this does not mean that pro-homosexual

legislators are under-represented or that anti-homosexual (or indifferent) legislators cannot be

made to compromise democratically. In the present case, it simply cannot be disputed that there

have historically been sufficient pro-homosexual legislators (or anti-homosexual and indifferent

legislators who can be democratically bargained with) in the State of Nevada to protect

homosexuals from oppression as a general matter. *See, e.g.*, Nev. Rev. Stat. §§ 118.020, 233.010,

613.330. Plaintiffs' democratic loss on a particular issue does not prove that they lack political

1   power for the purposes of an equal protection analysis.  That homosexuals cannot protect

2   themselves democratically without aid from other groups is a conclusion that is necessarily true

3   for any minority group by definition, so treating this point as dispositive would avoid any

4   meaningful analysis of the political powerlessness factor. *See City of Cleburne v. Cleburne*

5   *Living Ctr.*, 473 U.S. 432, 445 (1985) ("Any minority can be said to be powerless to assert direct

6   control over the legislature, but if that were a criterion for higher level scrutiny by the courts,

7   much economic and social legislation would now be suspect.").  The relevant consideration is the

8   group's "ability to attract the attention of the lawmakers," an ability homosexuals cannot

9   seriously be said not to possess. *See id.*  The issue of homosexual rights, and particularly the

10  issue of same-sex marriages or quasi-marriage relationships has been front and center in

11  American politics for nearly a decade.  Just this month, the People of several more States voted

12  whether to approve or prohibit same-sex marriages.

13         The *Windsor* court wrote that "it is safe to say that the seemingly small number of

14  acknowledged homosexuals [in positions of power or authority] is attributable either to a

15  hostility that excludes them or to a hostility that keeps their sexual preference private—which,

16  for our purposes, amounts to much the same thing." *Id.*  But it is not necessarily safe to say this.

17  A small number of homosexuals in certain positions of power could just as easily indicate that

18  homosexuals constitute an equally small proportion of the population.  The number of open

19  homosexuals in such positions will only "seem[] small" to an observer who assumes that the

20  proportion of homosexuals in society at large is greater than the proportion of open homosexuals

21  in these kinds of positions.  And there is a third option the *Windsor* court did not discuss, i.e.,

22  that the "seemingly" small number of open homosexuals in positions of power or authority may

23  be largely attributable to neither exclusion nor sexual-orientation-based shame that discourages

24  them from identifying themselves, but rather to the fact that people as a general matter—and

25  especially people in positions of power and prestige—tend not to draw attention to their sexual

1    practices or preferences, *whatever they may be*, for social, career, and economic reasons.  This

2    natural disinclination of public figures to announce their sexual practices or preferences does not

3    necessarily transform into passive oppression simply because the sexual practices or preferences

4    of a particular subset of persons also happens to be a matter of special social controversy.  Lastly,

5    a homosexual person simply need not announce his or her own homosexuality to be active in the

6    fight for homosexual rights.  Many advocates of homosexual rights are themselves heterosexual,

7    and there is no need to announce one's sexual orientation or preferences in order to advocate for

8    homosexual rights.  To whatever degree homosexuals have not been able to succeed politically to

9    the extent many people wish, it is clear that, in Nevada at least, homosexuals have been able to

10   enact laws protecting their interests through the democratic process, including laws protecting

11   them from discrimination in areas such as employment and housing, as well as laws creating

12   outright legal status for homosexual relationships.

13        In arguing for heightened scrutiny for gender-based distinctions in 1973, Justice Brennan

14   opined that women's recent political successes should not be dispositive of the political

15   powerlessness analysis. *See Frontiero v. Richardson*, 411 U.S. 677, 685–86 (1973) (Brennan, J.)

16   (plurality opinion).[2]  But even assuming this reasoning were precedential, the reasons with which

17   Justice Brennan supported his conclusion in that case are for the most part not present here.

18   Although women had been able to attract the attention of lawmakers during the early- and mid-

19   Twentieth Century, they had been under-represented democratically for a long time prior to those

20   political successes because they could not vote, such that for centuries their political voice was

21   disproportionately small compared to their numbers. *See id.* at 685.  Women had also been

22   excluded from juries and even been denied the basic right of property ownership for centuries.

23

24        [2]Four justices concurred in the judgment, based upon rational basis review. *See id.* at 691
     (Stewart, J., concurring in the judgment with Burger, C.J., and Blackmun, J.) (citing *Reed v.
     Reed*, 401 U.S. 71 (1971)); *id.* (Powell, J., concurring in the judgment) (citing *Reed*, 401 U.S.

25   71).

*See id.*  Homosexuals have not historically been denied the right to vote, the right to serve on

juries, or the right to own property.  Although the right to vote could have been lost for

conviction under a felony anti-sodomy law, the fraction of homosexuals disenfranchised due to

conviction of such crimes was almost certainly minuscule, and the need or desire to keep one's

sexual orientation secret because of such laws, though perhaps regrettable, would have no effect

on one's ability to vote, serve on a jury, or otherwise participate in American democracy.  Also,

the continued discrimination against women in 1973 was largely due to the high visibility of the

sex characteristic, a visibility that the characteristic of homosexuality does not have to nearly the

same extent as gender. *See id.* at 686.

