FILED

FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

JAN 09 2015

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| SUSAN LATTA; TRACI EHLERS; LORI WATSEN; SHARENE WATSEN; SHELIA ROBERTSON; ANDREA ALTMAYER; AMBER BEIERLE; RACHAEL ROBERTSON, | No. 14-35420 D.C. No. 1:13-cv-00482-CWD District of Idaho, Boise |
| Plaintiffs - Appellees, | |
| v. | ORDER |
| C. L. OTTER, "Butch"; Governor of the State of Idaho, in his official capacity, | |
| Defendant - Appellant, | |
| And | |
| CHRISTOPHER RICH, Recorder of Ada County, Idaho, in his official capacity, | |
| Defendant, | |
| STATE OF IDAHO, | |
| Intervenor-Defendant. | |

| | |
|---|---|
| SUSAN LATTA; TRACI EHLERS; LORI WATSEN; SHARENE WATSEN; SHELIA ROBERTSON; ANDREA ALTMAYER; AMBER BEIERLE; RACHAEL ROBERTSON, | No. 14-35421 D.C. No. 1:13-cv-00482-CWD District of Idaho, Boise |

Plaintiffs - Appellees,

v.

C. L. OTTER, "Butch"; Governor of the State of Idaho, in his official capacity,

Defendant,

And

CHRISTOPHER RICH, Recorder of Ada County, Idaho, in his official capacity,

Defendant - Appellant,

STATE OF IDAHO,

Intervenor-Defendant - Appellant.

BEVERLY SEVCIK; MARY BARANOVICH; ANTIOCO CARRILLO; THEODORE SMALL; KAREN GOODY; KAREN VIBE; FLETCHER WHITWELL; GREG FLAMER; MIKYLA MILLER; KATRINA MILLER; ADELE TERRANOVA; TARA NEWBERRY; CAREN CAFFERATA-JENKINS; FARRELL CAFFERATA-JENKINS; MEGAN LANZ; SARA GEIGER,

Plaintiffs - Appellants,

v.

No. 12-17668

D.C. No. 2:12-cv-00578-RCJ-PAL District of Nevada, Las Vegas

BRIAN SANDOVAL, in his official capacity as Governor of the State of Nevada; DIANA ALBA, in her official capacity as the County Clerk and Commissioner of Civil Marriages for Clark County, Nevada; AMY HARVEY, in her official capacity as the County Clerk and Commissioner of Civil Marriages for Washoe County, Nevada; ALAN GLOVER, in his official capacity as the Clerk Recorder for Carson City, Nevada,

     Defendants - Appellees,

 And

COALITION FOR THE PROTECTION OF MARRIAGE,

     Intervenor-Defendant - Appellee.

Before: REINHARDT, GOULD, and BERZON, Circuit Judges.

 The panel has voted to deny the petitions for rehearing en banc.

 The full court was advised of the petitions for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc reconsideration. Fed. R. App. P. 35.

 The petitions for rehearing en banc are denied.

FILED

*Latta v. Otter*, Nos. 14-35420, 14-35421;
*Sevcik v. Sandoval*, No. 12-17668

JAN 09 2015

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

O'SCANNLAIN, Circuit Judge, joined by RAWLINSON and BEA, Circuit
Judges, dissenting from the denial of rehearing en banc::

One month after the panel in these cases struck down the traditional

marriage laws of Idaho and Nevada, the Sixth Circuit upheld the essentially

identical laws of Michigan, Ohio, Tennessee, and Kentucky.  *See DeBoer v.*

*Snyder*, 772 F.3d 388 (6th Cir. 2014).  Clearly the same-sex marriage debate is not

over.  Indeed, not only does the debate now divide the federal circuit courts and

state legislatures, but it continues to divide the American public.[1]  And, of course,

---

[1]*See, e.g.,*
http://www.nbcnews.com/politics/elections/2014/US/house/exitpoll (showing that
in exit polling at the November 2014 election, respondents were equally divided,
48%-48%, on the question of whether same-sex marriage should be legally
recognized in their state).
    The debate even divides the globe—and the *DeBoer* majority is in
agreement with one of the world's most prominent human rights' tribunals.  Only a
few months ago, the European Court of Human Rights, hardly a hotbed of hardline
conservatism, made clear that the European Convention for the Protection of
Human Rights and Fundamental Freedom "enshrines the traditional concept of
marriage as being between a man and a woman," and "cannot be interpreted as
imposing an obligation on Contracting States to grant same-sex couples access to
marriage."  *Hämäläinen v. Finland*, No. 37359/09, HUDOC, at *18, *24
(Eur.Ct.H.R. July 16, 2014), *available at*
http://hudoc.echr.coe.int/sites/eng/pages/search.aspx?i=001-
145768#{"itemid":["001-145768"]}; *see also id.* at *19 (recognizing that "it cannot
be said that there exists any European consensus on allowing same-sex
marriages").