The assessment of a group's disabilities and its political power to remove them is a

critical factor in determining whether heightened scrutiny should apply under the Fourteenth

Amendment where a particular prohibition is not textually clear, because political power is the

factor that speaks directly to whether a court should take the extreme step of removing from the

People the ability to legislate in a given area. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411

U.S. 1, 28 (1973) (noting that a suspect class is one that is "saddled with such disabilities, or

subjected to such a history of purposeful unequal treatment, or relegated to such a position of

political powerlessness as to command extraordinary protection from the majoritarian political

process").

Gross movements by the judiciary with respect to democratic processes can cause an

awkward unbalancing of powers in a Madisonian constitutional democracy[3] and undermine both

---

[3]Justice Powell's note in concurrence in *Frontiero* that the plurality's suggestion of strict scrutiny for gender-based classifications would preempt the democratic adoption of the Equal Rights Amendment ("ERA") then being considered for ratification by the states was prophetic. *See Frontiero*, 411 U.S. at 692 (Powell, J., concurring in the judgment).  Perhaps because of the usurpation of the issue by the courts, the state legislatures felt neither the need nor the political pressure to adopt that proposed amendment, which has languished for nearly half a century after approval by Congress.  Because the courts have withdrawn the issue from legislative control, what rational state legislator would risk his political career by attempting to force a vote on the

public confidence in the judiciary and the legitimacy of the government in general. Where a constitutional prohibition is reasonably clear, a court's removal of the relevant issue from legislative control is largely uncontroversial, and appropriately so, because the People realize that the issue has in fact already been decided democratically, either at the Constitutional Convention or later via the Article V amendment procedure. In such cases, the judiciary does not usurp the democratic process but rather respects and enforces a democratic decision made at the constitutional level as against a more recent democratic attempt to change the law at a lower legislative level.

The Constitution and Amendments thereto, which have been ratified by the States, represent a collection of democratic choices adopted in order to control future democratic choices. The Constitution is in this regard a "super statute," i.e., a statute that controls the enactment of statutes. *Cf.* H.L.A. Hart, *The Concept of Law* 81 (2d ed. 1961) (explaining what he calls "primary" and "secondary" rules). When the judiciary interferes with a legislative democratic choice in favor of a constitutional democratic choice, it ensures that a legislature cannot countermand an earlier democratic choice to which the People have assigned a higher level of priority. *See Marbury v. Madison*, 5 U.S. 137, 176–80 (1803) (Marshall, C.J.). Such an act of "judicial review" is therefore not in derogation of democratic principles, but rather is ultimately in support of them.[4]

_____

ERA where there is no longer any practical need to do so? The supporters of the ERA no longer exert pressure on the legislatures to act, because they have been satisfied by the courts. A legislator has little to gain by supporting the ERA at this stage but the enmity of the amendment's opponents.

[4]It is often said that the Constitution is "anti-democratic" because it restricts legislative choices. But so long as judges read constitutional restrictions reasonably, the process remains democratic at its core, because the Constitution itself was and is subject to democratic forces. It was ratified by the People of the States, and it remains subject to amendment through a defined, democratic process. By contrast, in some nations, such as in the Islamic Republic of Iran, the process of judicial review is truly anti-democratic, because the standards by which a body such as the Guardian Council reviews the acts of the legislature are subject not only to a written constitution, but also to the Guardian Council's interpretation of a religious tradition that is not

1    But a court must only take such action when the constitutional rule is reasonably clear.

2 The most difficult problems arise when the text of a constitutional provision provides vague

3 standards, such as "equal protection of the laws."  Judges and laymen alike often disagree

4 whether a particular law runs afoul of the vaguer prohibitions of the Constitution.  Where a court

5 considers invalidating a democratically adopted law because of a conflict with one of these

6 vaguer clauses, it must tread lightly, lest its rulings appear to the People not to constitute a fair

7 and reasonable enforcement of constitutional restrictions to which they or their ancestors have

8 previously democratically agreed, but rather a usurpation of democratic governance via judicial

9 whim—a judicial practice much in vogue today.  Where there is no clear prohibition of

10 discrimination according to a particular category, and where the group complaining of

11 discrimination has meaningful political power to protect its own interests, it is inappropriate for a

12 court to remove the issue from legislative control.