1

the Supreme Court has not yet decided the issue, notwithstanding innuendo in the panel's opinion.[2]

Thoughtful, dedicated jurists who strive to reach the correct outcome—including my colleagues on the panel here—have considered this issue and arrived at contrary results. This makes clear that—regardless of one's opinion on the merits of the politically charged and controversial issues raised by these cases—we are presented with a "question of exceptional importance" that should have been reviewed by an en banc panel. *See* F.R.A.P. 35(a). Indeed, if for no other reason, we should have reheard these cases in order to consider the arguments of our colleagues on the Sixth Circuit, who, reviewing the same question raised here, arrived at the opposite result. *See DeBoer*, 772 F.3d 388. Whether my colleagues agree or disagree with the *DeBoer* majority, at the very least, the panel should have granted rehearing to address the points raised in that

---

Notably, even the dissenters on the particular issue before the court—recognition of a married person's change in gender identity—agreed that "States have a legitimate interest in protecting marriage in the traditional sense by legally reserving marriage to heterosexual partners." *Id.* at *34 (Joint Dissenting Opinion of Judges Sajó, Keller, and Lemmens).

[2]What the Supreme Court *has* decided is that the federal courts should not intrude, as the panel does here, on the choices of state electorates regarding whether to define marriage as a male-female union. *Baker v. Nelson*, 409 U.S. 810 (1972); *see* Part I, *infra*.

2

opinion.  Instead, we have utterly ignored another circuit's reasoned contribution to the debate.  Such a clear circuit split on such an exceptionally important issue demands en banc review.[3]

Because the panel opinion neglects to address the issues raised in the conflicting Sixth Circuit opinion, and 1) overlooks binding Supreme Court precedent, 2) fails to respect bedrock principles of democratic self-governance, and 3) ignores the adverse implications of its opinion on our federal structure, I must respectfully dissent from our decision not to rehear these cases en banc.

I

Even if the exceptional importance of the issues and the circuit split were somehow insufficient to warrant our rehearing these cases en banc, we still should have concluded rehearing was merited.  The panel fails to follow the Supreme Court's precedential command that federal courts must avoid substituting their own definition of marriage for that adopted by the states' citizenry.  By refusing to

---

[3]*See* F.R.A.P. 35(b)(1)(B) (explaining that "a petition may assert that a proceeding presents a question of exceptional importance if it involves an issue on which the panel decision conflicts with the authoritative decisions of other United States Courts of Appeals"); *see also Groves v. Ring Screw Works*, 498 U.S. 168, 172 n.8 (1990) (citing "a square conflict in the Circuits," as grounds for making rehearing en banc "appropriate"); Ninth Circuit Rule 35-1 (explaining that a direct conflict with another court of appeals "is an appropriate ground for petitioning for rehearing en banc").

rectify this error, we let stand an impermissible judicial intrusion into a debate reserved to the states' political processes.

A

For decades, our nation has engaged in an "earnest and profound debate" on marriage policy.  *See Washington v. Glucksberg*, 521 U.S. 702, 735 (1997) (praising the American public's on-going conversation on the "morality, legality, and practicality of physician-assisted suicide" and ultimately declining to interfere); *see also Hollingsworth v. Perry*, 133 S. Ct. 2652, 2659 (2013) ("The public is currently engaged in an active political debate over whether same-sex couples should be allowed to marry.").  State by state, citizens have considered the issue of same-sex marriage and, through legislation, popular referendum, or constitutional amendment, voiced their views on this question of immense public importance.[4]

Until quite recently, the judiciary has allowed this earnest democratic debate to continue unobstructed.  Forty-two years ago, the Supreme Court dismissed an appeal from a Minnesota Supreme Court decision, *Baker v. Nelson*, which held that

---

[4]To date, thirteen states and the District of Columbia have extended the traditional definition of marriage to include same-sex couples by statute or ballot initiative.  *See infra* footnote 9.  Many other states, including Idaho and Nevada, have used their democratic processes to retain the traditional definition of marriage.

4

(8 of 28)

Case 2:12-cv-00578-JGM-BAL Document 137 Filed 01/09/15 Page 8 of 28
Case: 14-35420, 01/09/2015, ID: 9387423, DktEntry: 110-2, Page 8 of 29

"[t]he equal protection clause of the Fourteenth Amendment, like the due process clause, is not offended by the *state's* classification of persons authorized to marry." 191 N.W.2d 185, 187 (Minn. 1971) (emphasis added).  Dismissing the plaintiffs' appeal "for want of a substantial *federal* question," 409 U.S. at 810 (emphasis added), the *Baker* Court confirmed that the Constitution commits questions of marriage policy to the citizens of each state, and that absent exceptional circumstances, federal courts should resist the temptation to interfere with a state marriage regulation.

This is not to say that a state's "powers to regulate marriage are unlimited notwithstanding the commands of the Fourteenth Amendment." *Loving v. Virginia*, 388 U.S. 1, 7 (1967).  There are clearly exceptional circumstances in which judicial interference is needed—no more so than when a husband and wife face criminal sanctions merely for marrying when they happen to be of different races. *See id.*

But while "invidious racial discriminations" warranted judicial action in *Loving v. Virginia*, no such discrimination is implicated here.[5]  Indeed, to argue that *Loving* controls here requires asserting that the Supreme Court forgot about

_____

[5]Indeed, the panel majority—though not Judge Reinhardt, *see Latta v. Otter*, No. 14-35420, slip op. at 1 (9th Cir. Oct. 7, 2014) (Reinhardt, J., concurring)—does not rest its decision on *Loving*.