13    The States are currently in the midst of an intense democratic debate about the novel

14 concept of same-sex marriage, and homosexuals have meaningful political power to protect their

15 interests.  At the state level, homosexuals recently prevailed during the 2012 general elections on

16 same-sex marriage ballot measures in the States of Maine, Maryland, and Washington, and they

17 prevailed against a fourth ballot measure that would have prohibited same sex marriage under the

18 Minnesota Constitution.  It simply cannot be seriously maintained, in light of these and other

19

---

20 and has never been subject to democratic forces.  Whether such a standard is grounded in religion
   or secular philosophy makes no difference with respect to the issue of self-governance.  If the
21 standards by which a judge reviews legislative acts are the product of his private philosophical
   views, and not simply a reasonable interpretation of a legal text to which the governed have
22 agreed, he exceeds his lawful power over the governed and to that extent becomes a despot just
   as if an executive officer had made the decision himself.  Were a court's opinions in the area of
23 judicial review treated only as advisory, the possibility of harm would not be so great.  But so
   long as the Executive and the States are not practically free to ignore a court's opinions in the
24 area of judicial review, but rather will follow them as a matter of course according to the
   constitutional culture of the Nation, it makes no difference that the judge himself does not have
25 the power of execution via officers directly in his employ.

1    recent democratic victories, that homosexuals do not have the ability to protect themselves from

2    discrimination through democratic processes such that extraordinary protection from majoritarian

3    processes is appropriate.[5]

4         "[D]emocratic institutions are weakened, and confidence in the restraint of the Court is

5    impaired, when we appear unnecessarily to decide sensitive issues of broad social and political

6    importance at the very time they are under consideration within the prescribed constitutional

7    processes." *Frontiero*, 401 U.S. at 692 (Powell, J., concurring in the judgment).  Only where a

8    discrete minority group's political power is so weak and ineffective as to make attempts to

9    succeed democratically utterly futile is it even arguably appropriate for a court to remove relevant

10   issues from the democratic process, except where a constitutional prohibition clearly removes the

11   issue from legislative control, in which case a court's intervention is mandated by democratic

12   constitutional principles. *See Marbury*, 5 U.S. at 176–80.  The Equal Protection Clause of the

13   Fourteenth Amendment does not clearly remove laws distinguishing between persons on the

14   basis of sexual orientation from democratic control.  Although the courts have ruled that a

15   challenge to virtually any law is entitled to at least rational basis review under the Equal

16   Protection Clause, the above analysis makes heightened scrutiny inappropriate in this case.

17        The *High Tech Gays* court also ruled that no fundamental rights were burdened in that

18   case, because there was no fundamental right to homosexual activity.  That holding has been

19   directly overruled by the *Lawrence* Court, but unlike the Department of Defense policy at issue

20   in *High Tech Gays* that made homosexual activity an automatic trigger for heightened

21   investigative attention when applying for a security clearance, *see* 895 F.2d at 568, the laws at

22   issue in the present case do not burden the right to private, consensual, homosexual activity that

23   ───────────────────

24        [5]The fact that national attitudes are shifting in favor of acceptance of same-sex marriage
     and homosexual rights in general only tends to weaken the argument that homosexuals require
     extraordinary protection from majoritarian processes via heightened scrutiny under the Equal
25   Protection Clause.

the *Lawrence* Court recognized.  The rights burdened under the challenged laws in this case are certain state-created rights, such as the right to have one's partner covered under an employer-provided health insurance plan and the right to enter into a marriage or quasi-marriage relationship with a sixteen or seventeen year-old person if that person's parent or guardian consents, *see supra*, which rights are not fundamental.  Although there is a fundamental right to "marry," that right consists substantively of the ability to establish a family, raise children, and, in certain contexts, maintain privacy. *Zablocki v. Redhail*, 434 U.S. 374, 383–84 (1978) (collecting cases).  It is these components that comprise the fundamental "right to marry" recognized under the Fourteenth Amendment, not the civil benefits and responsibilities accompanying the legal status of marriage, which vary from state to state.  Although the title of "marriage" has been withheld, the State of Nevada has burdened none of the core substantive rights that comprise the right to marry, sometimes referred to as the "constitutional incidents of marriage."  Plaintiffs may establish legally cognizable families under Nevada's domestic partnership laws—an option that was not available to Mr. Redhail in 1978 Wisconsin.

It is also worth noting that Nevada's laws do not purport to prevent (nor could they under the First Amendment prevent) the private use of the word "marriage" in the context of same-sex relationships, and same-sex couples will of course use the word if they wish to.  This has no bearing on whether the State must give the title its imprimatur.

Finally, the right to privacy is not implicated here, as Plaintiffs desire not to be left alone, but, on the contrary, desire to obtain public recognition of their relationships.  In summary, no fundamental rights are burdened by Nevada's marriage–domestic partnership regime.  Because homosexuals are not a suspect or quasi-suspect class, and because the laws at issue burden no fundamental rights, rational basis scrutiny applies.

///

///

1          3.      **Application of Rational Basis Scrutiny**

2          Under rational basis review, a court does not judge the perceived wisdom or fairness of a

3   law, nor does it examine the actual rationale for the law when adopted, but asks only whether

4   "there is any reasonably conceivable state of facts that could provide a rational basis for the

5   classification." *Heller*, 509 U.S. at 319–20 (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S.