*Loving* only five years later when it decided *Baker*. If the panel had any lingering doubts as to whether judicial interference is appropriate, *Baker* makes clear that it is not.

B

*Loving* holds that "restricting the freedom to marry solely because of racial classifications violates the central meaning of the Equal Protection Clause" and that the "Fourteenth Amendment requires that the freedom of choice to marry not be restricted by invidious racial discriminations." *Loving*, 388 U.S. at 12. Thus, *Loving* stands as a clear prohibition on racial discrimination in laws defining and regulating marriage, but it simply does not follow that *Loving* also somehow prevents the states from defining marriage as a union of a man and a woman.

Indeed state laws that define marriage as a union of a man and a woman bear little resemblance to the Virginia statute that *criminalized* Mildred and Richard Loving's marriage merely because Mildred was black and Richard was white. *Id.* at 11. Virginia recognized that Mildred and Richard had married in the District of Columbia, but "to maintain White Supremacy," *id.*, the state legislature chose to punish them for having the courage to do so.

Chief Justice Warren recognized that such punishment contravened the constitutional command that "the freedom of choice to marry not be restricted by

6

(10 of 28)

Case 2:12-cv-00578-RCJ-PAL Document 137 Filed 01/08/15 Page 10 of 28
Case: 14-15420, 01/09/2015, ID: 9372617, DktEntry: 109-1, Page 10 of 25

invidious racial discriminations." *Id.* at 12. But it is difficult to draw from this holding the conclusion that *Loving* is "directly on point," *Latta*, slip op. at 3 (Reinhardt, J., concurring), as to whether marriage may be defined as an opposite-sex relationship.

Of course, states are not *compelled* to define marriage as such an opposite-sex union—simply look to the many states that, since *Loving*, have defined it by statute or popular vote to extend to gay and lesbian couples.[6] But states are also not *compelled* by the federal Constitution to define marriage differently than the "generally accepted" opposite-sex relationship Mildred and Richard sought to enter in *Loving*. *See Loving*, 388 U.S. at 11; *cf. Bishop v. Smith*, 760 F.3d 1070, 1108–09 (10th Cir. 2014) (Holmes, J., concurring) (explaining that Oklahoma's codification of marriage as an opposite-sex relationship "cannot sensibly be depicted as 'unusual' where the State was simply exercising its age-old police power to define marriage in the way that it, along with every other State, always had" and noting that Oklahoma's law "formalized a definition that every State had employed for almost all of American history, and it did so in a province the states had always dominated"); *Hämäläinen*, No. 37359/09, HUDOC, at *19, *24 (explaining that the European Convention does not impose an obligation to

---

[6]*See infra* note 9.

7

recognize same sex marriage, and that only ten of the 47 member states of the

Council of Europe recognize such marriages).[7] *Loving* states that "[u]nder our

Constitution, the freedom to marry or not marry, a person of another race resides

with the individual and cannot be infringed by the State," but it says nothing about

the states' power to define marriage, as every state has done for almost all of

American history, as a male-female relationship. *Loving*, 388 U.S. at 12.

## C

It is utterly unsurprising then, that only five years after *Loving*, when the

viability of the "generally accepted" opposite-sex definition of marriage was

squarely before the Court, the Court concluded no substantial federal question was

implicated. *Baker*, 409 U.S. 810. Such a conclusion was completely consistent

with *Loving*: there simply is no conflict in holding both that the Constitution

prohibits racial restrictions on the right to enter marriage, and that the Constitution

is not offended by a state's choice to define marriage as an opposite-sex

relationship.

Of course we cannot ignore Chief Justice Marshall's observation, as true as

---

[7]Notwithstanding my views on the applicability of foreign law in the analysis of constitutional terms, *see* Diarmuid F. O'Scannlain, *What Role Should Foreign Practice and Precedent Play in the Interpretation of Domestic Law?*, 80 NOTRE DAME L. REV. 1893 (2005), marriage is not defined in the U.S. Constitution, and it is telling that the ECHR has left such a fundamental issue to be resolved by member-states rather than via judicial fiat.

ever, that if "the Courts are to regard the Constitution, and the Constitution is superior to any ordinary act of the Legislature, the Constitution, and not such ordinary act, must govern the case to which they both apply." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

We must ask, then: Is leaving the political process intact here not an impermissible abdication of our "authority, and indeed [] responsibility, to right fundamental wrongs left excused by a majority of the electorate?" *DeBoer*, 772 F.3d at 436–37 (Daughtrey, J., dissenting). Is this situation not analogous to those, where, even while recognizing "that certain matters requiring political judgments are best left to the political branches," we must ensure that courts and not the political branches, "say what the law is?" *Boumediene v. Bush*, 553 U.S. 723, 765 (2008) (citing *Marbury*, 5 U.S. (1 Cranch) at 177).