6   307, 313 (1993)).  Those challenging a law on rational basis grounds "have the burden to

7   negat[e] every conceivable basis which might support it." *Diaz v. Brewer*, 676 F.3d 823, 826 (9th

8   Cir. 2012) (O'Scannlain, J., dissenting from order denying rehearing en banc) (quoting *Beach*

9   *Commc'ns*, 508 U.S. at 315 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356,

10  364 (1973))) (alteration in *Diaz*; internal quotation marks omitted)).  The question of rationality

11  is a matter of law for which a state need not provide evidence but may rely on speculation alone.

12  *Heller*, 509 U.S. at 320.  In the summary judgment context, if the facts determining a question

13  that is subject only to rational basis review are "at least debatable," the state is entitled to

14  summary judgment. *See Jackson*, 2012 WL 3255201, at *33 (citing *Vance v. Bradley*, 440 U.S.

15  93, 110–11 (1979); *Lupert v. Cal. State Bar*, 761 F.2d 1325, 1328 (1985)).

16         The protection of the traditional institution of marriage, which is a conceivable basis for

17  the distinction drawn in this case, is a legitimate state interest.  Although traditional moral

18  disapproval is not alone a valid state interest for prohibiting private, consensual activity, *see*

19  *Lawrence*, 539 U.S. at 577–78 (quoting *Bowers*, 478 U.S. at 216 (Stevens, J., dissenting)), civil

20  marriage is at least partially a public activity, and preventing "abuse of an institution the law

21  protects" is a valid state interest, *see id.* at 567.  More specifically:

22         That [the Texas anti-sodomy law] as applied to private, consensual conduct
       is unconstitutional under the Equal Protection Clause does not mean that other laws
23     distinguishing between heterosexuals and homosexuals would similarly fail under
       rational basis review.  Texas cannot assert any *legitimate state interest* here, *such as*
24     national security or *preserving the traditional institution of marriage*.  Unlike the
       moral  disapproval  of  same-sex  relations—the  asserted  state  interest  in  this

25

case—*other reasons exist to promote the institution of marriage beyond mere moral disapproval of an excluded group*.

*Id.* at 585 (O'Connor, J., concurring in the judgment) (emphases added).  The *Lawrence* Court appears to have strongly implied that in an appropriate case, such as the present one, the preservation of the traditional institution of marriage should be considered a legitimate state interest rationally related to prohibiting same-sex marriage. *See id.* at 578 (majority opinion) ("The present case does not involve . . . whether the government must give formal recognition to any relationship that homosexual persons seek to enter.").  The State of Nevada has made available to same-sex partners the vast majority of the civil rights and responsibilities of marriage, and it has made all of the fundamental rights comprising the "right to marry" available via the domestic partnership laws, even assuming for the sake of argument that it is the "right to marry" or the "right to marry a person of one's choice," and not the "right to marry a person of the same sex" that is at issue.  The State has not crossed the constitutional line by maintaining minor differences in civil rights and responsibilities that are not themselves fundamental rights comprising the constitutional component of the right to marriage, or by reserving the label of "marriage" for one-man–one-woman couples in a culturally and historically accurate way.  And unlike in *Perry*, the State of Nevada has not stripped away any existing right to the title of "marriage" while leaving its constitutional incidents in place. *See Perry*, 671 F.3d at 1076–78.

As Justice O'Connor noted in concurrence in *Lawrence*, there are additional reasons to promote the traditional institution of marriage apart from mere moral disapproval of homosexual behavior, and these reasons provide a rational basis for distinguishing between opposite-sex and same-sex couples in the context of civil marriage.  Human beings are created through the conjugation of one man and one woman.  The percentage of human beings conceived through non-traditional methods is minuscule, and adoption, the form of child-rearing in which same-sex couples may typically participate together, is not an alternative means of creating children, but

rather a social backstop for when traditional biological families fail.  The perpetuation of the

human race depends upon traditional procreation between men and women.  The institution

developed in our society, its predecessor societies, and by nearly all societies on Earth throughout

history to solidify, standardize, and legalize the relationship between a man, a woman, and their

offspring, is civil marriage between one man and one woman. *See Maynard v. Hill*, 125 U.S. 190,

211 (1888) ("It is an institution, in the maintenance of which in its purity the public is deeply

interested, for it is the foundation of the family and of society, without which there would be

neither civilization nor progress.").[6]  Should that institution be expanded to include same-sex

couples with the state's imprimatur, it is conceivable that a meaningful percentage of

heterosexual persons would cease to value the civil institution as highly as they previously had

and hence enter into it less frequently, opting for purely private ceremonies, if any, whether

religious or secular, but in any case without civil sanction, because they no longer wish to be

associated with the civil institution as redefined,[7] leading to an increased percentage of out-of-