Simply put, no. We are a Court of Appeals, not the Supreme Court, and our obligation is to

> adhere to the view that if the Court has branded a question as unsubstantial, it remains so except when doctrinal developments indicate otherwise. . . . [T]he lower courts are bound by summary decisions by th[e Supreme] Court until such time as the Court informs [them] that [they] are not.

*Hicks v. Miranda*, 422 U.S. 332, 344–45 (1975) (citations omitted).

Far from avoiding our responsibilities, following *Baker* here constitutes the

Case 2:12-cv-00578-JGM-PAL Document 137 Filed 01/09/15 Page 13 of 28
Case: 14-09572, 01/09/2015, ID: 0354423, DktEntry: 1409/15, Page 30 of 29

(13 of 28)

only permissible exercise of our limited authority—the eagerness of the panel

members to pronounce their views on the merits of same-sex marriage

notwithstanding.[8]  When the Supreme Court "concludes [an] appeal should be

dismissed because the constitutional challenge" presented "was not a substantial

one," it makes a precedential decision on the merits.  *Hicks*, 422 U.S. at 344 (citing

*Ohio ex rel. Eaton v. Price*, 360 U.S. 246, 247 (1959); R. Stern & E. Gressman,

*Supreme Court Practice* 197 (4th ed. 1969); C. Wright, *Law of Federal Courts* 495

(2d ed. 1970)).

Indeed, when "a precedent of th[e Supreme] Court has direct application in a

case," we must follow it even if it "appears to rest on reasons rejected in some

other line of decisions."  *Rodriguez de Quijas v. Shearson/AMEX, Inc.*, 490 U.S.

477, 484 (1989).  "[T]he Court of Appeals should follow the case which directly

---

[8]It is questionable whether judicial intrusion on the peoples' political choices is truly an effective means of advancing the same-sex marriage cause.  As one legal academic and same-sex marriage supporter explains:

> Court victories are hollow victories for the LGBT community, failing to deliver the societal respect they seek, and in fact *removing the opportunity* for collective expression of such respect through voluntary legislative reform or popular referendum.

James G. Dwyer, *Same-Sex Cynicism and the Self-Defeating Pursuit of Social Acceptance Through Litigation*, 68 S.M.U. L. REV. ___ (forthcoming 2015). Courts "cannot deliver the type of dignity that comprises social respect"—in fact "a judicial victory obviates legislative change, and therefore collective or majoritarian expression of respect."  *Id*.

10

(14 of 28)

Case 2:12-cv-00578-JCM-PAL Document 137 Filed 01/09/15 Page 14 of 28
Case: 14-05420, 01/09/2015, ID: 9374437, DktEntry: 110-2, Page 49 of 29

controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Id.* *Baker* is a precedential disposition on the merits which *Hicks* and *Rodriguez de Quijas* make clear we are not at liberty to disregard.

The panel ignores *Rodriguez de Quijas* and attempts to turn the command of *Hicks* on its head. Rather than heeding the clear statement that "the lower courts are bound by summary decisions by th[e Supreme] Court until such time as the Court informs [them] that [they] are not," the panel searches for "doctrinal developments" that, when interpreted *just so*, imply that *Baker* is no longer good law. Apparently the panel believes the Supreme Court, rather than speaking clearly when it overrules dispositions on the merits, "informs" the lower courts of an overruling with so many winks and nods.

Unfortunately, the panel is not without company in its approach. *See, e.g.*, *Baskin v. Bogan*, 766 F.3d 648, 659–60 (7th Cir. 2014) (doctrinal developments preclude application of *Baker*); *Bostic v. Schaefer*, 760 F.3d 352, 373–75 (4th Cir. 2014) (same); *Bishop*, 760 F.3d at 1079–81 (same); *Kitchen v. Herbert*, 755 F.3d 1193, 1204–08 (10th Cir. 2014) (same).

Yet neither am I. *See, e.g.*, *DeBoer*, 772 F.3d at 399–402 (*Baker* is still binding precedent); *Massachusetts v. U.S. Dep't of Health & Human Servs.*, 682 F.3d 1, 8 (1st Cir. 2012) (same), *cited in U. S. v. Windsor*, 133 S. Ct. 2675, 2688,

11

(15 of 28)

Case 2:12-cv-00578-JGM-PAL Document 137 Filed 01/09/15 Page 15 of 28
Case: 14-05420, 01/09/2015, ID: 9394437, DktEntry: 140-5, Page 12 of 28

2693 (2013); *Conde-Vidal v. Garcia-Padilla*, No. 14-1253 PG, 2014 WL

5361987, at *6 (D.P.R. Oct. 21, 2014) (same); *cf.*, *Hämäläinen*, No. 37359/09,

HUDOC, at *24 (holding, like *Baker*, that same-sex marriage is an issue reserved

to the democratic process).

## D

Wishing that *Baker* has been overruled, however, does not make it so.