---

[6] Plaintiffs' historical and sociological experts attest that marriage has changed in various ways throughout history, that homosexuality is no longer considered a "disorder" by mainstream psychiatrists and sociologists, that same-sex couples can be suitable parents, that same-sex marriage would not harm traditional marriages, that there is and has been discrimination against homosexuals, that they lack political power, and even concerning the alleged economic impact of the challenged laws, but even assuming the Court were to find all of these opinions credible—a finding the Court need not make in the rational basis context—none of Plaintiffs' experts attest that same sex marriage has ever been recognized in the history of the Anglo-American peoples except very recently and sporadically. (*See generally* Cott. Decl., Sept. 4, 2012, ECF No. 86-2, at 3; Peplau Decl., Aug. 20, 2012, ECF No. 86-2, at 45; Badgett Decl., Spet. 7, 2012, ECF No. 86-2, at 92; Chauncey Decl., June 27, 2012, ECF No. 86-2, at 132; Segura Decl., Sept. 5, 2012, ECF No. 86-3, at 3; Lamb Decl., Aug. 27, 2012, ECF No. 86-3, at 57).  The level of scrutiny is controlled by precedent in this case.  Because that level of scrutiny is rational basis scrutiny, the Court need not examine the parties' evidence (which evidence is, in any case, better characterized as dueling collections of sociological opinions as opposed to scientific or other specialized evidence).  The State need only have a conceivable basis for its laws.

[7] Some commentators have argued that the fact that same-sex couples may marry takes nothing from the value of an opposite-sex couple's marriage. *See, e.g.*, Michael Mello, *For Today, I'm Gay: The Unfinished Battle for Same-Sex Marriage in Vermont*, 25 Vt. L. Rev. 149, 229 (2000).  Traditional spouses will have lost no rights, after all.  But the legal question under

---

1  wedlock children, single-parent families, difficulties in property disputes after the dissolution of

2  what amount to common law marriages in a state where such marriages are not recognized, or

3  other unforeseen consequences. *See Jackson*, 2012 WL 3255201, at *39–41.  Because the family

4  is the basic societal unit, the State could have validly reasoned that the consequences of altering

5  the traditional definition of civil marriage could be severe. *See id.* at *44 ("[I]t is not beyond

6  rational speculation to conclude that fundamentally altering the definition of marriage to include

7  same-sex unions might result in undermining the societal understanding of the link between

8  marriage, procreation, and family structure.").  The Court finds Judge Kay's conclusions

9  concerning the rational bases for Hawaii's marriage–civil union regime equally persuasive as

10  applied to Nevada's marriage–domestic partnership regime. *See id.* at *38–45.

11        Although a nontrivial argument can be made that the nature of marriage as a

12  philosophical matter is any exclusive romantic relationship between any two (or more) persons,

13  or some other such definition, and that the condition that the partners in a marriage must be one

14  man and one woman is only a special case no matter how historically consistent, the State of

15  Nevada need not eschew tradition in the name of philosophical purity, not in the context of

16  rational basis review, anyway, and certainly not where the philosophical issue is itself

17  controversial.  The legal question is not whether Plaintiffs have any conceivable rational

18

19  ─────────────────────

    rational basis review is not whether spouses or prospective spouses have good reasons (in a

20  court's reckoning) for believing that their marriages will be harmed by the inclusion of same-sex
    couples in the institution of civil marriage.  The question is whether the State has any

21  conceivable basis, even speculatively, to believe that spouses or prospective spouses might feel
    this way, for whatever reason, and that their reaction to the redefinition of civil marriage to

22  include same-sex couples might have detrimental societal effects. *See Jackson*, 2012 WL
    3255201, at *44.  One might argue by analogy that the expected reaction of bigots would be an

23  insufficient reason for a state to refuse to implement policies of racial equality, but the analogy
    would be flawed, because race-based distinctions command strict scrutiny under the Equal

24  Protection Clause, whereas sexual-orientation-based restrictions command only rational basis
    scrutiny.

25

philosophical argument concerning the nature of marriage.  They do.[8]  The legal question is

whether the State of Nevada has any conceivable rational basis for the distinction it has drawn.  It

does, and the laws at issue in this case therefore survive rational basis review under the Equal

Protection Clause.[9]

Plaintiffs also argue that because the State has provided for domestic partnerships with

most of the same rights and responsibilities that accompany civil marriage, the State has

necessarily abandoned any possible basis for withholding the title of "marriage" apart from the

sole and improper purpose of stigmatizing Plaintiffs.  But the Court finds that there are rational

bases for withholding the title of marriage. *See supra*.  The conceivable benefits to society from

maintaining a distinction between traditional marriage and same-sex domestic partnerships

provide a rational basis for the State of Nevada to maintain the distinction, even if one result of

the distinction is the stigmatization of same-sex relationships or if bias was one motivating

factor. *See Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 367 (2001) (citing *Cleburne*, 473

U.S. at 448) (noting that even where animus is a motivating factor, a law survives rational basis

review where there is also a conceivable legitimate purpose behind it).  Preserving the traditional

institution of marriage is different from the mere moral disapproval of a disfavored group,

---

[8]If the State were to adopt a "genderless marriage" regime, it would almost certainly
withstand a putative equal protection attack by opposite-sex spouses arguing that the state had no
rational basis for implementing genderless marriage because of some perceived reduction in the
prestige of their traditional marriages, i.e., a putative "reverse stigma" argument.  Where both
sides of an issue have fair arguments, the State may choose between them without risking an
equal protection violation under rational basis review.