Indeed, even if the panel's tea-leaf-reading approach to finding implicit overruling

were viable, it still could not plausibly argue that *Baker* has been abrogated. In

making the determination that "doctrinal developments" indicate that the Court no

longer views *Baker* as good law, the panel relies on *United States v. Windsor*, 133

S.Ct. 2675, *Lawrence v. Texas*, 539 U.S. 558 (2003), and *Romer v. Evans*, 517 U.S.

620 (1996). But each of these cases presented distinctly different questions from

whether a *state* may lawfully define marriage as between a man and a woman.

## 1

In *Windsor*, the Court struck down a *federal* law that intruded on a state's

prerogative to define marriage, what the Court characterized as "'virtually [an]

exclusive province of the States.'" *Windsor*, 133 S. Ct. at 2691 (quoting *Sosna v.

Iowa*, 418 U.S. 393, 303 (1975)). If anything, *Windsor*'s emphasis on the

unprecedented federal intrusion into the states' authority over domestic relations

12

reaffirms *Baker*'s conclusion that a state's definition of marriage presents no
"substantial federal question." *Baker*, 409 U.S. at 810. The *Windsor* opinion
expressly "confined [itself] to . . . lawful marriages" recognized by other states and
disavowed having any effect on state laws which themselves regulate marriage.
*Windsor*, 133 S. Ct. at 2696.

2

Likewise, in *Lawrence*, the Court did not implicate *Baker* when it struck
down Texas's criminal anti-sodomy law on the ground that it interfered with
personal autonomy. Like in *Windsor*, the *Lawrence* Court expressly stated that it
was not deciding whether a state must recognize same-sex marriages. *See*
*Lawrence*, 539 U.S. at 578 ("The present case does not involve . . . whether the
government must give formal recognition to any relationship that homosexual
persons seek to enter.").

3

Similarly, *Romer* did not involve the definition of marriage, but rather a
Colorado constitutional amendment that "nullifie[d] specific legal protections for
[homosexuals] in all transactions in housing, sale of real estate, insurance, health
and welfare services, private education, and employment" as well as laws
providing protection "from discrimination by every level of Colorado

13

(17 of 28)

Case 2:12-cv-00578-JCM-PAL Document 137 Filed 01/09/15 Page 17 of 28
Case: 14-15726, 01/09/2015, ID: 9374437, DktEntry: 140-1, Page 16 of 29

government." *Romer*, 517 U.S. at 629. Such a "[s]weeping and comprehensive

change" in Colorado law that withdrew existing anti-discrimination protections for

homosexuals "across the board" is easily distinguishable from a law defining

marriage. *Id.* at 627, 633; *see also* Kenji Yoshino, *The New Equal Protection*, 124

HARV. L. REV. 747, 777–78 (2011) (noting that "the Court emphasized that *Romer*

might be a ticket good only for one day" as the amendment at issue effectuated an

"unprecedented" harm).

## 4

*Windsor*, *Lawrence*, and *Romer* simply do not limit the states' authority to

define marriage and certainly do not contradict *Baker*'s conclusion that the

Constitution does not require states to recognize same-sex marriage. *See Bishop*,

760 F.3d at 1104 (Holmes, J., concurring) (explaining that state laws defining

marriage as between an opposite-sex couple are clearly distinguishable from those

at issue in *Romer* and *Windsor* as they neither "target[] the rights of a minority in a

dangerously expansive and novel fashion" as in *Romer*, nor do they "stray[] from

the historical territory of the lawmaking sovereign just to eliminate privileges that

a group would otherwise receive," as the federal law did in *Windsor*).

Our place in the federal judicial hierarchy carries with it restrictions that,

inconvenient as they may be to implementing our policy choices, restrain and

14

guide our discretion. We cannot ignore our obligation to follow *Baker*'s precedent.

## II

Not only does the panel fail to abide by Supreme Court precedent, but, by injecting itself in the public's "active political debate over whether same-sex couples should be allowed to marry," *Hollingsworth*, 133 S. Ct. at 2659, it acts in a way Justice Kennedy has deemed "inconsistent with the underlying premises of a responsible, functioning democracy." *Schuette v. Coalition to Defend Affirmative Action*, 134 S.Ct. 1623, 1637 (2014) (plurality opinion). Rather than allow further change "primarily [to] be made by legislative revision and judicial interpretation of the existing system," the panel chooses to "leap ahead—revising (or even discarding) the system by creating a new constitutional right and taking over responsibility for refining it." *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 74 (2009). Such a leap should never be made lightly, yet here the panel takes it without regard to the fact that our country's citizens have shown themselves quite capable of "engag[ing] in serious, thoughtful examinations" of the issue of same-sex marriage. *Glucksberg*, 521 U.S. at 719.