[9] As to a putative due process challenge, which Plaintiffs do not bring, unlike laws against
homosexual activity per se, which were not prevalent in the United States until the late
Nineteenth Century and therefore have no "ancient roots," *see Lawrence*, 539 U.S. at 568–70, the
prohibition against same-sex civil marriage has been nearly ubiquitous since antiquity, *see, e.g.*,
*Andersen v. King Cnty.*, 138 P.3d 963, 976–77 (Wash. 2006) (en banc) (collecting cases).  Until
very recently, it has been utterly unknown to the history or traditions of this Nation, and it is still
unknown in the vast majority of American jurisdictions, as well as in the vast majority of
international jurisdictions.  Unlike private, consensual, homosexual activity, therefore, same-sex
civil marriage is not a fundamental right.

1 | *Massachusetts v. HHS*, 682 F.3d 1, 16 (1st Cir. 2012), and the positive benefits of preserving the

2 | distinction need only be conceivable for the state's laws to stand. Plaintiffs argue that preserving

3 | the traditional institution of marriage as between one man and one woman necessarily excludes

4 | same-sex couples, based at least in part upon a normative bias. But this is permitted so long as

5 | preserving the traditional institution of marriage is a legitimate state interest in-and-of-itself and

6 | any attendant bias is based upon a distinction subject only to rational basis review. *See Cleburne*,

7 | 473 U.S. at 448.

8 | Plaintiffs' argument that Nevada's creation of a parallel but differently titled civil

9 | institution for same-sex relationships necessarily renders the State's pre-existing prohibition

10 | against same-sex marriages invalid, if accepted, would permit a plaintiff to show an equal

11 | protection violation by the very fact that a state had recently *increased* his rights in relevant

12 | respects, which is not the law. *Cf. Jackson*, 2012 WL 3255201, at *37 (noting that such a holding

13 | would both discourage the states from experimenting with social change for fear of

14 | constitutionalizing issues and would provide perverse incentives for the states to withhold

15 | rights). Perhaps if there had previously been no such institution as civil marriage, and if the State

16 | of Nevada had simultaneously, or nearly so, created both the institutions of civil marriage and

17 | domestic partnership, excluding only same-sex couples from one but not the other, Plaintiffs'

18 | stigmatization argument would carry more weight. In such a case, although same-sex partners'

19 | rights would have been increased by the State in an absolute sense, their rights with respect to

20 | other persons' rights would have been simultaneously decreased, indicating a potential

21 | constitutional harm. Here, the State of Nevada has only increased Plaintiffs' rights and has not

22 | simultaneously decreased them with respect to other persons' rights. The traditional form of civil

23 | marriage predates the State of Nevada by many centuries, having existed in the same form in the

24 | relevant respect (one man and one woman) for millennia in Nevada's predecessor societies. The

25 | State of Nevada's extension of the fundamental (and most of the civil) incidents of marriage to

1  same-sex couples in recent years cannot reasonably be said to reflect anti-homosexual animosity

2  under these circumstances, but only benevolence.  Perceiving a violative malevolence in the

3  expansion of rights alone is possible only if one presupposes that there is an additional right

4  being withheld, which reasoning is circular.  Where a minority group's rights have not been

5  decreased by a state's acts either absolutely or in relation to other person's rights, the proffered

6  additional right must stand on its own.

7        Furthermore, standing in this case cannot be based upon an allegation of harm consisting

8  of pure stigma, because the relief Plaintiffs seek cannot redress that measure of harm.  *See Lujan*

9  *v. Defenders of Wildlife*, 504 U.S. 555, 568 (1992).  Any stigma arising out of the State's refusal

10  to recognize same-sex relationships as "marriages" simply cannot be removed by judicial decree.

11  In some cases, where the stigma complained of is entirely created by the state, as in the

12  hypothetical example given above, a judicial decree might remedy it.  Here, however, one-

13  man–one-woman civil marriage is a longstanding institution not created by State of Nevada, and

14  the decision not to recognize same-sex marriages was adopted by the People through ballot

15  initiative.  It is not plausible that the People of the State of Nevada will change their views on the

16  matter because of any judicial decree or proclamation by the State (voluntary or not) that

17  conflicts with their private beliefs concerning the nature of marriage.  Nor can a judicial decree

18  cure the State's own contribution to any stigma, because an act or statement made involuntarily is

19  not, and will be known both by Plaintiffs and the rest of the populace not to be, a genuine

20  reflection of the State's viewpoint, which is, of course, simply the collection of the viewpoints of

21  its citizens.  That is, the People will know—because they know their own opinions—that the

22  State of Nevada does not approve of same-sex marriages despite the fact that it has been forced

23  by judicial decree to act as if it does.  This is not to say that Plaintiffs have no recourse, but they

24  must rely on more than pure stigma as the measure of harm.  Plaintiffs must rely on a measure of

25

1  harm that the Court can actually redress, i.e., the denial of equal treatment under the law itself.