In some states, democratic majorities have enacted laws that expand the traditional definition of marriage to include same-sex relationships. *See Windsor*, 133 S. Ct. at 2710–11 (noting, for example, that in Maryland, voters approved a

15

(19 of 28)

Case 2:12-cv-00578-JCM-PAL Document 137 Filed 01/09/15 Page 19 of 28
Case: 14-05420, 01/09/2015, ID: 9374437, DktEntry: 110-1, Page 46 of 29

measure, by a vote of 52% to 48%, establishing that "Maryland's civil marriage laws allow gay and lesbian couples to obtain a civil marriage license").[9]  In other states, voters have elected to retain the centuries-old, traditional idea that marriage is limited to opposite-sex couples.  *Id.* (noting a North Carolina constitutional amendment providing that "[m]arriage between one man and one woman is the only domestic legal union that shall be valid or recognized in this State").  Indeed, in Maine, citizens voted to reject same-sex marriage in 2009 (by a vote of 53% to 47%) only to change course in 2012, voting to permit same-sex marriages by that same margin.  *Id.*  It seems marriage-defining is a state-law issue that the states are quite capably handling through deliberation in their own state lawmaking processes.[10]

---

[9]*See also* Cal. Fam. Code § 300 (permitting same-sex marriage); Conn. Gen. Stat. Ann. § 46b-20a (same);  Del. Code Ann. tit. 13, § 129 (same); Haw. Rev. Stat. § 572-1 (same); 750 Ill. Comp. Stat. Ann. 5/212 (same); Md. Code Ann., Fam. Law § 2-201 (same); Minn. Stat. Ann. § 517.01 (same); N.H. Rev. Stat. Ann. § 5-C:42 (same); N.Y. Dom. Rel. Law § 10 (same); R.I. Gen. Laws Ann. § 15-1-1 (same); V.T. Stat. Ann. tit. 15, § 8 (same); Wash. Rev. Code Ann. § 26.04.010 (same).  If marriage is to be extended to same-sex couples, our democratic institutions provide the proper means to effect such an extension.

[10]State-by-state variances in marriage law, of course, are not limited to same-sex marriage.  For instance, states have different age requirements. *Compare* Idaho Code Ann. § 32-202 (individuals must be 18 to marry without parental consent), *with* Miss. Code. Ann. § 93-1-5 (individuals must be 21).  States also differ in their consanguinity requirements.  *Compare* Idaho Code Ann. § 32-206 (prohibiting marriages between first cousins), *with* Cal. Fam. Code § 2200 (permitting such

(20 of 28)

Case 2:12-cv-00578-JGM-PAL Document 137 Filed 01/09/15 Page 20 of 28
Case: 14-99724, 01/09/2015, ID: 9374437, DktEntry: 140-1, Page 20 of 29

The panel's opinion cuts short these "earnest and profound debate[s]," silencing the voices of millions of engaged and politically active citizens. *Glucksberg*, 521 U.S. at 735. By doing so, the panel suggests that citizens of Nevada and Idaho, indeed of the nation, are not capable of having this conversation, or of reaching the "correct" conclusion. But such a view eschews the very foundational premises of democratic self-governance. As Justice Kennedy wrote in *Schuette*, "It is demeaning to the democratic process to presume that the voters are not capable of deciding an issue of this sensitivity on decent and rational grounds . . . . Freedom embraces the right, indeed the duty, to engage in a rational, civic discourse in order to determine how best to form a consensus to shape the destiny of the Nation and its people." *Schuette*, 134 S.Ct. at 1637.

## A

Nothing about the issue of same-sex marriage exempts it from the general principle that it is the right of the people to decide for themselves important issues of social policy. On the contrary, the Court's decision in *Windsor* recognizes the importance to democratic self-government of letting *the People* debate marriage

---

marriages). Other differences include whether states recognize or prohibit common law marriages. *Compare* Idaho Code Ann. § 32-201 (prohibiting common law marriages), *with* Mont. Code Ann. § 40-1-403 (permitting such marriages). Query if the panel's holding nullifies such prohibitions as well.

17

(21 of 28)

Case 2:12-cv-00578-JCM-PAL Document 137 Filed 01/09/15 Page 21 of 28
Case: 14-05728, 01/09/2015, ID: 9374437, DktEntry: 110-1, Page 98 of 29

policy. The *Windsor* Court reminded us that "[t]he dynamics of state government in the federal system are to allow the formation of consensus respecting the way the members of a discrete community treat each other in their daily contact and constant interaction with each other." *Windsor*, 133 S. Ct. at 2692.

Despite such express instruction from the High Court, the panel assumes it is *its* right, indeed *its* duty to reach the conclusion that it does. But recent developments suggest otherwise. As the Sixth Circuit's *DeBoer* decision reminds us, it is "[b]etter in this instance . . . to allow change through the customary political processes, in which the people, gay and straight alike, become the heroes of their own stories by meeting each other not as adversaries in a court system but as fellow citizens seeking to resolve a new social issue in a fair-minded way." *DeBoer*, 772 F.3d at 421; *see also Garcia-Padilla*, No. 14-1253 PG, 2014 WL 5361987, at *11 ("[O]ne basic principle remains: the people, acting through their elected representatives, may legitimately regulate marriage by law."); *Robicheaux v. Caldwell*, 2 F.Supp.3d 910, 926–27 (E.D. La. 2014) (noting the importance of respecting democratic voices).[11]