2  The Court has addressed Plaintiffs' claim in this regard under the relevant standards.

3      **4.**   ***Romer v. Evans***

4      There is an additional line of cases to consider when a state withdraws an existing right or

5  enacts sweeping, draconian changes in a minority group's legal status, and the Court finds that

6  analysis under this line of cases is not precluded by *Baker*.  In *Romer*, the Supreme Court ruled

7  that a law born of animosity for a discrete minority group that withdraws existing rights from the

8  group, or which effects a sweeping change in the legal status of the group, does not survive

9  rational basis review under the Equal Protection Clause. *See* 517 U.S. at 627 ("The amendment

10  withdraws from homosexuals, but no others, specific legal protection from the injuries caused by

11  discrimination, and it forbids reinstatement of these laws and policies").[10]

12      Based upon *Romer*, the Court of Appeals recently struck down an amendment to the

13  California Constitution that had withdrawn an existing state law right to same-sex marriage while

14  leaving the constitutional incidents of marriage in place via the domestic partnership laws. *See*

15  *Perry*, 671 F.3d at 1076 (citing *Romer*, 517 U.S. at 634–35) ("Proposition 8 singles out same-sex

16  couples for unequal treatment by *taking away* from them alone the right to marry, and this action

17  amounts to a distinct constitutional violation because the Equal Protection Clause protects

18  minority groups from being targeted for the deprivation of an existing right without a legitimate

19  reason.").  The *Perry* court, however, explicitly declined to address whether the amendment

20  would have failed under the Fourteenth Amendment had there never been a right to same-sex

21           [10]The *Perry* Court struck down the amendment to the California Constitution enacted via

22  Proposition 8 because it believed *Romer* prevented the targeted withdrawal of any right
whatsoever from a minority group, whereas the dissent believed *Romer* prevented only sweeping

23  changes in a minority group's legal status.  In other words, the dispositive disagreement in that
case concerned the meaning of *Romer*, which is somewhat cryptic as to its applicability beyond

24  the facts of that case itself.  Although the *Romer* doctrine is still nascent and controversial, the
Court will for the sake of argument assume that either type of state action—withdrawal of an

25  existing right or a sweeping change in legal status—is infirm under *Romer*.

1    marriage in California. *See id.* at 1064.  The dispositive issue in *Perry* was that the State of

2    California had targeted a discrete group and withdrawn an existing right from its members. *See*

3    *id.* at 1076.  The People of California had only withdrawn from same-sex couples the right to the

4    title of "marriage," while leaving the constitutional incidents of marriage in place via a domestic

5    partnership regime. *See id.* at 1077–78 ("Proposition 8 did not affect [certain civil incidents of

6    marriage under California law] or any of the other constitutionally based incidents of marriage

7    guaranteed to same-sex couples and their families.  In adopting the amendment, the People

8    simply took the designation of marriage away from lifelong same-sex partnerships, and with it

9    the State's authorization of that official status . . . ." (citations and internal quotation marks

10   omitted)).  The Court of Appeals ruled that the right to the title of marriage was concrete enough

11   to establish an injury (though not itself of constitutional dimension), and that the withdrawal of

12   the right to the title of marriage was therefore unconstitutional under *Romer* regardless of the

13   constitutional dimension of the right itself. *See id.* at 1096 ("By using their initiative power to

14   target a minority group and withdraw a right that it possessed, without a legitimate reason for

15   doing so, the People of California violated the Equal Protection Clause.").

16        Because there has never been a right to same-sex marriage in Nevada, *Romer* and *Perry*

17   are inapplicable here as to NRS section 122.020.  That section of the NRS removed no

18   preexisting right and effected no change whatsoever to the legal status of homosexuals when

19   adopted by the Nevada Territorial Legislature in 1861. *See* Nev. Comp. Laws § 196 § 2, at 65

20   (1861–1873).

21        It can be argued, however, that Section 21 removed an existing right for the purposes of a

22   *Romer* analysis.  Section 21 did not remove any preexisting right to the formation of same-sex

23   marriage, but it did make it more difficult to change section 122.020 and other statutes through

24   the democratic process.  Before the adoption of Section 21, the People of the State of Nevada

25   could have democratically altered section 122.020 via legislation to provide for same sex

marriages.  Section 21 removed their ability to do so.  Although homosexuals have meaningful

political power, they would now have to convince their fellow citizens to amend the Nevada

Constitution to achieve the particular democratic goal of legalizing same-sex marriage in

Nevada, and it is more difficult to amend the Nevada Constitution than it is to amend the NRS.

The *Romer* Court does not, however, appear to have announced a general constitutional

principle that any state action making it more difficult for the People to achieve a particular goal

in aid of the rights of a discrete minority group through democratic processes is necessarily

infirm under the Equal Protection Clause.  Such a rule would be so broad and dramatic as to be

unmistakable when announced.[11]  Rather, the *Romer* Court emphasized the insidious nature of

laws that impose general hardships, as contrasted with laws imposing only particular disabilities.