_____

[11]Of course, blind deference to legislative majorities would be an abdication of our judicial duty. But, as explained in Part I, no such blind deference occurs when inferior courts follow Supreme Court precedent directly on point, the states have codified rational and long-accepted definitions of marriage, and the legislative process has shown itself to be capable of giving voice (and winning

(22 of 28)

Case 2:12-cv-00578-JCM-PAL Document 137 Filed 01/09/15 Page 22 of 28
Case: 14-05420, 01/09/2015, ID: 9374437, DktEntry: 140-2, Page 19 of 29

The healthy, spirited, and engaged debate over marriage policy represents the virtues of democratic self-governance. The panel's opinion shuts down the debate, removing the issue from the public square. In so doing, it reflects a profound distrust in—or even a downright rejection of—our constitutional structure. As the Court warned in *Osborne*, this course of action "takes[s] the development of rules and procedures in this area out of legislatures and state courts shaping policy in a focused manner and turn[s] it over to federal courts applying the broad parameters of the [Fourteenth Amendment]." 557 U.S. at 56.

Justice Powell, dissenting in the noted death penalty case *Furman v. Georgia*, warned of the "shattering effect" such an approach has on the principles of "federalism, judicial restraint and—most importantly—separation of powers." 408 U.S. 238, 417 (1972) (Powell, J., dissenting). Justice Powell acknowledged that in situations where, as here, "the language of the applicable provision provides great leeway and where the underlying social policies are felt to be of vital importance, the temptation to read personal preference into the Constitution is understandably great." *Id.* Nevertheless, he maintained that despite the temptation, "it is not the business of [courts] to pronounce policy." *Id.* Here, the panel's inability to resist such temptation reflects a "lack of faith and confidence in

_____

results) to both sides of the heretofore on-going conversation.

19

the democratic process." *Id.* at 464–65.

Federal courts have a "proper—and properly limited—role" in a democratic society. *Allen v. Wright*, 468 U.S. 737, 750 (1984) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). When we artificially expand our role, not only does it flout the Constitution, it also has deleterious effects on the civic health of our country. We should not be so quick to presume we know what's best. Judicial humility in service of democratic self-rule is reason alone to rehear these cases en banc.

III

In addition to sweeping aside the virtues of democracy, the panel ignores our federal structure. The panel fails to recognize the principle that marriage law, like other areas of domestic relations, has been and should continue to be an area committed to the states. *See Windsor*, 133 S.Ct. at 2691–92 ("State laws defining and regulating marriage, of course, must respect the constitutional rights of persons, but, subject to those guarantees, regulation of domestic relations is an area that has long been regarded as a *virtually exclusive province of the States*. . . . [T]he incidents, benefits, and obligations of marriage are uniform for all married couples within each State, though they may vary, subject to constitutional guarantees, from one State to the next." (emphasis added)); *U.S. Dep't of Health & Human Servs.*, 682 F.3d at 12 (explaining that "DOMA intrudes extensively into a realm that has

20

from the start of the nation been primarily confided to state regulation—domestic relations and *the definition* and incidents of lawful marriage" (emphasis added)). The panel's opinion ignores this important aspect of Our Federalism.

## A

"Long ago," the Supreme Court "observed that 'the whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States.'" *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004) (quoting *In re Burrus*, 136 U.S. 586, 593–94 (1890)). Indeed, for over a century, federal courts have recognized that actions concerning domestic relations are entrusted to state legislatures and state courts.

In the latest Supreme Court opinion addressing the issue of same-sex marriage, the Court gave a ringing endorsement of the central role of the states in fashioning their own marriage policy. *Windsor*, 133 S. Ct. at 2689–93. "By history and tradition," the Court stated in *Windsor*, "the definition and regulation of marriage . . . has been treated as being within the authority and realm of the separate States." *Id.* at 2689–90. Indeed, the Court continued, "[t]he recognition of civil marriages is *central* to state domestic relations law applicable to its residents and citizens." *Id.* at 2691 (emphasis added); *see also id.* ("The definition of marriage is the foundation of the State's broader authority to regulate the subject

21

(25 of 28)

Case 2:12-cv-00578-JCM-PAL Document 137 Filed 01/09/15 Page 25 of 28
Case: 14-05420, 06/09/2015, ID: 9571437, DktEntry: 24-05, Page 26 of 29

of domestic relations . . . ."); *Williams v. North Carolina*, 317 U.S. 287, 298 (1942)
("Each state as a sovereign has a rightful and legitimate concern in the marital
status of persons domiciled within its borders.").

Thus, in *Windsor*, the Court struck down the *federal intrusion* into a realm
committed to the states, emphasizing the exclusive role that states have in
regulating marriage law. *Windsor*, 133 S. Ct. at 2691. *Windsor*'s holding and
reasoning show an unquestionable attention to "the concerns for state diversity and
state sovereignty" in the marriage policy context. *Id.* at 2697 (Roberts, C.J.,
dissenting). The panel's opinion ignores the "undeniable" conclusion that
*Windsor*'s "judgment is based on federalism." *Id.*

### B

*Windsor* was correct in resting its holding on federalism. In striking down
the federal *legislature's* intrusion into this area of law committed to the states, it
held Congress to the same standards to which federal *courts* have long adhered.
Simply stated: the federal judiciary has affirmatively sought to *avoid*
encroachments into state domestic relations policy.