*See* 517 U.S. at 633 ("Respect for this principle explains why laws singling out a certain class of

citizens for *disfavored legal status or general hardships* are rare.  A law declaring that *in general*

it shall be more difficult for one group of citizens than for all others to seek aid from the

government is itself a denial of equal protection of the laws in the most literal sense." (emphases

added)).  That is not to say that laws imposing particular disabilities are immune from equal

protection challenges, but it is to say that such challenges are governed by traditional equal

protection principles, not by *Romer*, which governs only the imposition of generalized

disabilities upon a disfavored group.

---

[11]Although, according to a separate line of cases not argued by the parties, an equal protection violation may result from a law making it more difficult for members of a racial minority group to protect themselves through democratic processes, such violations only occur in the context of race. *Hunter v. Erickson*, 393 U.S. 385, 391–93 (1969); *Coalition to Defend Affirmative Action v. Regents of the Univ. of Mich.*, ---F.3d ----, 2012 WL 5519918, at *8 (6th Cir. 2012).  Also, the *Hunter* principal applies only when the racial classification appears on the face of the challenged law. *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 484–85 (1982). Section 21 contains no facial distinction on the basis of sexual orientation, much less on the basis of race.

1    Where a legitimate state purpose is furthered by the challenged legislation, as here, it

2   survives an equal protection analysis at the rational basis level.  There was no legitimate state

3   purpose behind the challenged law in *Romer*, because the sole conceivable purpose there was

4   anti-homosexual animus. *See id.* at 634–35.  Colorado's constitutional provision "prohibit[ed] all

5   legislative, executive or judicial action at any level of state or local government designed to

6   protect the named class," *id.* at 624, effected a "[s]weeping and comprehensive . . . change in

7   legal status," *id.* at 627, and was "inexplicable by anything but animus toward the class it

8   affect[ed]," *id.* at 632.  Section 21, by contrast, imposes a single, particularized disability, not a

9   broad, sweeping change in legal status, and it was not passed without any legitimate purpose.

10  *Romer* was an extreme case concerning a novel and ambitious type of law—a law that identified

11  a minority group and declared that no organ of the State of Colorado should dare attempt to

12  protect the group under the law.  That kind of law is prevalent only under totalitarian regimes,

13  and the *Romer* Court noted that it was totally outside of American constitutional traditions to

14  enact such laws. *See id.* at 633.  Section 21 is not in the character of the constitutional provision

15  struck down in *Romer*.  It does not purport to remove any of the many protections already in

16  place in the State of Nevada prohibiting discrimination on the basis of sexual orientation or to

17  prevent the adoption of additional protections.  It prevents only the amendment of state statutes

18  to provide for same-sex marriage—a targeted discrimination, to be sure, but one based upon a

19  distinction subject only to rational basis review, based at least in part upon a legitimate state

20  interest, i.e., the protection of the traditional institution of marriage, and not based purely upon

21  anti-homosexual animus, as the constitutional provision in *Romer* was.  Section 21 therefore

22  survives *Romer* review.

23    Because the maintenance of the traditional institution of civil marriage as between one

24  man and one woman is a legitimate state interest, because the exclusion of same-sex couples

25  from the institution of civil marriage is rationally related to furthering that interest, and because

1  the challenged laws neither withdraw any existing rights nor effect a broad change in the legal

2  status or protections of homosexuals based upon pure animus, the State is entitled to summary

3  judgment.  As to those Plaintiffs validly married in other jurisdictions whose marriages the State

4  of Nevada refuses to recognize, the protection of Nevada's public policy is a valid reason for the

5  State's refusal to credit the judgment of another state, lest other states be able to dictate the

6  public policy of Nevada. *See Nevada v. Hall*, 440 U.S. 410, 423–24 (1979) ("Full Faith and

7  Credit does not . . . enable one state to legislate for the other or to project its laws across state

8  lines so as to preclude the other from prescribing for itself the legal consequences of acts within

9  it." (quoting *Pac. Ins. Co. v. Indus. Accident Comm'n*, 306 U.S. 493, 504–05 (1939))).

10  ///

11  ///

12  ////

13  ///

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

**CONCLUSION**

IT IS HEREBY ORDERED that the Motions to Dismiss (ECF Nos. 32, 33) are GRANTED IN PART and DENIED IN PART.  The Complaint is dismissed as precluded by *Baker v. Nelson* with respect to the traditional equal protection challenge, but the Complaint is not dismissed with respect to the challenge under *Romer v. Evans*.

IT IS FURTHER ORDERED that the Motions for Summary Judgment (ECF Nos. 72, 74, 85) are GRANTED.

IT IS FURTHER ORDERED that the Motion for Summary Judgment (ECF No. 86) is DENIED.

IT IS FURTHER ORDERED that the Motion for Leave to File Reply (ECF No. 100) is DENIED.  No party has been permitted to file a reply.  The arguments have been comprehensively presented, and no reply is necessary to preserve the relevant issues on appeal.

IT IS FURTHER ORDERED that the Clerk shall enter judgment and close the case.

IT IS SO ORDERED.

DATED:  This 26th day of November, 2012.

_____
ROBERT C. JONES
United States District Judge