Federal judges have used various doctrinal mechanisms to refrain from
intruding into the uncharted waters of state domestic relations law. As the Court
explained in *Ankenbrandt v. Richards*, courts have often avoided such an intrusion

(26 of 28)

Case 2:12-cv-00578-JCM-PAL Document 137 Filed 01/09/15 Page 26 of 28
Case: 14-95729, 03/03/2015, ID: 9394137, DktEntry: 11-3, Page 26 of 29

by invoking the "domestic relations exception" to federal jurisdiction under the diversity statute.  504 U.S. 689, 693 (1992).  Other courts have extended the exception to federal question jurisdiction.[12]  *See, e.g.*, *Jones v. Brennan*, 465 F.3d 304, 306–08 (7th Cir. 2006).  And others have invoked abstention doctrines to avoid state-law domestic relations issues.  *See, e.g.*, *Moore v. Sims*, 442 U.S. 415, 423–35 (1979); *Coats v. Woods*, 819 F.2d 236, 237 (9th Cir. 1987) ("This case, while raising constitutional issues, is at its core a child custody dispute."); *Peterson v. Babbitt*, 708 F.2d 465, 466 (9th Cir. 1983) ("There is no subject matter jurisdiction over these types of domestic disputes.").[13]

In one notable case, the Supreme Court refrained from ruling on the constitutionality of the Pledge of Allegiance—certainly a question of key

---

[12]Recent scholarship has even argued that federal courts may not have Article III jurisdiction over cases involving marital status determinations.  *See* Steven G. Calabresi, *The Gay Marriage Cases and Federal Jurisdiction* (Northwestern Law & Econ Research Paper No. 14-18; Northwestern Pub. Law Research Paper No. 14-50, 2014), *available at* http://ssrn.com/abstract=2505514.

[13]Though the domestic relations exception itself is typically confined to divorce or child custody cases, the *Ankenbrandt* Court acknowledged that the exception could be broadly applied when appropriate for the federal courts to decline to hear a case involving "elements of the domestic relationship," *Ankenbrandt*, 504 U.S. at 705, even when divorce or child custody is not strictly at issue.  "This would be so when a case presents 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar.'" *Id.* (citation omitted).  Undoubtedly, these are such cases.

23

(27 of 28)

Case 2:12-cv-00578-JCM-PAL Document 137 Filed 01/09/15 Page 27 of 28
Case: 14-05720, 01/09/2015, ID: 9394137, DktEntry: 14-2, Page 26 of 29

constitutional import—because doing so would have required rejecting a state court order regarding parental rights of the plaintiff.  *Newdow*, 542 U.S. at 17. Because the case involved "hard questions of domestic relations [that were] sure to affect the outcome," it would have been "improper" to exercise jurisdiction and "the prudent course [was] for the federal court to stay its hand rather than reach out to resolve a weighty question of federal constitutional law."  *Id.*; *see also Smith v. Huckabee*, 154 F. App'x 552, 555 (8th Cir. 2005) (citing *Newdow* in declining to exercise jurisdiction over questions implicating state domestic relations law); *United States v. MacPhail*, 149 F. App'x 449, 456 (6th Cir. 2005) (same).

In short, through various doctrinal mechanisms, federal courts have avoided the kind of federal intrusion into state domestic relations law exemplified by the panel's opinion.[14]  Whatever the doctrinal tool, the result is the same: because family law issues—including the definition and recognition of marriage—are

_____

[14]The Court has also noted, of course, that "rare instances arise in which it is necessary to answer a substantial federal question *that transcends or exists apart from* the family law issue."  *Newdow*, 542 U.S. at 12–13 (emphasis added) (citation omitted).  This was the case, for instance, in *Palmore v. Sidoti* and *Loving v. Virginia.  See Palmore v. Sidoti*, 466 U.S. 429 (1984); *Loving*, 388 U.S. 1.  In both *Palmore* and *Loving*, the Court struck down state laws that "raise[d] important federal concerns arising from the Constitution's commitment to eradicating discrimination based on race."  *Palmore*, 466 U.S. at 432.  Here, however, not only is the Constitution's commitment to eradicating discrimination based on race not present, but there is no "substantial federal question that *transcends or exists apart from* the family law issue."

24

committed to the states, federal courts ought to refrain from intruding into this core area of state sovereignty.

Here, our court need not decide which of these many potential sources of restraint we should draw from. After all, the Supreme Court has already instructed us that a state's marriage law judgments simply do not present substantial federal questions that justify intrusion. *Baker*, 409 U.S. at 810.

The panel's failure to follow *Baker*'s command upsets our federal structure and warrants en banc reconsideration.

IV

The panel's opinion ignores the wisdom of a sister circuit, disregards binding Supreme Court precedent, intrudes on democratic self-governance, and undermines our Constitution's commitment to federalism. I respectfully dissent from our regrettable failure to rehear these cases en banc.